**EXHIBIT A**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLORADO

 3   - - - - - - - - - - - - - - - - -x
     CYPRESS ADVISORS INC., a          :
 4   Florida Corporation, d/b/a        :
     THE CYPRESS GROUP,                :
 5                 Plaintiff,          :
           v.                          :   C.A. No.
 6   KENT MCCARTY DAVIS, a North       :   16-cv-01935
     Carolina citizen, a/k/a CARTY     :   MSK-MEH
 7   DAVIS, d/b/a CYPRESS              :
     INTERNATIONAL INC.,               :
 8                 Defendant,          :
           v.                          :
 9   DEAN ZUCCARELLO, a Colorado       :
     citizen,                          :
10       Counterclaim-Defendant.       :
     - - - - - - - - - - - - - - - - -x
11

12           DEPOSITION OF ROBERT EDWARD CARLUCCI

13                    Washington, D.C.

14                 Thursday, June 29, 2017

15                        9:39 a.m.

16

17   Reported By:  Joan V. Cain

18

19

20

21

22

23

24

25
```

**H+G**

Hunter+Geist, Inc.

303.832.5966   1900 Grant Street, Suite 1025   ■ www.huntergeist.com
800.525.8490   Denver, CO 80203                ■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**1**

```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
- - - - - - - - - - - - - - - - - -x
 CYPRESS ADVISORS INC., a         :
 Florida Corporation, d/b/a       :
 THE CYPRESS GROUP,               :
              Plaintiff,          :
         v.                       :  C.A. No.
 KENT MCCARTY DAVIS, a North      :  16-cv-01935
 Carolina citizen, a/k/a CARTY    :  MSK-MEH
 DAVIS, d/b/a CYPRESS             :
 INTERNATIONAL INC.,              :
              Defendant,          :
         v.                       :
 DEAN ZUCCARELLO, a Colorado      :
 citizen,                         :
    Counterclaim-Defendant.       :
- - - - - - - - - - - - - - - - - -x

           DEPOSITION OF ROBERT EDWARD CARLUCCI
                    Washington, D.C.
                 Thursday, June 29, 2017
                       9:39 a.m.

 Reported By:  Joan V. Cain
```

**2**

         Deposition of ROBERT EDWARD CARLUCCI, held at
the law offices of:

             FAEGRE BAKER DANIELS, LLP
             1050 K Street, Northwest
             Suite 400
             Washington, D.C. 20001


         Pursuant to Notice, before Joan V. Cain, Court
Reporter and Notary Public in and for the District of
Columbia.

**3**

                    A P P E A R A N C E S

   ON BEHALF OF PLAINTIFF AND COUNTERCLAIM-DEFENDANT:
       BRADFORD DEMPSEY, ESQUIRE
       FAEGRE BAKER DANIELS, LLP
       3200 Wells Fargo Center
       1700 Lincoln Street
       Denver, Colorado 80203




   ON BEHALF OF DEFENDANT:
       MARK E. LACIS, ESQUIRE
       IRELAND STAPLETON PRYOR & PASCOE, PC
       717 17th Street
       Suite 2800
       Denver, Colorado 80202

**4**

            A P P E A R A N C E S   C O N T I N U E D

   ON BEHALF OF THE DEPONENT:
       KEVIN M. TRACY, ESQUIRE
       MCNAMEE HOSEA
       888 Bestgate Road
       Suite 402
       Annapolis, Maryland 21401



   ALSO PRESENT:
       Kent McCarty "Carty" Davis

1 (Pages 1 to 4)

Case 1:16-cv-01935-PAB-MEH   Document 233-1   Filed 10/04/19   USDC Colorado   Page 4 of 15

ROBERT EDWARD CARLUCCI - 6/29/2017
Cypress Advisors, Inc. v. Kent McCarty Davis, et al.

5

C O N T E N T S

| EXAMINATION OF ROBERT EDWARD CARLUCCI | PAGE |
|---|---|
| By Mr. Dempsey | 10, 239 |
| By Mr. Lacis | 236, 243 |

E X H I B I T S
(Attached to the Transcript.)

| CARLUCCI DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| EXHIBIT 1 | Notice of Deposition | 10 |
| EXHIBIT 2 | E-mail from Carty Davis to Bob Carlucci, 4/27/17 | 60 |
| EXHIBIT 3 | Engagement Agreement Between R&R Ventures and Cypress Consulting Group, 4/12/12 | 77 |
| EXHIBIT 4 | Engagement Agreement Between R&R Ventures and Cypress Consulting Group, 2/17/14 | 80 |
| EXHIBIT 5 | Portions of Purchase Agreement Between Bravo Foods and R&R Atlanta, 6/27/16 | 110 |
| EXHIBIT 6 | E-mail Chain, 5/16/16 | 118 |
| EXHIBIT 7 | E-mail Chain, 6/21/16 | 127 |
| EXHIBIT 8 | E-mail Chain, 7/12/16 | 131 |
| EXHIBIT 9 | E-mail Chain, 7/13/16 | 141 |

6

E X H I B I T S   C O N T I N U E D
(Attached to the Transcript.)

| CARLUCCI DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| EXHIBIT 10 | E-mail Chain, 7/15/16 | 148 |
| EXHIBIT 11 | E-mail Chain, 7/19/16 | 159 |
| EXHIBIT 12 | E-mail from Carty Davis to Bob Carlucci, 9/12/16 | 162 |
| EXHIBIT 13 | Letter from Brad Dempsey to Tim O'Neill, 7/26/16 | 164 |
| EXHIBIT 14 | Letter from Brad Dempsey to Tim O'Neill, 9/14/16 | 165 |
| EXHIBIT 15 | Escrow Agreement, 9/14/16 | 166 |
| EXHIBIT 16 | E-mail from Brad Dempsey to Tim O'Neill and Others, 9/15/16 | 174 |
| EXHIBIT 17 | E-mail Chain, 10/4/16 | 179 |
| EXHIBIT 18 | E-mail Chain, 10/24/16 | 183 |
| EXHIBIT 19 | Testimonial of Bob Carlucci from the C Squared Web Site | 187 |
| EXHIBIT 20 | Representative Transactions from the C Squared Web Site | 189 |
| EXHIBIT 21 | E-mail Chain, 1/25/17 | 193 |
| EXHIBIT 22 | Subpoena to Produce Documents | 200 |
| EXHIBIT 23 | Letter from Bob Carlucci to Faegre Baker Daniels, 4/17/17 | 205 |

7

E X H I B I T S   C O N T I N U E D
(Attached to the Transcript.)

| CARLUCCI DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| EXHIBIT 24 | Deposition Subpoena to Bob Carlucci | 209 |
| EXHIBIT 25 | Letter from Bob Carlucci to Faegre Baker Daniels, 5/4/17 | 211 |
| EXHIBIT 26 | E-mail with Attachments from Brad Dempsey to Bob Carlucci and others, 5/26/17 | 216 |
| EXHIBIT 27 | E-mail Chain, 5/29/14 | 240 |

8

1    P R O C E E D I N G S
2        ROBERT EDWARD CARLUCCI
3  having been duly sworn under penalties of perjury, was
4  examined and did testify as follows:
5        MR. TRACY:  Before we get started, I just
6  want to put on the record what we just discussed off
7  the record, and that is, as counsel for Mr. Carlucci,
8  I've requested that this deposition be his only
9  deposition in all the related litigation between the
10 two parties.  I understood there to be two separate
11 cases, and I understand now there's actually three
12 separate cases, which may or may not be consolidated.
13       We believe that if Mr. Carlucci's testimony,
14 if it's relevant at all, is the same issues would be
15 raised in any of these cases.  We believe he should
16 only be deposed once.  So I've asked parties to
17 stipulate that this deposition will be used in all
18 litigation between these parties.  I understand --
19 I'll let Mr. Lacis speak for himself.  They may
20 stipulate on behalf of Mr. Davis, and if Dean
21 Zuccarello does not stipulate, we will object to any
22 subsequent subpoenas that are served on Mr. Carlucci.
23       MR. LACIS:  And I'll just say on behalf of
24 the defendant Carty Davis that we are willing to
25 stipulate in the interest of judicial economy and

2 (Pages 5 to 8)

Case 1:16-cv-01935-PAB-MEH   Document 233-1   Filed 10/04/19   USDC Colorado   Page 5 of 15

ROBERT EDWARD CARLUCCI - 6/29/2017
Cypress Advisors, Inc. v. Kent McCarty Davis, et al.

13

1  A   Okay.
2  Q   If you need a break, just let me know.
3  We'll be happy to accommodate that.
4  A   Okay.
5  Q   The only request I have is that we ask for
6  breaks after any -- the conclusion of any question and
7  answer. Okay?
8  A   Yeah.
9  Q   Are you feeling well today?
10 A   Yeah.
11 Q   Is there any reason you can't testify
12 truthfully and honestly today?
13 A   None.
14 Q   All right. Can you tell me about your
15 educational background?
16 A   I -- my educational background is I
17 graduated from high school and I completed 2 years of
18 college.
19 Q   Did you graduate with a degree?
20 A   No.
21 Q   Where did you go to college?
22 A   Boston Conservatory of Music.
23 Q   And what did you study there?
24 A   Music education.
25 Q   And then what did you do after that?

14

1  A   I went to work.
2  Q   And what work did you do?
3  A   I started a company, self-employed, and also
4  worked for a couple companies to support my -- my
5  initial project company.
6  Q   And about when was that?
7  A   I don't know. I'm going to say '68
8  somewhere, '67, '68.
9  Q   What was the name of the company you
10 started?
11 A   Started a company called Robert's Vending
12 Machine Company.
13 Q   And then -- that was about 1968 you said?
14 A   Yeah, around that time.
15 Q   Okay. And how long did you work in that
16 enterprise?
17 A   In what?
18 Q   In that enterprise?
19 A   In that enterprise, probably 10 years.
20 Q   And was that the sole focus of your work at
21 that time?
22 A   Yes.
23 Q   And then what did you do after that?
24 A   I moved to Maryland and became president of
25 another vending machine company.

15

1  Q   What was the name of that company?
2  A   That was -- the initial name was Baltimore
3  Cigarette Service.
4  Q   And then did it change names?
5  A   No. We just had other names besides that,
6  affiliate companies.
7  Q   Do you remember what those were?
8  A   Excuse me?
9  Q   Do you remember what those were?
10 A   One was Cooperative Refreshment Centers.
11 Q   And then how long did you serve as president
12 of that company?
13 A   Oh, probably 10 years.
14 Q   So that takes you into what? 1988?
15 A   Probably, yeah.
16 Q   And between '78 and '88 when you were
17 president of the Baltimore Cigarette Service company,
18 did you do anything else?
19 A   Yeah. I started another company.
20 Q   What was that?
21 A   It was called R&R Ventures, Incorporated.
22 Q   When was that founded?
23 A   You know, I don't recall. I'm going to say
24 '87 or somewhere in that vicinity.
25 Q   Was that founded solely by you, or did you

16

1  have partners?
2  A   Partners.
3  Q   Is that company still in existence today?
4  A   It is.
5  Q   And do you have partners today?
6  A   No.
7  Q   You're the sole shareholder of R&R Ventures,
8  Inc.?
9  A   That's correct.
10 Q   How long have you been the sole owner?
11 A   Approximately 10 years.
12 Q   What does R&R Ventures do?
13 A   We're a company that develops and operates
14 fast food restaurants.
15 Q   And is there a particular brand that you
16 work with?
17 A   Primarily Yum! Corporation brands.
18 Q   And which brands would those be?
19 A   Taco Bell, KFC, Pizza Hut Express, Long John
20 Silver's.
21 Q   And does R&R Ventures have a specific
22 geography for its operations?
23 A   Presently or specific to the future?
24 Q   Presently.
25 A   Presently, yes.

Case 1:16-cv-01935-PAB-MEH   Document 233-1   Filed 10/04/19   USDC Colorado   Page 6 of 15

ROBERT EDWARD CARLUCCI - 6/29/2017
Cypress Advisors, Inc. v. Kent McCarty Davis, et al.

Page 29

1  A   Because it's something I just don't know. I
2  can't answer.
3  Q   And what do those employees do?
4  A   A number of different duties.
5  Q   And what would they be?
6  A   Okay. We have accounts payable. We have
7  accounts receivable. We have loss control. We have
8  HR. We have a vice president of operations. That's
9  about it.
10 Q   And the payables and receivables, is that
11 for all the 100 restaurants?
12 A   Yes.
13 Q   So it's all consolidated there at that
14 office?
15 A   Yes.
16 Q   The same with the HR function, that's all
17 consolidated?
18 A   That's correct.
19 Q   Does R&R Ventures or RC Group have any other
20 offices?
21 A   No.
22 Q   Do they have any offices in Colorado?
23 A   No.
24 Q   Do they have any bank accounts in Colorado?
25 A   No.

Page 30

1  Q   Any employees in Colorado?
2  A   No.
3  Q   All right. You know Dean Zuccarello?
4  A   I do.
5  Q   Okay. And how do you know him?
6  A   I think I was introduced to him by Carty
7  Davis.
8  Q   And why do you think that?
9  A   I think that was the first time I met him.
10 Q   When do you think you first met him?
11 A   It was at a finance conference in Las Vegas,
12 Nevada.
13 Q   And when was that?
14 A   I'd probably say -- well, I can't. It could
15 be 5, 6 years ago.
16 Q   And you met Mr. Zuccarello at that
17 conference?
18 A   Yes. I was introduced to him.
19 Q   And what do you recall about that
20 introduction?
21 A   I was introduced to him by Carty and part of
22 The Cypress Group.
23 Q   And did Mr. Zuccarello visit you in your
24 office?
25 A   Never.

Page 31

1  Q   You sure?
2  A   Absolutely.
3  Q   Why are you so sure of that?
4  A   Why wouldn't I be so sure? If somebody
5  visited me in my office, I'd tell you if he did or
6  not.
7  Q   Okay. So if Mr. Zuccarello has a different
8  view of that then he would be wrong?
9  A   Absolutely.
10 Q   Have you exchanged phone calls with
11 Mr. Zuccarello?
12 A   I have.
13 Q   He's called you?
14 A   I'm not sure if I called him or he's called
15 me, but we've exchanged phone calls.
16 Q   Okay. But he has called you from time to
17 time?
18 A   Possibly.
19 Q   Okay. And you've called him?
20 A   I would assume one of us called each other,
21 whether I called him or he's called me. It would
22 relate to, I would assume, some type of a business
23 transaction, so he may have called me, and I believe I
24 probably called him as well.
25 Q   Okay. So Mr. Zuccarello was involved in

Page 32

1  your business transactions with R&R Ventures?
2       MR. LACIS: Object to the form of the
3  question.
4       THE WITNESS: You know, I -- to a certain
5  extent.
6  BY MR. DEMPSEY:
7  Q   Was Mr. Zuccarello involved in your business
8  transactions?
9  A   To a certain extent.
10 Q   And why do you say to a certain extent?
11 A   Well, he was part The Cypress Group, and The
12 Cypress Group was involved in our business
13 transactions -- some of our business transactions.
14 Q   Okay. You say some of your business
15 transactions. Which ones -- which transactions was
16 Cypress Group not a party?
17 A   The last one.
18      MR. TRACY: Are you referencing from '87
19 forward?
20      THE WITNESS: And I don't know how many. I
21 don't know how many transactions you're talking about.
22 Could you explain what you mean by a transaction?
23 BY MR. DEMPSEY:
24 Q   Well, what do you mean by transaction, sir?
25 A   Well, representing me in a buy and sell

8 (Pages 29 to 32)

Case 1:16-cv-01935-PAB-MEH   Document 233-1   Filed 10/04/19   USDC Colorado   Page 7 of 15

ROBERT EDWARD CARLUCCI - 6/29/2017
Cypress Advisors, Inc. v. Kent McCarty Davis, et al.

### 33

1  process.
2  Q   Okay.  For --
3  A   Not -- not obviously building a restaurant,
4  developing any restaurants, doing any outside advisory
5  process for the company, et cetera.  They had --
6  that's not what he was involved with.  Cypress Group
7  was involved in acquisitional transactions.
8  Q   And they're also involved in refinancings?
9  A   As part of the acquisition.
10 Q   How many of those transactions would you say
11 R&R Ventures had?
12 A   Over what period of time?
13 Q   Since inception.
14     MR. TRACY:  How many acquisitions you mean?
15     MR. DEMPSEY:  Yeah.
16     THE WITNESS:  I don't know.  Somewhere
17 around eight to ten maybe.
18 BY MR. DEMPSEY:
19 Q   R&R Ventures has had eight to ten
20 acquisition transactions since its inception?
21 A   Probably.
22 Q   Okay.  And how many of those was The Cypress
23 Group involved in?
24 A   I believe two, maybe three.
25 Q   Okay.  Which ones were they?

### 34

1  A   Well, two that I can recall is the 28
2  restaurants.  They were purchased in Atlanta.  That
3  was our first acquisition in Atlanta, and the second
4  one would be the ten restaurants in Atlanta, which was
5  our second acquisition in Atlanta, and I'm not sure if
6  the Virginia acquisition prior to that may have been
7  Cypress.
8       That was an acquisition we made of a group
9  of restaurants that we purchased from corporate Taco
10 Bell, so there was no negotiations as far as that's
11 concerned.  I would assume that they did not, although
12 they may have helped and assisted in financing.
13 Q   Do you remember what year the first one was,
14 the 28-restaurant transaction?
15 A   The first one was actually the restaurants
16 in Virginia, and that was probably -- these happened
17 quite quickly over the course of about 5 years, but
18 the first one was the Virginia acquisition of the
19 corporate stores, and that -- dates I don't know, but
20 I'm assuming it's somewhere around 5 years ago, maybe
21 4 years ago.
22 Q   So that'd be around 2013?
23 A   Yeah, somewhere like that.
24 Q   Okay.  And if that were the first -- strike
25 that.

### 35

1      If Cypress Group had participated in that
2  transaction, would that have been the very first
3  transaction that Cypress Group assisted R&R Ventures
4  on?
5      MR. LACIS:  Object to the form of the
6  question.
7      THE WITNESS:  I'm not sure.  I'm not sure if
8  they assisted in any financing prior to that, but I
9  know acquisition-wise, no.
10 BY MR. DEMPSEY:
11 Q   Okay.  So you're making a distinction
12 between acquisition --
13 A   Yes.
14 Q   -- and financing?
15 A   Yes.
16 Q   These other two transactions, when did they
17 occur?
18 A   Well, the first one was the 28, the second
19 one I believe was the 10 restaurants, and that was --
20 that was right after -- about a year later.  So I'm
21 going to say the 10 restaurants was -- what? -- 2015
22 to 2016.  Last year or just in the cusp of the year
23 prior.
24 Q   That was the 10 restaurant group?
25 A   Yes.

### 36

1  Q   Did you have a name for that transaction?
2  A   That was Bravo I believe, Bravo Foods.  Amy
3  Rice is Amy's last name, by the way.  I remembered
4  that.  Have to include that in.
5  Q   Amy Rice is your controller?
6  A   Yes.  She'd kill me if she ever read that.
7  Q   I understand.  It's early.
8  A   I know.
9  Q   The 28-restaurant acquisition --
10 A   Yes.
11 Q   -- when did that occur?
12 A   That was about 3, 4 years ago.
13 Q   Did you have a name for that transaction?
14 A   Yes.  That was -- I'm trying to think of the
15 name of it -- Exceptional, Exceptional Restaurant
16 Group.
17 Q   Okay.  Going back to the Virginia
18 acquisition, was there a name for that?
19 A   No.  It was just called the corporate
20 stores.
21     MR. TRACY:  It was corporate.
22 BY MR. DEMPSEY:
23 Q   Okay.  And then just to clarify, those three
24 you believe Cypress Group played a role?
25 A   Yes.

Case 1:16-cv-01935-PAB-MEH   Document 233-1   Filed 10/04/19   USDC Colorado   Page 8 of 15

ROBERT EDWARD CARLUCCI - 6/29/2017
Cypress Advisors, Inc. v. Kent McCarty Davis, et al.

69

1  involved in it; is that right?
2     A   Yes.
3     Q   You look at the services to be provided?
4     A   Yes.
5     Q   The cost structure?
6     A   Yes.
7     Q   And would there be negotiation about those
8  items with the potential financial advisor?
9     A   Typically.
10    Q   And which of your senior staff would be
11 involved in that?
12    A   Probably operations and CFO and financials.
13    Q   So specifically by name, who would they be?
14    A   Vice president of operations is Bill Retz,
15 R-E-T-Z, and the CEO is presently Don Darnes,
16 D-A-R-N-E-S.
17    Q   He's the CFO or CEO?
18    A   He's the CFO.  Did I say CEO?  CFO.
19    Q   With the engagement of Cypress in the 28
20 restaurants acquisition back 3, 4 years ago --
21    A   Yes.
22    Q   -- were those two involved in the discussion
23 about the form of the engagement with Cypress?
24        MR. LACIS:  Object to the form of the
25 question.

70

1         THE WITNESS:  Excuse me?  Were those two?
2  You know, I'm not sure if we got into the weeds as far
3  as what Cypress represented.  We knew Cypress history,
4  but I can't answer that question if they were or were
5  not.
6  BY MR. DEMPSEY:
7     Q   But it wasn't unusual to include them?
8     A   No.  I mean, depending on what role we
9  wanted them -- the merger or acquisition company
10 wanted to play.  So, for example, if it was
11 negotiating the acquisition, that's one role, and I'm
12 involved in that.  We all are basically because we run
13 numbers on -- EBITDA numbers and valuations and those
14 types of formulas that we use in the industry, and
15 then we negotiate.  So if we engaged Cypress for that
16 part of it, they would help us in negotiating a
17 purchase price.
18        Then we may engage Cypress in the verbiage
19 of the operations, going through our due diligence,
20 and we may engage Cypress for the financial part of
21 it, acquiring or putting together the financial --
22 banks to finance that acquisition.  So there are
23 different moving parts depending on what we require.
24 We bring in our staff and take a look at questions and
25 answers and feed them back to the potential mergers

71

1  and acquisition group and come up with a fee
2  structure.
3     Q   Was every engagement with Cypress a unique
4  engagement?
5         MR. LACIS:  Object to the form of the
6  question.
7         MR. DEMPSEY:  What's the objection?
8         MR. LACIS:  I think it's ambiguous.  It's
9  question as to which entity you're referring to, so
10 I'm just going to impose a continuing objection for
11 any reference to Cypress because have a contention
12 that you consider Cypress Group and Cypress Advisors
13 one thing.  We have a contention that Cypress Advisors
14 and Cypress Group is another thing.
15        So for the purposes of having a clear
16 record, I think it's important to be precise as to
17 which entity you're referring to.  So if you're just
18 referring to Cypress generally, I'm going to impose a
19 general objection to that vague assertion because it's
20 vague.
21 BY MR. DEMPSEY:
22    Q   You've heard Mr. Lacis's objection now.  But
23 from your understanding, is there only one Cypress
24 that you dealt with?
25    A   Yes.

72

1     Q   And I guess we didn't get my question
2  answered.  Was every engagement with Cypress a unique
3  engagement?
4     A   Probably, yeah.
5     Q   You didn't have a master Engagement
6  Agreement?
7     A   No.  No cookie-cutter situation.
8     Q   Every one would have to be negotiated
9  separately?
10    A   Yes.
11    Q   Were you the one that would sign engagement
12 agreements with Cypress?
13    A   Yes.
14        MR. TRACY:  Objection.
15        MR. DEMPSEY:  What's the objection?
16        MR. TRACY:  You haven't shown him an
17 Engagement Agreement.  There's no foundation.
18 BY MR. DEMPSEY:
19    Q   You're not aware of anybody else in your
20 organization signing engagement agreements with
21 Cypress?
22    A   No.
23    Q   Did anybody else in your organization have
24 authority to sign engagement agreements with Cypress?
25    A   Not to my knowledge, no.

Case 1:16-cv-01935-PAB-MEH Document 233-1 Filed 10/04/19 USDC Colorado Page 9 of 15

ROBERT EDWARD CARLUCCI - 6/29/2017
Cypress Advisors, Inc. v. Kent McCarty Davis, et al.

93

1 A I believe Carty and Dean.
2 Q And then suddenly there's a $100,000 flat
3 fee verbal agreement at that point?
4 A Yes.
5 Q Who negotiated that?
6 A I think I did. I also believe Don Darnes
7 knew about it as well.
8 Q Don Darnes knew about it?
9 A Sure. It was a flat fee.
10 Q Who negotiated the agreement on behalf of
11 Cypress?
12 A I believe it was Carty, and I'm not sure if
13 it was Dean and Carty.
14 Q But you spoke with Mr. Davis?
15 A Yes.
16 Q When we say Carty, we're talking about
17 Mr. Davis?
18 A Yes.
19 Q You say you're not sure if Mr. Zuccarello
20 was involved?
21 A No. I didn't say that. I spoke with
22 Mr. Davis.
23 Q That was the only person you spoke with
24 about that fee arrangement?
25 A I believe so, yes.

94

1 Q How did you hear about the Taco Bell
2 opportunity in Atlanta, this Bravo Foods deal?
3 A The Bravo? I'm not sure. I think it was
4 through The Cypress Group, both Carty and Dean,
5 Mr. Davis and Mr. Zuccarello.
6 Q Were you aware that the seller in that
7 transaction had initially reached out to
8 Mr. Zuccarello at Cypress to represent them in the
9 sale?
10 A No. For them to represent?
11 Q For Cypress to represent the seller.
12 A No.
13 Q Were you aware that the seller determined
14 that they were going to use another sell side advisor
15 and that Mr. Zuccarello inquired about the ability to
16 enter into a preemptive sale agreement with one of
17 Cypress's existing clients, meaning you?
18 A Yes. I wasn't aware of the details, but I
19 knew that Carty and Dean knew the sellers and it was a
20 preempted negotiation.
21 Q Do you know that Mr. Zuccarello was the one
22 that inquired about making that preemptive approach?
23 A I know he was involved.
24 Q Do you know that the seller did in fact
25 encourage Mr. Zuccarello to contact the seller's

95

1 advisor to pursue the preemptive offer?
2 A I don't know that.
3 Q Did Mr. Davis inform you that Mr. Zuccarello
4 told him of this opportunity and suggested that he
5 contact you about the opportunity?
6 A No.
7 Q You mentioned that you engaged -- that R&R
8 engaged Cypress for this Bravo Taco Bell deal.
9 A Yes.
10 Q What was the nature of the engagement?
11 A A flat fee.
12 Q Okay. And what was the flat fee?
13 A $100,000.
14 Q What was the scope of services?
15 A It was very, very -- it wasn't that broad.
16 It was very unique because it was already negotiated.
17 There was no title work. So basically it was rolling
18 up or getting additional funding from the lender.
19 That's basically the scope.
20 Q The lender being Citizens Bank?
21 A Yes.
22 Q So what exactly was Cypress supposed to do
23 in this transaction for R&R?
24 A Once we got the deal, I agreed to a specific
25 price. Their representation was basically to get a

96

1 good deal with Citizens Bank representing us in
2 funding the acquisition.
3 Q But didn't Cypress also play a role in the
4 acquisition component of the transaction?
5 A I'm not sure what -- it wasn't a major role
6 if they did. They may have had some role with Bravo
7 Foods.
8 Q Mr. Davis was involved in some of the work
9 on the lease issues?
10 A Possibly. I'm not sure. Probably with the
11 leases themselves, validating the leases. I'm not
12 sure.
13 Q Weren't there issues with some of the
14 leases?
15 A There was one issue with I think a lease,
16 and there was another with a restaurant that was under
17 construction or remodeling during the process where we
18 took over the remodeling process and held somebody in
19 escrow. So I believe Mr. Davis was involved in that
20 negotiation as well.
21 Q And that's more than just working with a
22 lender to get a better deal on a loan?
23 A Yeah. Well, it's going through the process
24 of -- yes.
25 Q That would be considered acquisition work?

24 (Pages 93 to 96)

Case 1:16-cv-01935-PAB-MEH   Document 233-1   Filed 10/04/19   USDC Colorado   Page 10 of 15

ROBERT EDWARD CARLUCCI - 6/29/2017
Cypress Advisors, Inc. v. Kent McCarty Davis, et al.

101

1  A   That's correct.
2  Q   -- where something slipped through the
3  cracks, using your words, was this lack of a written
4  Engagement Agreement?
5  A   Engagement Agreement.
6  Q   We talked over each other on that.  I'm
7  going to ask it again.
8      So this is the one instance where something
9  slipped through the cracks, using your words, was this
10 lack of a written Engagement Agreement?
11 A   Yes.
12 Q   Did you discuss with Mr. Davis the need for
13 a written Engagement Agreement?
14 A   I didn't.
15 Q   Did Mr. Davis ever follow up on his own to
16 discuss the written Engagement Agreement?
17 A   No.
18 Q   Were there negotiations about what the terms
19 would be for this engagement?
20 A   Prior to anything, the negotiation was the
21 flat fee.
22 Q   Who came up with the proposal for the flat
23 fee?
24 A   I think I did.
25 Q   And was that your first offer, $100,000?

102

1  A   I think -- I'm not sure.  I'm not sure.  We
2  knew it was a simple transaction.  It was already a
3  done deal.  We were going through a very minor part of
4  rolling up financing.  As you mentioned, a couple of
5  leases may have been contacted by the -- us or Cypress
6  to the seller.  So it was really a very easy process.
7  So I don't know who -- if I got a counteroffer, but I
8  believe I came up with the $100,000 flat fee offer.
9  Q   So you did get a counteroffer?
10 A   No.
11 Q   Oh, I misread your testimony then.
12    MR. TRACY:  He said I don't know if we did.
13    THE WITNESS:  I don't know if we did.  I
14 offered $100,000 for what we felt was a fairly fast
15 deal.
16 BY MR. DEMPSEY:
17 Q   And you communicated that offer to
18 Mr. Davis?
19 A   Yes.
20 Q   And you can't recall if there was a
21 counteroffer?
22 A   I don't think there was, but I can't recall.
23 Q   Did you contact Mr. Zuccarello?
24 A   No.
25 Q   Why not?

103

1  A   Because I was talking to The Cypress Group.
2  I was talking to Mr. Davis.
3  Q   And did you ever sign an Engagement
4  Agreement with Mr. Davis?
5  A   No.
6  Q   So why did you think he had the authority to
7  negotiate a flat fee undocumented engagement for
8  Cypress?
9  A   I've dealt with them for a lot of years and
10 all their reputation.  It was The Cypress Group.  I
11 didn't have any idea there was anything wrong with it.
12 Q   Did Mr. Davis represent to you that he had
13 the authority to enter into an engagement with you?
14 A   No, not on a specific -- just an assumption
15 on my part.
16 Q   Okay.  And how did this discussion occur?
17 Was it by e-mail about this flat fee arrangement?
18 A   I don't believe so.  There may have been an
19 e-mail.  I'm not sure.  But I remember saying, hey,
20 listen, we're tired of paying these crazy fees.  You
21 don't need Jeff Katz.  We don't need a CFO.  We have
22 our own CFO.  We ran our own numbers.  We negotiated a
23 deal already between Cypress and us.  There's no title
24 work to be done.  We're engaging an attorney for that
25 type of buy/sell agreement and the title -- and the

104

1  leases.  So it was a simple transaction.  You know,
2  we'd like a flat fee, $100,000.
3  Q   And then Mr. Davis accepted that?
4  A   I believe so, yeah.
5  Q   And, again, you don't recall any pushback or
6  counteroffer?
7  A   I don't recall.
8  Q   And how were those fees to be paid?
9  A   At closing.
10 Q   And to whom?
11 A   To The Cypress Group.
12 Q   Was it Mr. O'Neil's responsibility for
13 getting a written Engagement Agreement in place
14 between R&R Ventures and The Cypress Group?
15 A   And that's a good question.  I never -- I
16 don't think I -- we got to that point of whose
17 responsibility it was because we didn't get to that
18 closing document point without having knowledge of an
19 issue between partners.
20 Q   Did you typically have Mr. O'Neil or your
21 outside counsel engage or participate in the
22 negotiation or drafting of engagement agreements with
23 Cypress?
24 A   No.
25 Q   So this would have been a first time if you

Case 1:16-cv-01935-PAB-MEH   Document 233-1   Filed 10/04/19   USDC Colorado   Page 11 of 15

ROBERT EDWARD CARLUCCI - 6/29/2017
Cypress Advisors, Inc. v. Kent McCarty Davis, et al.

105

1  had asked Mr. O'Neil to do it?
2      A   I imagine so.
3      Q   Because typically you handled them?
4      A   Yes.
5      Q   Your engagement -- R&R engagement with --
6  I'm sorry.  Bad question.
7          R&R Ventures did not engage Carty Davis for
8  this Bravo Foods transaction?
9      A   No.
10     Q   And R&R Ventures did not engage C Squared
11 Advisors for this engagement?
12     A   No.
13     Q   Did you talk to Mr. Jim Christopherson about
14 the terms of this engagement?
15     A   Never.
16     Q   Do you know who he is?
17     A   No.
18     Q   You ever contacted him?
19     A   No.
20     Q   Did you expect Cypress to be the exclusive
21 financial advisor for R&R Ventures in this engagement?
22     A   Yes.
23     Q   And why?
24     A   Because that's -- because Mr. Davis was
25 Cypress and Mr. Zuccarello was Cypress.

106

1      Q   Did you discuss that term with Mr. Davis
2  when you agreed to this oral agreement?
3      A   No.
4      Q   It was implied in the deal?
5      A   I had no reason to ask if he's employed or
6  with Cypress or not with them.  There's no reason to
7  even ask that question.
8      Q   So exclusivity didn't come up at all?
9      A   Absolutely not.
10     Q   What about confidentiality?
11     A   Absolutely not.
12     Q   That wasn't a concern to you?
13     A   No.
14     Q   Did you expect Cypress Advisors to be acting
15 confidentially in this engagement?
16     A   Absolutely.
17     Q   But you didn't have a written agreement
18 about that?
19     A   No.
20     Q   What about if there was a dispute between
21 R&R Ventures and Cypress, what was going to happen
22 there?
23     A   I have no idea.
24     Q   And typically the prior engagement
25 agreements provided an arbitration provision.  What

107

1  was your expectation if there was a dispute?
2      A   I had none.  It didn't even dawn on me.
3      Q   Was this Engagement Agreement confirmed in
4  writing in any way?
5      A   No.
6      Q   It wasn't put down on paper?
7      A   I don't believe so.
8      Q   Not in an e-mail?
9      A   I don't believe so.
10     Q   Not on an a napkin?
11     A   I don't believe so.  I know not on a napkin.
12     Q   Wouldn't you have wanted some kind of record
13 of the terms so there'd be no misunderstanding?
14         MR. LACIS:  Object to the form of the
15 question.
16         THE WITNESS:  I would, yes.  We didn't get
17 to that part of the process.
18 BY MR. DEMPSEY:
19     Q   And given that all prior engagement
20 agreements had been executed by Mr. Zuccarello, why
21 would you believe that Mr. Davis had the authority to
22 negotiate an oral agreement with you?
23     A   He's representing Cypress.  I had no idea.
24 I wouldn't -- why wouldn't I not think he would?
25     Q   You trusted Mr. Davis?

108

1      A   Absolutely.  I trusted the whole company.  I
2  trusted Dean Zuccarello too, absolutely.
3      Q   Your relationship with Mr. Davis is such
4  that you felt comfortable with an oral agreement for a
5  significant --
6      A   My relationship with Cypress I felt very
7  comfortable.
8      Q   Comfortable to have an oral agreement for
9  significant compensation?
10     A   That was not comfortable for an oral
11 agreement.  As I stated earlier, we didn't even -- it
12 slipped through the cracks as far as receiving an
13 engagement letter.  We already negotiated and agreed
14 to a fee, and we were in the early stages of the
15 transaction materializing anyway.
16     Q   Did Mr. Davis talk you into this?
17     A   Talk me into what?
18     Q   An oral agreement.
19     A   No, not at all.
20     Q   Did he tell you not to worry about it?
21     A   Never.
22     Q   Did he give you a discount for this oral
23 arrangement?
24     A   Not at all.
25     Q   Was this a discounted engagement to your

Case 1:16-cv-01935-PAB-MEH   Document 233-1   Filed 10/04/19   USDC Colorado   Page 12 of 15

ROBERT EDWARD CARLUCCI - 6/29/2017
Cypress Advisors, Inc. v. Kent McCarty Davis, et al.

157

1  engagement?
2  A   Right.
3  Q   Mr. Davis writes this e-mail to the seller
4  group saying there is no agreement.  Essentially you
5  can talk to me.  I'm going to continue to work on this
6  deal.
7      MR. LACIS:  Object to the form of the
8  question.
9  BY MR. DEMPSEY:
10 Q   And you say nothing?
11 A   Yeah, I said nothing.
12 Q   Doesn't that violate the agreement --
13     MR. LACIS:  Object to form.
14     MR. DEMPSEY:  I'm sorry.  Can I ask the
15 question first.
16 BY MR. DEMPSEY:
17 Q   Doesn't that violate the exclusivity
18 provision of the oral agreement between R&R Ventures
19 and Cypress?
20     MR. LACIS:  Object to the form of the
21 question.
22     MR. TRACY:  Objection.
23     THE WITNESS:  I have no idea.
24 BY MR. DEMPSEY:
25 Q   What does exclusive financial advisory mean

158

1  to you?
2  A   We made a deal with the RC Group and
3  Cypress.  We put the money in escrow, and we decided
4  let both parties fight.  I don't know who is right,
5  who is wrong.  I don't even know what the parties
6  argued about.  I can't talk to my attorney because of
7  attorney privileges, but that was the advice.
8  Q   So the oral agreement with Cypress was an
9  exclusive arrangement until July 15th when it became a
10 nonexclusive arrangement?
11     MR. LACIS:  Object to the form of the
12 question.
13     MR. TRACY:  Objection.  He's already
14 testified that he paid the money to Cypress.  It's
15 sitting in escrow waiting for Cypress to figure out
16 how to distribute it.
17 BY MR. DEMPSEY:
18 Q   And then didn't Mr. Davis form a competing
19 company to Cypress?
20     MR. LACIS:  Object to the form of the
21 question.
22     THE WITNESS:  I have no idea.
23 BY MR. DEMPSEY:
24 Q   He formed C Squared Advisors.
25 A   Okay.

159

1  Q   And you started working with C Squared
2  Advisors.
3  A   Never.  Never.
4      (Carlucci Deposition Exhibit 11 was
5  marked for identification and was attached to the
6  deposition transcript.)
7  BY MR. DEMPSEY:
8  Q   Exhibit 11 is another e-mail from your
9  production.  Do you recognize it?
10 A   Yeah.  Go ahead.
11 Q   So moving up the timeline here, we're now
12 into August.  This is about a month after the
13 so-called termination of Mr. Davis.
14 A   Okay.
15 Q   And at this point looks as though this is
16 the same -- I'm sorry -- Bravo Foods sellers group --
17 A   Yeah.
18 Q   -- in the e-mail addresses here.
19 A   Mm-hmm.
20 Q   Is this e-mail related to the Bravo Foods
21 closing?
22 A   Yeah, it is.
23 Q   Talking about a projected closing date?
24 A   Yeah.
25 Q   And at this point, Mr. Davis was starting to

160

1  operate under a company called C Squared Advisors,
2  LLC.
3  A   Okay.
4  Q   Do you see that?
5  A   Yeah, I do.
6  Q   All right.  So he says -- he says we'll
7  huddle with Bob's team, Bob, Don, Bill, Tim and I, and
8  get back to you early next week before the call.
9  Carty.
10     So Bob, that was you, right, talking about
11 Bob's team here at the top?
12 A   Mm-hmm.  Yeah.
13 Q   That's you?
14 A   Yeah.
15 Q   Don is Don Darnes?
16 A   That's right.
17 Q   Bill, who's that?
18 A   That's Bill Retz.
19 Q   Okay.  Tim is Tim O'Neil?
20 A   Tim, that's correct.
21 Q   Okay.  And so your group there is now
22 continuing with Carty on this Bravo Foods transaction;
23 is that right?
24 A   Yeah.
25 Q   And Mr. Davis is now representing himself as

Case 1:16-cv-01935-PAB-MEH Document 233-1 Filed 10/04/19 USDC Colorado Page 13 of 15

ROBERT EDWARD CARLUCCI - 6/29/2017
Cypress Advisors, Inc. v. Kent McCarty Davis, et al.

233

1 Q An hour?
2 A I have no idea.
3 Q Did anybody help you?
4 A Show me where the deletion and get them
5 back? I told you. It was Don Darnes, who came in the
6 office and showed me how to do it.
7 Q Okay. And then did he find them on your
8 system and then print each one of them out?
9 A No. I printed them out.
10 Q Okay. And then what did you do with them
11 then?
12 A I bundled them and gave them to my attorney
13 to send to you.
14 Q And then who did the redaction on -- who did
15 the redaction?
16 A My attorney.
17 Q So there was no effort on your part to
18 search that cloud, and you didn't ask anybody to help
19 you search the cloud?
20 A There were no other e-mails.
21 MR. TRACY: Objection.
22 BY MR. DEMPSEY:
23 Q Do you know?
24 A Do I know? I don't know.
25 Q What is stored on the cloud?

234

1 A Excuse me? I have no idea.
2 Q Will you review the cloud and take a look at
3 whether there's further responsive documents?
4 MR. TRACY: Objection.
5 MR. DEMPSEY: What's the objection?
6 MR. TRACY: Counsel, the subpoena is to Bob
7 Carlucci, not to R&R Ventures.
8 THE WITNESS: Those e-mails are every e-mail
9 that I could. I didn't review them. I don't have any
10 agenda. I have no -- just get it, take it, figure it
11 out, and that's it. I told you what I did. I engaged
12 Cypress. I've used Cypress for every transaction
13 until the last one, Auspex, for obvious reasons, and
14 that's it. It is what it is. If you want to subpoena
15 our attorney Tim O'Neil, he did the last two deals
16 with me. Prior to that, the banks -- you want to
17 subpoena Citizens Bank or any of those people, please
18 do.
19 I mean, everything is going to be there.
20 There's going to be settlement papers to show who gets
21 the commissions. All of the commissions were through
22 a settlement sheet. There was never a signed check to
23 anybody ever. It was all on a settlement sheet. So
24 I'm assuming that if you want to look at what Cypress
25 did, they have the record of the money and they have

235

1 the record of how they got paid. So I don't know what
2 else you want from me. I'm trying to run a business.
3 This is, I don't think, very fair, to be kind.
4 BY MR. DEMPSEY:
5 Q Will you review the cloud for responsive
6 documents?
7 A I'll ask.
8 MR. TRACY: Objection.
9 THE WITNESS: I'll ask somebody if we have
10 anything like that.
11 BY MR. DEMPSEY:
12 Q Who do you think you would ask?
13 A I guess I would ask Don Darnes or one of the
14 people that -- or my secretary or somebody in the
15 office. I mean, I don't have a person that does that
16 specific.
17 Q Okay. Do you ever travel to Colorado?
18 A Do I? No. I haven't been to Colorado in
19 quite a number of years.
20 Q And do you have any bank accounts in
21 Colorado?
22 A No. You asked me that question before I
23 believe, but, no, I don't.
24 Q I think I asked about R&R Ventures.
25 A Okay. Myself personally, no.

236

1 Q Do you have any business relationships in
2 Colorado?
3 A No.
4 MR. DEMPSEY: Okay. I will pass it over to
5 you.
6 EXAMINATION BY COUNSEL FOR DEFENDANT
7 BY MR. LACIS:
8 Q Thank you, Mr. Carlucci for being patient,
9 and I appreciate that patience. I'll be really brief.
10 Do you need to take a break or anything now?
11 A No. I just want to get out of here.
12 Q Let's finish up then. Mr. Carlucci, you
13 know I represent Carty Davis in this case.
14 A Okay.
15 ==Q Do you know what Carty Davis's role was at==
16 ==Cypress Group?==
17 ==A I think he was a deal maker, an M&A person.==
18 ==Q Do you know what his title was?==
19 ==A I think he was partner.==
20 ==Q And how did you come to that understanding?==
21 ==A Well, I remember when Carty contacted -- I==
22 ==don't remember, but when we talked at a trade show or==
23 ==something, that he introduced himself as part of the==
24 ==Cypress Group and partner and his one partner was West==
25 ==Coast more or less in Colorado, and he's in the East==

Case 1:16-cv-01935-PAB-MEH   Document 233-1   Filed 10/04/19   USDC Colorado   Page 14 of 15

ROBERT EDWARD CARLUCCI - 6/29/2017
Cypress Advisors, Inc. v. Kent McCarty Davis, et al.

237

1  Coast, North Carolina or South Carolina, Atlanta.  I
2  think at the time it was Atlanta, a number of years
3  ago.  And prior to that I knew him from another M&A
4  group that started many, many years ago.
5      Q   When you reference another partner, you're
6  speaking about Dean Zuccarello?
7      A   Yes.
8      Q   Your testimony this morning about a number
9  of deals that you did with Cypress Group, I just want
10 to run those really quickly --
11     A   Okay.
12     Q   -- specifically about the transactions you
13 did with Cypress Group and who you worked with at the
14 Cypress Group on those transactions.
15     A   All right.
16     Q   So there was testimony about the Bravo
17 transaction.
18     A   Yes.
19     Q   Who at the Cypress Group did you work with
20 on that deal?
21     A   Carty Davis.
22     Q   Anybody else?
23     A   I think Dean may have got involved to a
24 certain extent because he was the guy that had the
25 connection with Bravo.  That's what I was told at

238

1  least.
2      Q   Did you have periodic conference calls
3  related to the Bravo transaction?
4      A   Yes.
5      Q   Were they weekly?
6      A   A lot of times they were, yes.
7      Q   And was Carty Davis on those weekly calls?
8      A   Yes.
9      Q   Was Dean Zuccarello?
10     A   No.
11     Q   Okay.  We also heard about a deal referred
12 to as the Exceptional group.
13     A   Yes.
14     Q   Same question:  Who did you work with at
15 Cypress Group on the Exceptional deal?
16     A   Cypress Group was Carty Davis.
17     Q   Did you work with Dean at all?
18     A   No.  I think at one time Carty was on
19 vacation and Dean interjected and, you know, worked
20 those calls or whatever had to be done at the time,
21 picking up for Carty's, you know, vacation.
22     Q   Okay.  Thank you.  And then there's talk
23 about a Virginia Taco Bell financing deal --
24     A   Yes.
25     Q   -- with Cypress Group.  Same question:  Who

239

1  did you work with at The Cypress Group on the Virginia
2  Taco Bell financing?
3      A   Carty Davis.
4      Q   Did you work with Dean Zuccarello at all?
5      A   I didn't, no.
6      Q   Is it a fair statement that most of your
7  interactions with The Cypress Group were through Carty
8  Davis?
9      A   Yes.
10         MR. DEMPSEY:  Object to form.
11         THE WITNESS:  Yes.
12 BY MR. LACIS:
13     Q   How many times have you spoken with Dean
14 Zuccarello, if you know?
15     A   A handful probably.
16     Q   That's all I have.  Thank you for your time.
17     A   You're welcome.
18         FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF AND
19         COUNTERCLAIM DEFENDANTS
20 BY MR. DEMPSEY:
21     Q   Just a follow-up question on Mr. Lacis's
22 questioning.  You testified that Mr. Davis introduced
23 himself as a partner at these -- at this --
24     A   I don't know if he did that.  He introduced
25 his company and passed out business cards.  I don't

240

1  know if it had partner on it.  Some of these e-mails
2  say partner, et cetera.  That's just, you know, a
3  title.  Carty Davis, partner, right here, June 21st,
4  2016.
5      Q   But it was Mr. Davis that was making that
6  representation?
7      A   Well, I don't know.  This says The Cypress
8  Group and his company, the company he represents, with
9  his title underneath it.  Here's one for example,
10 Exhibit 17.  I just pulled it out of the pile.  I'm
11 sure there's plenty of them.  Oh, that's C Squared.
12 I'm sorry.  Let me find one.  I've got them upside
13 down here.  Here Carty Davis, partner, Cypress Group.
14 Here it is, Carty Davis.
15     Q   Which exhibit is that?
16     A   This is Exhibit 8.
17     Q   Okay.  And that's an e-mail from Mr. Davis?
18     A   Bob, Please forward Barbara's response to
19 me, yes.  Yes, Carty Davis, partner of the Cypress
20 Group.  I know there's plenty of them around.
21     Q   And you mentioned that Mr. Zuccarello
22 assisted in some way in the Exceptional group
23 transaction.
24         MR. DEMPSEY:  Mark that exhibit there.
25         (Carlucci Deposition Exhibit 27 was

```
1          CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2              I, Joan V. Cain, Court Reporter, the officer
3     before whom the foregoing deposition was taken, do
4     hereby certify that Robert Edward Carlucci personally
5     appeared before me on June 29, 2017 and was duly
6     sworn; that the foregoing transcript is a true and
7     correct record of the testimony given; that said
8     testimony was taken by me stenographically and
9     thereafter reduced to typewriting under my direction;
10    that reading and signing was requested; and that I am
11    neither counsel for, related to, nor employed by any
12    of the parties to this case and have no interest,
13    financial or otherwise, in its outcome.
14             IN WITNESS WHEREOF, I have hereunto set my
15    hand and affixed my notarial seal this 12th day of
16    July 2017.
17
18    My commission expires:
19    July 31, 2019
20
21    Joan V Cain
22    _____
23    NOTARY PUBLIC IN AND FOR THE
24    DISTRICT OF COLUMBIA
25
```