## Exhibit B

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
 2

 3   Civil Action No. 17-cv-01219-MSK-KLM

 4   CYPRESS ADVISORS, INC., a Florida   )
     corporation, d/b/a THE CYPRESS      )
 5   GROUP,                              )
                                         )
 6              Plaintiff,               )
                                         )
 7         vs.                           )
     KENT McCARTY DAVIS, an individual   )
 8   and c SQUARED ADVISORS, LLC, a      )
     North Carolina limited liability    )
 9   company,                            )
                                         )
10              Defendants.              )
     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )
11

12   VIDEOTAPE TELEPHONIC DEPOSITION OF MATTHEW BOULDEN

13                 (Taken by the Plaintiff)

14                  Raleigh, North Carolina

15                Wednesday, January 16, 2019

16                  Reported in Stenotype by

17             Lynn A. Ruggiro, Court Reporter

18   Transcript produced by computer-aided transcription

19

20
```



Hunter + Geist, Inc.

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

www.huntergeist.com
scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

MATTHEW BOULDEN - 1/16/2019
Cypress Advisors, Inc., et al. v. Kent McCarty Davis, et al.

## Page 1

```
               IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-01219-MSK-KLM
CYPRESS ADVISORS, INC., a Florida   )
corporation, d/b/a THE CYPRESS      )
GROUP,                              )
                                    )
                  Plaintiff,        )
                                    )
           vs.                      )
KENT McCARTY DAVIS, an individual   )
and c SQUARED ADVISORS, LLC, a      )
North Carolina limited liability    )
company,                            )
                                    )
                  Defendants.       )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )


      VIDEOTAPE TELEPHONIC DEPOSITION OF MATTHEW BOULDEN
                  (Taken by the Plaintiff)
                  Raleigh, North Carolina
                Wednesday, January 16, 2019
                 Reported in Stenotype by
              Lynn A. Ruggiro, Court Reporter
    Transcript produced by computer-aided transcription
```

## Page 2

```
                         APPEARANCES
ON BEHALF OF THE PLAINTIFF:
     BRADFORD E. DEMPSEY, ESQUIRE
     KYLE HOSMER, ESQUIRE
     FAEGRE BAKER DANIELS L.L.P.
     3200 Wells Fargo Center
     1700 Lincoln Street
     Denver, Colorado  80203


ON BEHALF OF THE DEFENDANTS:
     K.C. GROVES, ESQUIRE
     IRELAND STAPLETON PRYOR & PASCOE, P.C.
     717 17th Street, Suite 2800
     Denver, Colorado  80202



Also Present:  Roosevelt Harrison, III, Videographer


     VIDEOCONFERENCE VIDEOTAPED TELEPHONIC DEPOSITION OF
MATTHEW ALLEN BOULDEN, a witness called on behalf of
Defendants, before Lynn A. Ruggiro, Notary Public, in and
for the State of North Carolina, at the offices of
CaseWorks, 3739 National Drive, Suite 200, Raleigh, North
Carolina, on Wednesday, January 16, 2019, commencing at
11:37 a.m.
```

## Page 3

INDEX OF EXAMINATION

|  | PAGE |
|---|---|
| BY MR. DEMPSEY: | 4 |

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 22 | Second Amended Notice of Deposition of Matthew Boulden | 10 |
| Exhibit 24 | AT Home PC Support Web Page | 37 |
| Exhibit 25 | Email chain dated February 4, 2016 | 43 |
| Exhibit 26 | Email chain dated February 2, 2016 | 47 |
| Exhibit 27 | Three invoices dated 2/19/16, 2/19/2016 and 3/14/2016 | 57 |
| Exhibit 28 | Email chain dated 6/15/16 | 71 |
| Exhibit 29 | Email dated 8/24/16 | 104 |
| Exhibit 30 | Email dated 8/29/16 | 107 |
| Exhibit 31 | Email chain dated 8/29/16 | 109 |
| Exhibit 32 | Email dated 10/25/2016 | 112 |
| Exhibit 33 | Email chain dated 10/28/16 | 116 |
| Exhibit 34 | Email chain dated 10/28/16 | 120 |
| Exhibit 35 | Email chain dated 12/14/16 | 125 |
| Exhibit 36 | Email chain dated 12/19/16 | 137 |
| Exhibit 37 | Email chain dated 1/10/17 | 157 |
| Exhibit 38 | Email chain dated 1/11/17 | 158 |
| Exhibit 39 | Complaint | 161 |
| Exhibit 40 | Print-out from C Squared's website | 175 |

## Page 4

| | | |
|---|---|---|
| 11:36:37 | 1 | THE VIDEOGRAPHER:  Okay.  Good morning. |
| 11:36:37 | 2 | Here begins the Videotape Number 1 in the |
| 11:36:51 | 3 | deposition of Matt Boulden, in the matter of |
| 11:36:59 | 4 | Cypress Advisors, Incorporated versus Kent |
| 11:37:02 | 5 | McCarty Davis in the United States District |
| 11:37:05 | 6 | Court of Colorado. |
| 11:37:07 | 7 | Counsel, please state your names and whom |
| 11:37:08 | 8 | you represent after which the court reporter, |
| 11:37:10 | 9 | Lynn Ruggiro of CaseWorks, will swear in the |
| 11:37:15 | 10 | witness. |
| 11:37:18 | 11 | MR. DEMPSEY:  Yeah, good morning, this is |
| 11:37:19 | 12 | Brad Dempsey on behalf of Cypress Advisors, |
| 11:37:23 | 13 | Inc., the plaintiff, and with me is my |
| 11:37:26 | 14 | colleague Kyle Hosmer, H-o-s-m-e-r. |
| 11:37:31 | 15 | MR. GROVES:  And this is K.C. Groves, |
| 11:37:32 | 16 | counsel for defendants, C Squared Advisors, LLC |
| 11:37:39 | 17 | and Kent McCarty Davis, so appearing as counsel |
| 11:37:43 | 18 | for the witness, Matt Boulden, solely for |
| 11:37:45 | 19 | purposes of this deposition. |
| 11:37:46 | 20 | MATTHEW ALLEN BOULDEN, |
| 11:37:46 | 21 | having been duly sworn, testifies as follows: |
| 11:37:46 | 22 | EXAMINATION |
| 11:37:46 | 23 | BY MR. DEMPSEY: |
| 11:37:55 | 24 | Q.  Okay, good morning, Mr. Boulden.  First |
| 11:38:02 | 25 | off, I just want to make sure you're -- you're |

1 (Pages 1 to 4)

Case 1:16-cv-01935-PAB-MEH   Document 233-2   Filed 10/04/19   USDC Colorado   Page 4 of 10

MATTHEW BOULDEN - 1/16/2019
Cypress Advisors, Inc., et al. v. Kent McCarty Davis, et al.

45

```
12:55:32   1    Mr. Davis at the bottom of the first email writes to
12:55:40   2    you and then it says, "Matt, I've been through about
12:55:43   3    half the photos, how do I save this?"  What -- what
12:55:52   4    did you understand Mr. Davis asking from -- from
12:55:56   5    this email?
12:55:59   6         A.  He was trying to put the photos in
12:56:00   7    chronological order, and he was worried that he was
12:56:02   8    going to lose his progress and have to go back and
12:56:06   9    redo everything that he had done.
12:56:10  10         Q.  Okay.  And when he say he was scared to
12:56:12  11    touch anything, was -- did he convey to you that he
12:56:16  12    had concerns about any ability that he -- ability or
12:56:20  13    inability to handle technology?
12:56:22  14         A.  This is my first interaction with Mr.
12:56:24  15    Davis, so no.
12:56:28  16         Q.  Okay.  And then you responded to him and
12:56:34  17    he was asking you if -- you said, it's already
12:56:36  18    saved, all you're doing was editing files.  So you
12:56:41  19    explained all this to him.  Throughout this
12:56:45  20    conversation, did you get a sense of Mr. Davis'
12:56:51  21    technical capabilities with respect to computers?
12:56:54  22         A.  I was starting to learn that, yes.
12:56:56  23         Q.  And what did you start to learn?
12:57:03  24         A.  That he had no idea what he was doing.
12:57:10  25         Q.  All right.  And then later on Mr. Davis
```

46

```
12:57:18   1    continued to use your services after the -- after
12:57:21   2    your project on the photos.  Did he continue to use
12:57:26   3    your ser -- (the video sound cut out.)
12:57:28   4         A.  Can you repeat the question, the video
12:57:29   5    feed cut out.
12:57:33   6         Q.  Sure.  After you completed the photo
12:57:37   7    project for him, it looks like in January 2016, did
12:57:41   8    Mr. Davis continue to use your company's services?
12:57:45   9         A.  Yes.
12:57:48  10         Q.  And so tell me about that, did he just
12:57:53  11    keep calling you or -- for projects?  What was the
12:57:58  12    relationship after that first project?
12:58:00  13         A.  Anything and everything that Carty or
12:58:01  14    Holly needed technologically, I handled for them.
12:58:09  15         Q.  How complex would you say the tasks that
12:58:13  16    they were asking you to do were?
12:58:17  17         A.  Fairly simple.
12:58:19  18         Q.  I'm sorry, can you say that again?
12:58:21  19         A.  Fairly simple.
12:58:26  20         Q.  And would it be Mr. Davis calling or Mrs.
12:58:28  21    Davis?
12:58:29  22         A.  Both.
12:58:33  23         Q.  Okay.  With respect to those tasks that
12:58:35  24    Mr. Davis contacted you about, were those simple or
12:58:39  25    complex requests?
```

47

```
12:58:42   1         A.  Both.
12:58:45   2         Q.  Okay.  What's an example of a complex
12:58:49   3    request?
12:58:51   4         A.  Some of the syncing with his iPhone to his
12:58:54   5    computer.
12:58:57   6         Q.  Okay.  And so what about simple requests?
12:59:03   7         A.  Not being able to print, installing a new
12:59:05   8    printer, not being able to turn on his Sonos, things
12:59:09   9    of that nature.
12:59:12  10         Q.  Turn on -- I'm sorry, Sonos, what's a
12:59:14  11    Sonos?
12:59:15  12         A.  It's a music player, speakers.
12:59:20  13         Q.  Okay.  Like a Blue tooth speaker?
12:59:22  14         A.  Essentially, yes, it has its own app.  You
12:59:25  15    can control it through a phone or a computer.
12:59:35  16         Q.  Was Mr. Davis able to -- he had a Drop Box
12:59:40  17    account; is that right?
12:59:43  18         A.  I don't know.
12:59:45  19         Q.  All right.  Let's pull that up.  Did he
12:59:51  20    use a Drop Box account for that photo project?
13:00:00  21    Let's scroll down a little more and see the --
13:00:03  22    again, this is another email chain, we're going to
13:00:05  23    mark this as Exhibit 26.
13:00:07  24              (EXHIBIT NUMBER 26 WAS MARKED FOR
13:00:08  25                   IDENTIFICATION.)
```

48

```
13:00:08   1         Q.  And this is a --
13:00:13   2         A.  Okay.
13:00:13   3         Q.  -- the first email is from Drop Box to Mr.
13:00:17   4    Davis dated February 11, 2016, and then there's an
13:00:23   5    intermediate message here from Mr. Davis on February
13:00:27   6    13 and then an email, looks like from your address.
13:00:31   7    Do you recognize this email chain?
13:00:34   8         A.  Yes.
13:00:38   9         Q.  Is this a true and accurate copy of the
13:00:40  10    email chain between yourself and Mr. Davis?
13:00:43  11         A.  Yes.
13:00:43  12         Q.  And so in this one, Drop Box emails to Mr.
13:00:51  13    Davis advising him that his Drop Box is full and no
13:00:54  14    longer syncing files, correct?
13:00:57  15         A.  Yes.
13:01:00  16         Q.  And then he forwards, looks like he
13:01:02  17    forwarded it to you and he just says "Got this
13:01:06  18    message."
13:01:07  19         A.  Yes.
13:01:07  20         Q.  Right?  So what -- why would he do that?
13:01:13  21         A.  Because he didn't know what it meant or
13:01:15  22    what to do moving forward.
13:01:17  23         Q.  Okay.  And then you responded pretty
13:01:22  24    quickly and you said you'd give him a call, appears
13:01:28  25    to have exceeded the limit of the Drop Box, et
```

Case 1:16-cv-01935-PAB-MEH   Document 233-2   Filed 10/04/19   USDC Colorado   Page 5 of 10

MATTHEW BOULDEN - 1/16/2019
Cypress Advisors, Inc., et al. v. Kent McCarty Davis, et al.

61

```
13:18:28   1    requirements did he require for this new laptop?
13:18:31   2    Did he just say get me a new laptop?
13:18:34   3        A.  Yes.
13:18:37   4        Q.  And then the next invoice shows, it's a
13:18:46   5    March invoice, looks like, if I'm reading it right,
13:18:49   6    two hours of labor for new laptop set up, is that
13:18:56   7    fair?
13:18:56   8        A.  Yes.
13:18:58   9        Q.  All right.  So what did you do there?
13:19:01  10        A.   So for any of my customers, a new computer
13:19:03  11    set up consists of basically reinstalling the
13:19:06  12    operating system, putting the bare bones on it,
13:19:07  13    getting rid of any bloatware or freeware that's
13:19:14  14    installed in the laptop, installing an antivirus, a
13:19:17  15    Microsoft -- a copy of Microsoft Office, Google
13:19:20  16    Chrome, Java, Adobe, basically the essential
13:19:22  17    software as well as doing a data transfer from his
13:19:27  18    desktop to his laptop so he had all his working
13:19:30  19    files as well as his email, and connecting printers.
13:19:38  20        Q.  All right.  So you didn't do a data
13:19:42  21    transfer from his desktop to this laptop?
13:19:44  22        A.  Yes.
13:19:48  23        Q.  What did that consist of, do you recall
13:19:50  24    the files?
13:19:51  25        A.  No.
```

62

```
13:19:57   1        Q.  What was your process for doing that?
13:20:00   2        A.  Copy the data from his desktop to an
13:20:02   3    external hard drive, moved it to the laptop and
13:20:06   4    copied the files there.
13:20:07   5        Q.  Okay.  So did he bring his desktop to you
13:20:18   6    or did you go visit him?
13:20:20   7        A.  I did it all at his house.
13:20:28   8        Q.  Who provided the hard drive that you used
13:20:31   9    to transport the data?
13:20:38  10        A.  I don't understand the question.
13:20:41  11        Q.  You said that you downloaded the data onto
13:20:43  12    a hard drive and then moved that over to the new
13:20:46  13    laptop.
13:20:47  14        A.  Well, so -- you mean the external hard
13:20:52  15    drive that was used to move the data?
13:20:55  16        Q.  Correct.
13:20:55  17        A.  They're the company's.
13:20:59  18        Q.  Who, which company?
13:21:01  19        A.  At Home PC Support.
13:21:12  20        Q.  All right.  So -- so you went to Mr.
13:21:15  21    Davis' house, you -- in the process of moving this
13:21:21  22    data onto the At Home PC Support external hard
13:21:26  23    drive, was Mr. Davis there when you did that?
13:21:28  24        A.  Yes.
13:21:31  25        Q.  Okay.  Did he have to enter a password
```

63

```
13:21:35   1    into his computer to be able to allow you to get to
13:21:39   2    that data?
13:21:40   3        A.  I don't remember.
13:21:54   4        Q.  Would it be common to have a password?
13:21:57   5        A.  Yes.
13:22:02   6        Q.  Do you think you could have done this
13:22:04   7    project without Mr. Davis being there?
13:22:06   8        A.  I wouldn't be in his house without him but
13:22:10   9    I can certainly do the job at my store, yes, but I
13:22:13  10    wouldn't be in his house in his office without him
13:22:16  11    probably being present.
13:22:17  12        Q.  But would you be able to access his data
13:22:21  13    without him present?
13:22:25  14        A.  Yes.
13:22:27  15        Q.  How would you do that?
13:22:30  16        A.  Well, with any computer, I can take a hard
13:22:32  17    drive and hook up to another computer and extract
13:22:33  18    the data out of it.
13:22:39  19        Q.  All right.  Without a password?
13:22:42  20        A.  Yes, that's correct.
13:22:48  21        Q.  All right.  But you don't remember the
13:22:51  22    files that you transferred to the laptop?
13:22:54  23        A.  For Carty's computer specifically, no,
13:22:56  24    typically what we do is move an entire user folder
13:22:59  25    all at once.  We don't go through individual files
```

64

```
13:23:02   1    and folders, it's an invasion of privacy.
13:23:09   2        Q.  Did you keep any sort of a log about what
13:23:12   3    you were moving?
13:23:13   4        A.  No.
13:23:13   5        Q.  Did -- does your company or do you require
13:23:20   6    your customers to sign any sort of a release or
13:23:22   7    waiver before you will transfer data like this?
13:23:27   8        A.  Yes.
13:23:31   9        Q.  And so tell me about that release or
13:23:33  10    waiver.
13:23:34  11        A.  Basically, it states that we are not
13:23:36  12    responsible for any data lost in data transfer and
13:23:43  13    that the customer is responsible ultimately for
13:23:45  14    their data.
13:23:53  15        Q.  What about if -- is there any release or
13:23:58  16    waiver with respect to transferring data that
13:24:02  17    belongs to some other party?
13:24:05  18        A.  No.
13:24:10  19        Q.  Did Mr. Davis sign your release or waiver?
13:24:13  20        A.  I believe so, yes.
13:24:18  21        Q.  And where would you keep that?
13:24:20  22        A.  In my office.  And to be clear, it's not a
13:24:24  23    release or a waiver, it's just a work order.
13:24:36  24        Q.  And will you provide a copy of that to me?
13:24:39  25            MR. GROVES:  Mr. Boulden is not subject to
```

Case 1:16-cv-01935-PAB-MEH   Document 233-2   Filed 10/04/19   USDC Colorado   Page 6 of 10

MATTHEW BOULDEN - 1/16/2019
Cypress Advisors, Inc., et al. v. Kent McCarty Davis, et al.

81

```
13:47:55   1   before?
13:47:55   2       A.  No.
13:47:58   3       Q.  Mr. Davis was the first client or contact
13:48:02   4   that you had done this particular procedure for?
13:48:05   5       A.  Yes.
13:48:08   6       Q.  Okay.  And so you said you weren't sure at
13:48:10   7   that moment how to do it and then you had to figure
13:48:13   8   out how to do it, correct?
13:48:14   9       A.  Yes.
13:48:17  10       Q.  All right.  So what -- what steps did you
13:48:20  11   go through to figure out that process?
13:48:25  12       A.  It was a lot of trial and error.
13:48:27  13   Ultimately, I found a software that enabled me to do
13:48:30  14   it.
13:48:46  15       Q.  Okay.  How -- when were you successful in
13:48:51  16   accomplishing the task?
13:48:53  17       A.  I can't remember.
13:48:59  18       Q.  Wasn't that a big moment?
13:49:04  19       A.  I mean to me, it was just getting a job
13:49:06  20   done, so.....
13:49:09  21       Q.  Okay.
13:49:09  22       A.  To me, I was given a task and got it done,
13:49:11  23   so it's my job.  People give me problems all day,
13:49:15  24   every day, I solve them, that's my job.
13:49:18  25       Q.  Okay.  So did it take more than a week?
```

82

```
13:49:22   1       A.  Honestly, I can't remember how long it
13:49:24   2   took.  He had gotten a new phone in the meantime and
13:49:27   3   I don't remember how long it took to get the
13:49:28   4   contacts out of that phone.
13:49:32   5       Q.  Okay.  So -- so Mr. Davis, at that time,
13:49:34   6   did he go out and acquire a new phone?
13:49:37   7       A.  Yes.
13:49:40   8       Q.  And was that another iPhone?
13:49:42   9       A.  Yes.
13:49:44  10       Q.  Do you know what model?
13:49:45  11       A.  No.
13:49:49  12       Q.  All right.  What was the model that you
13:49:51  13   were working with to try to extract the contacts
13:49:54  14   from?
13:49:54  15       A.  I don't know.
13:49:57  16       Q.  All right.  So Mr. Davis gets a new phone,
13:50:01  17   did he turn over his phone to you?
13:50:03  18       A.  No.
13:50:07  19       Q.  All right.  So how did you -- so did you
13:50:10  20   have to research this process to find the right
13:50:13  21   software?
13:50:13  22       A.  Yes.
13:50:23  23       Q.  And what research did you do?
13:50:26  24       A.  Read a lot of forums, looked at different
13:50:28  25   apps available in the App Store, talked to other
```

83

```
13:50:33   1   people in the industry, talked to Apple including.
13:50:46   2           Another big part of the problem was his
13:50:48   3   Apple ID for his iPhone was set up to his Cypress
13:50:52   4   account, so without having access to his Cypress
13:50:56   5   account, we could do very little with his account or
13:50:58   6   with the iPhone in general.  That's why we had to
13:51:02   7   contact Apple.
13:51:05   8       Q.  Okay.  So you went to forums, you talked
13:51:09   9   to people in the industry, how many people did you
13:51:11  10   talk to?
13:51:16  11       A.  Maybe four to five.
13:51:21  12       Q.  Okay.  And then you actually contacted
13:51:23  13   Apple?
13:51:24  14       A.  Yes.
13:51:27  15       Q.  All right.  And tell me about that.  Who
13:51:29  16   did you speak to there?
13:51:32  17       A.  I -- I have no idea.
13:51:35  18       Q.  What did you tell them?
13:51:37  19       A.  Basically the whole situation, that the
13:51:39  20   Apple ID was linked to an email address, an exchange
13:51:41  21   email address that we had no longer had access to
13:51:44  22   and there's no way we could get access to it.
13:51:49  23       Q.  And what was their response?
13:51:51  24       A.  Well, after four or five phone calls later
13:51:53  25   and finally getting to somebody that could
```

84

```
13:51:55   1   understand our real problem, they migrated his Apple
13:52:01   2   ID to a -- Cypress Apple ID to his Gmail to a new
13:52:05   3   Apple ID account.
13:52:18   4       Q.  So that took four or five calls with
13:52:20   5   Apple?
13:52:21   6       A.  Yes.
13:52:23   7       Q.  All right.  And did that solve the
13:52:24   8   problem?
13:52:26   9       A.  The problem being?
13:52:31  10       Q.  Well, did it allow you to get the access
13:52:33  11   to the contacts?
13:52:35  12       A.  Yes.
13:52:39  13       Q.  And you mentioned special software?
13:52:42  14       A.  Yes.
13:52:44  15       Q.  What was that software?
13:52:46  16       A.  I don't remember.
13:52:52  17       Q.  What would help you remember that?
13:52:59  18       A.  I mean potentially it may still be on
13:53:02  19   Carty's computer, but I mean, this was three years
13:53:04  20   ago so, I don't know.  I work on 20 to 30 computers
13:53:10  21   a day, so for me to try to remember what I did three
13:53:13  22   and a half years ago on one person's phone, that was
13:53:16  23   not relevant to me at the point.  To me the job was
13:53:18  24   done, it's over with, move onto the next job, so....
13:53:23  25       Q.  Special project.  This was a project that
```

21 (Pages 81 to 84)

Case 1:16-cv-01935-PAB-MEH   Document 233-2   Filed 10/04/19   USDC Colorado   Page 7 of 10
MATTHEW BOULDEN - 1/16/2019
Cypress Advisors, Inc., et al. v. Kent McCarty Davis, et al.

97

"Our team." And from what this appears to me, it appears to be a team of people that work at C Squared.
 A. Okay.
 Q. And so -- and I just want to understand, Mr. Boulden, he's testified that he's not working for C Squared, he's not a part of the C Squared team, but at the same time, he's featured on the C Squared website as part of the C Squared team. So I want to know, which is it, are you on the C Squared team or part of it or are you not?
 MR. GROVES: I object to the form of the question as almost incomprehensible and also mischaracterizing Mr. Boulden's testimony.
 Mr. Boulden, if you can answer that poorly worded question, you may do so.
 A. I don't understand what you mean by "team." Am I an employee, is that what you're asking me?
 Q. So what are you -- let me -- let's -- let's back up, let's don't waste time here.
 All right. When you agreed to be on the C Squared website, and you saw that it says "Our team" --
 A. I never saw that.

98

 Q. You were under that tab, you're part of -- you never saw the page that said "Our team?"
 A. No. Carty asked me if he cared if I was on their website, I told him no, I did not care. Holly came and took the picture and that was that.
 Q. And then you never visited the C Squared website after that point?
 A. No, makes no difference to me.
 Q. All right. So now you've seen it.
 A. Okay.
 Q. And now you see -- now you see the phrase "Our team."
 A. Okay.
 Q. And you see how you're presented here, you see how you're presented on the C Squared website as part of their team. Is that an accurate statement of your role with C Squared?
 A. Can you scroll down so I can revisit it, please?
 Yes, I would say those first two sentences, statements about my experience -- actually, three sentences including Apple Microsoft and PC products is an accurate statement.
 Q. But in terms of how it presents you, how the website presents you as being part of the C

99

Squared team --
 A. It looks like I --
 Q. Are you or are you not --
 THE COURT REPORTER: You're both talking at the same time, sorry.
 Q. Yeah.
 A. It appears that I assist them with their computer needs, which is correct, I did assist them in their computer needs and general IT support.
 Q. All right.
 A. Was I employee of them? No.
 Q. So --
 A. But did I help them with things? Absolutely.
 Q. Okay.
 A. So I would argue yes, I was a member of the team.
 Q. Are you featured on any other websites? I'm sorry, Mr. Boulden, let me ask my question. Are you featured on any other websites of any of your other clients as being part of their team?
 A. I don't know the answer to that question. I've got over 5,000 clients so I have to search all their websites to find out the answer to that, so I don't know.

100

 Q. Okay. So in terms of the statements here on the website, it says you're an experienced computer technician and IT consultant, expertise includes computer networking, website design, and maintenance, email and contact management and general IT support. Did you or -- strike that.
 Have you provided computer networking services to C Squared Advisors?
 A. Yes.
 Q. And what did that consist of?
 A. Network in Carty's office, giving Jim the ability to -- go ahead.
 Q. No, I interrupted your answer, I'm sorry.
 A. Also gave Jim the ability to connect to Carty's computer and vice versa through the internet.
 Q. Could you repeat that last sentence? Our video cut out a little bit.
 A. I gave Jim and Carty the ability to connect to each other's computer via the internet, networking them together.
 Q. Was there a particular program that you used for that?
 A. Yes.
 Q. And what was that?

Case 1:16-cv-01935-PAB-MEH   Document 233-2   Filed 10/04/19   USDC Colorado   Page 8 of 10

MATTHEW BOULDEN - 1/16/2019
Cypress Advisors, Inc., et al. v. Kent McCarty Davis, et al.

137

```
15:49:41   1      A.  I don't believe software, no.
15:49:45   2      Q.  Okay.  Any other programs or --
15:49:51   3      A.  When you say "programs" --
15:49:53   4      Q.  Strike that.  Let's -- I'm just going to
15:49:54   5   go ahead and show you another exhibit here we're
15:50:00   6   going to mark as 36.
15:50:02   7          (EXHIBIT NUMBER 36 WAS MARKED FOR
15:50:02   8              IDENTIFICATION.)
15:50:09   9      Q.  So 36 is another email chain from Mr.
15:50:11  10   Davis' production around December, mid-December
15:50:20  11   2016, December 17th to the 19th, a discussion
15:50:26  12   between Mr. Davis, Mr. Christopherson and looks like
15:50:31  13   yourself.  Let's start at the bottom.
15:50:39  14          So the first email from Mr. Christopherson
15:50:44  15   is there, and then the next one up is Mr. Davis and
15:50:59  16   then the next one up is a short one from you there,
15:51:05  17   Mr. Davis, and then another one appears from you.
15:51:10  18   Do you recognize this email chain?
15:51:12  19      A.  Yes.
15:51:14  20      Q.  Is this a true and accurate copy of the
15:51:17  21   email discussion that was occurring between the
15:51:21  22   three of you on or about December 17th through the
15:51:24  23   19th of 2016?
15:51:25  24      A.  Yes.
15:51:28  25      Q.  Okay.  So starting with the first email at
```

138

```
15:51:31   1   the bottom, Mr. Christopherson is writing
15:51:34   2   to info@Athomesupport.com.  Is that you?
15:51:42   3      A.  Yes.
15:51:43   4      Q.  All right.  Copied Mr. Davis, and subject
15:51:47   5   is Database Info.  "Hi Matt, Attached is today's
15:51:51   6   export of my contract list."
15:51:55   7          Then he says, "The dummy Gmail account you
15:51:58   8   set up is C2advisorgroup@Gmail.com and the password
15:52:04   9   is," and it lists it there.  So can you tell me, he
15:52:10  10   says, "The dummy Gmail account you set up," what is
15:52:13  11   he talking about there?
15:52:14  12      A.  So we created an account to send the
15:52:19  13   contacts from -- the announcement from, so they
15:52:27  14   wouldn't get all of the kickbacks from email
15:52:29  15   addresses that were no longer valid, because we knew
15:52:34  16   there were going to be a lot of contacts that people
15:52:36  17   weren't using anymore, people switched jobs, people
15:52:39  18   canceled accounts, whatever, so we created a third
15:52:43  19   email address that we would send the announcement
15:52:46  20   from, so Carty and Jim's cell phones wouldn't get
15:52:50  21   blown up with thousands of automatic replies from
15:52:54  22   email addresses that were no longer valid.
15:53:01  23      Q.  And it sounds like it was you that set up
15:53:03  24   the dummy Gmail account?
15:53:05  25      A.  I can't remember who set that account up.
```

139

```
15:53:08   1      Q.  Mr. Christopherson says, he says, The
15:53:13   2   dummy Gmail account you set up."
15:53:16   3      A.  Right, but it's --
15:53:17   4      Q.  It's directed to you.
15:53:17   5      A.  Right, if but I set it up, why would he
15:53:18   6   tell me the password?  So I don't....
15:53:23   7      Q.  Well, was it set up a couple of months
15:53:26   8   before, maybe on October 14th?
15:53:29   9      A.  I don't know.  I don't remember.
15:53:33  10      Q.  Was there an effort to try to send out the
15:53:35  11   announcement back in October, the launch
15:53:40  12   announcement back in October before the restaurant
15:53:42  13   franchise conference?
15:53:46  14      A.  I don't believe so, no.
15:53:52  15      Q.  And then he says, "Attached is today's
15:53:55  16   export of my contact list."  Did he actually -- was
15:53:58  17   he actually able to send it to you?
15:54:02  18      A.  If you scroll down, you should be able to
15:54:03  19   see if there's an attachment or not.  Does not
15:54:07  20   appear so.
15:54:12  21      Q.  All right.  So then Mr. Davis writes on
15:54:24  22   the 8th of December, "Jim, Matt was going to call
15:54:29  23   you on some possible second thoughts on merger.  He
15:54:32  24   is researching tomorrow A.M. and will reach out to
15:54:36  25   one or both of us."  So what second thoughts were
```

140

```
15:54:40   1   you having about the merger?
15:54:42   2      A.  So some of my customers were using a
15:54:45   3   program called Outlook Contact Manager.  Jim had
15:54:50   4   already purchased Office 365 for Jim and Carty,
15:54:53   5   that's a free service as part of that, but I heard
15:54:58   6   that they were cutting support for that the end of
15:55:00   7   the year, so I was doing some homework to see if
15:55:04   8   that was going to be an option for them or not to
15:55:06   9   maintain the database moving forward, because
15:55:09  10   Constant Contact was not going to be a way to
15:55:14  11   constantly update the database, that was just a
15:55:16  12   merge at one point.  So Outlook Contact Manager was
15:55:20  13   going to be how they maintained the database moving
15:55:22  14   forward, so that way, if Carty added 500 contacts
15:55:26  15   with people he had met, Jim would be able to get
15:55:28  16   those contacts as well and vice-versa.
15:55:34  17      Q.  Okay.  All right.  Were any of your second
15:55:38  18   thoughts here about whether you should be merging
15:55:43  19   these contacts or where they might have come from?
15:55:46  20      A.  No, why?
15:55:50  21      Q.  I'm sorry?
15:55:51  22      A.  No, that's what I was told to do.  That's
15:55:53  23   what I was hired to do.
15:55:56  24      Q.  Okay.  You didn't have any concern that
15:55:59  25   these contacts didn't belong to either Mr.
```

35 (Pages 137 to 140)

Case 1:16-cv-01935-PAB-MEH   Document 233-2   Filed 10/04/19   USDC Colorado   Page 9 of 10

MATTHEW BOULDEN - 1/16/2019
Cypress Advisors, Inc., et al. v. Kent McCarty Davis, et al.

141

```
15:56:02  1   Christopherson or Mr. Davis?
15:56:05  2       A.  No, I mean Carty was a partner in the
15:56:08  3   company, it was on his iPhone, he owned those
15:56:11  4   contacts.
15:56:12  5       Q.  And so you -- you knew about Mr. Davis'
15:56:19  6   business relationships?
15:56:21  7       A.  At that point, I knew he was a partner in
15:56:22  8   the old company, in Cypress.
15:56:25  9       Q.  Why do you know that?
15:56:31 10       A.  Because Carty's business card had partner
15:56:32 11   on it.
15:56:36 12       Q.  Okay.  And so -- and Mr. Christopherson,
15:56:39 13   was he a partner in C Squared?
15:56:44 14       A.  Yes, it was my understanding he was.
15:56:48 15       Q.  Okay.  So but so -- the only information
15:56:55 16   you have about Cypress Advisors or Mr. Zuccarello is
15:57:04 17   because you saw a business card with partner on it?
15:57:08 18       A.  Well, and Carty told me that he was
15:57:10 19   business partners with Dean for however many years,
15:57:13 20   I don't remember exactly how many years he told me
15:57:16 21   but that they were partners.
15:57:17 22       Q.  Okay.  All right.  So it's Mr. Davis'
15:57:24 23   discussions with you about his business relationship
15:57:26 24   and a business card, that's the scope of your
15:57:30 25   knowledge about Mr. Davis' business relationship
```

142

```
15:57:32  1   with my client?
15:57:35  2       A.  Yes.
15:57:38  3       Q.  Okay.  All right.  So you were talking
15:57:44  4   about Outlook Contact Manager, was that
15:57:48  5   recommendation accepted by Mr. Davis and Mr.
15:57:52  6   Christopherson?
15:57:54  7       A.  Well, once I talked to them and told them
15:57:55  8   they were cutting support for it, it was a moot
15:57:58  9   point.
15:58:01 10       Q.  Okay.  So -- so you recommended -- so it
15:58:04 11   was Outlook Contact Manager that was cutting the
15:58:06 12   support?
15:58:07 13       A.  Yes.  Well, Microsoft was cutting support
15:58:10 14   for that program.
15:58:12 15       Q.  So you recommended that -- okay.
15:58:16 16           So you made the recommendation to them
15:58:19 17   initially to use Outlook Contact Manager in this
15:58:22 18   email, you just said, "Just called and left Jim a
15:58:26 19   message about Outlook Contact Manager, may be a
15:58:29 20   great option for you guys, especially moving
15:58:31 21   forward."  So you did make that recommendation to
15:58:34 22   them?
15:58:34 23       A.  No, that's not a recommendation, that's
15:58:36 24   just mentioning the software, told Jim to look into
15:58:38 25   it.  He called, found out about it and verified what
```

143

```
15:58:41  1   I had already speculated, that they were cutting
15:58:44  2   support for it and that was the end of it.
15:58:48  3       Q.  Okay.  So what -- what -- do you know what
15:58:53  4   C Squared ultimately chose for its contact database,
15:59:00  5   what platform?
15:59:01  6       A.  They just went back to the old ways with
15:59:03  7   PST files and Outlook syncing with their iPhones.
15:59:11  8       Q.  Now, just below that Exhibit 36 still
15:59:16  9   here, just below that, your next sentence here you
15:59:18 10   say, "Carty, your data has been overnighted to
15:59:22 11   Brandon and he has been notified and is on its way
15:59:26 12   to him."  All right.  So -- so what were you doing
15:59:31 13   with somebody named Brandon?
15:59:39 14       A.  I believe that was sending off Carty's
15:59:44 15   information on his computer to his attorney.
15:59:51 16       Q.  Okay.  So Brandon is Mr. Davis' counsel,
15:59:56 17   his attorney?  Is that -- did he have any other
16:00:02 18   litigation going on besides our litigation, do you
16:00:05 19   know?
16:00:06 20       A.  I do not know.
16:00:09 21       Q.  Okay.  And is Brandon, is that Brandon
16:00:12 22   Newman?
16:00:14 23       A.  Possibly, the name sounds familiar but I
16:00:17 24   can't swear that's who that Brandon was.
16:00:22 25       Q.  Okay.
```

144

```
16:00:23  1       A.  I believe it was a law firm in Georgia.
16:00:25  2       Q.  What kind of data were you -- I'm sorry?
16:00:27  3       A.  I believe it was a law firm in Georgia.
16:00:31  4       Q.  Okay.  What kind of data were you
16:00:33  5   sending -- were you overnighting to Brandon?
16:00:36  6       A.  It was a copy of everything on Carty's
16:00:38  7   computer.
16:00:43  8       Q.  And so did you invoice Mr. Davis for
16:00:46  9   that --
16:00:47 10       A.  Yes.
16:00:47 11       Q.  -- service?
16:00:48 12       A.  Yes.
16:00:50 13       Q.  And do you recall how much you invoiced
16:00:53 14   him for?
16:00:55 15       A.  No, I don't.
16:01:00 16       Q.  And did you provide a copy to anybody
16:01:04 17   else?
16:01:05 18       A.  A copy of the invoice?
16:01:09 19       Q.  No, the data that you overnighted to
16:01:11 20   Brandon, did you provide that to Mr. Christopherson?
16:01:14 21       A.  No.
16:01:41 22       Q.  What's your understanding of who owns the
16:01:43 23   Constant Contact database?
16:01:49 24       A.  When you say "who owns it."
16:01:51 25           MR. GROVES:  Objection, foundation.
```

36 (Pages 141 to 144)

```
 1    STATE OF NORTH CAROLINA

 2    COUNTY OF WAKE

 3

 4                REPORTER'S CERTIFICATE

 5         I, Lynn A. Ruggiro, a Notary Public in and for

 6    the State of North Carolina, do hereby certify that there

 7    came before me on Wednesday, January 16, 2019, the person

 8    hereinbefore named, who was by me duly sworn to testify to

 9    the truth and nothing but the truth of his knowledge

10    concerning the matters in controversy in this cause; that

11    the witness was thereupon examined under oath, the

12    examination reduced to typewriting under my direction, and

13    the deposition is a true record of the testimony given by

14    the witness.

15         I further certify that I am neither attorney or

16    counsel for, nor related to or employed by, any attorney or

17    counsel employed by the parties hereto or financially

18    interested in the action.

19         IN WITNESS WHEREOF, I have hereto set my hand and

20    affixed my official notarial seal, this the 21st day of

21    January, 2019.

22

23                                 _____
                                   Lynn A. Ruggiro, Notary Public
24                                 My commission expires: 4/01/2023

25
```