**E<small>XHIBIT</small> D**

```
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 16-cv-01935-MSK-MEH
 3   _____

 4              VIDEOTAPE DEPOSITION OF:
             JAMES CHRISTOPHERSON - May 9, 2018
           (Confidential Sections Pending Pursuant
                    to Protective Order)
 6   _____

 7   CYPRESS ADVISORS, INC., a Florida Corporation, d/b/a
     THE CYPRESS GROUP,
 8
     Plaintiff and Counterclaim-Defendant,
 9
     v.
10
     KENT McCARTY DAVIS, a North Carolina citizen, a/k/a
11   CARTY DAVIS, d/b/a CYPRESS INTERNATIONAL, INC.,

12   Defendant and Counterclaim-Plaintiff,

13   v.

14   DEAN ZUCCARELLO, a Colorado citizen,

15   Counterclaim-Defendant.
     _____
16
              PURSUANT TO NOTICE, the videotape
17   deposition of JAMES CHRSITOPHERSON was taken on
     behalf of the Plaintiff and Counterclaim-Defendant
18   at 1700 17th Street, Suite 3200, Denver, Colorado
     80203, on May 9, 2018 at 9:06 a.m., before Tracy R.
19   Stonehocker, Certified Realtime Reporter, Registered
     Professional Reporter and Notary Public within
20   Colorado.

21

22

23

24

25
```

**H+G**

**Hunter + Geist, Inc.**

303.832.5966       1900 Grant Street, Suite 1025       ▪ www.huntergeist.com
800.525.8490       Denver, CO 80203                    ▪ scheduling@huntergeist.com

                   Your Partner in Making the Record

**JAMES CHRISTOPHERSON - 5/14/2018**
**Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.**

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-01935-MSK-MEH
_____

VIDEOTAPE DEPOSITION OF:
JAMES CHRISTOPHERSON - May 9, 2018
(Confidential Sections Pending Pursuant
to Protective Order)
_____

CYPRESS ADVISORS, INC., a Florida Corporation, d/b/a
THE CYPRESS GROUP,

Plaintiff and Counterclaim-Defendant,

v.

KENT McCARTY DAVIS, a North Carolina citizen, a/k/a
CARTY DAVIS, d/b/a CYPRESS INTERNATIONAL, INC.,
Defendant and Counterclaim-Plaintiff,
v.
DEAN ZUCCARELLO, a Colorado citizen,
Counterclaim-Defendant.
_____

PURSUANT TO NOTICE, the videotape
deposition of JAMES CHRSITOPHERSON was taken on
behalf of the Plaintiff and Counterclaim-Defendant
at 1700 17th Street, Suite 3200, Denver, Colorado
80203, on May 9, 2018 at 9:06 a.m., before Tracy R.
Stonehocker, Certified Realtime Reporter, Registered
Professional Reporter and Notary Public within
Colorado.

---

**2**

A P P E A R A N C E S
For the Plaintiff and Counterclaim-Defendant:
BRADFORD E. DEMPSEY, ESQ.
KELLEN N. WITTKOP, ESQ.
Faegre Baker Daniels L.L.P.
1700 Lincoln Street, Suite 3200
Denver, Colorado  80203

For the Defendant and Counterclaim-Plaintiff:

K.C. GROVES, ESQ.
Ireland Stapleton Pryor & Pascoe, P.C.
717 17th Street, Suite 2800
Denver, Colorado  80202

For the Deponent:

JASON B. ROBINSON, ESQ.
SCOTT ROGERS, ESQ.
Fairfield and Woods P.C.
1801 California Street
Suite 2600
Denver, Colorado  80202

Also Present:

Dean Zuccarello
Houston Woodhouse, Videographer

---

**3**

I N D E X
EXAMINATION OF JAMES CHISTOPHERSON:          PAGE
May 9, 2018
By Mr. Dempsey                              7, 300
By Mr. Groves                                  294
                                           INITIAL
DEPOSITION EXHIBITS:                      REFERENCE

Exhibit 52  Plaintiff Cypress Advisors, Inc.'s    10
            Amended Notice of Deposition of
            James "Jim" Christopherson

Exhibit 53  Christopherson LinkedIn Profile       21

Exhibit 54  Confidential Independent Contractor   54
            Agreement

Exhibit 55  Letter from Davis to Christopherson,  65
            12/18/17, Re:  Notice of Termination of
            Confidential Independent Contractor
            Agreement

Exhibit 56  Complaint - Christopherson v Cypress 148
            Advisors, et al.

Exhibit 57  E-mail from Christopherson to Davis, 174
            Re:  RMA, 5/17/16

Exhibit 58  E-mail from Christopherson to Davis, 176
            Re:  Dates, 5/22/16

Exhibit 59  C Squared Advisors LLC Profit & Loss 193
            YTD Comparison, Aug through Dec 2016

Exhibit 60  Check to Christopherson, 12/19/16    197

Exhibit 61  C Squared Advisors LLC Balance       199
            Sheet Detail as of December 31, 2016

Exhibit 62  E-mail from Davis to Christopherson  205
            Fwd:  Valenti Transaction, 6/23/16

Exhibit 63  E-mail from Davis to Christopherson  208
            FW:  Follow-up, 6/23/16

---

**4**

Exhibit 64  E-mail from Davis to Christopherson  214
            RE:  Contacts, 6/28/16

Exhibit 65  E-mail from Christopherson to Davis  229
            Re:  Contacts, 6/28/16

Exhibit 66  E-mail from Christopherson to Davis  231
            Re:  Contacts, 6/28/16

Exhibit 67  E-mail from Davis to Christopherson  233
            FW:  North Carolina KBBE Filing Accepted,
            6/29/16

Exhibit 68  Consent of Initial Members and       234
            Managers of C Squared Advisors LLC to
            Action without Meeting

Exhibit 69  Operating Agreement of C Squared     234
            Advisors LLC, 7/28/16

Exhibit 70  E-mail from Bryant to Davis,         238
            Fwd:  Wendy's NDA, 6/29/16

Exhibit 71  E-mail from Davis to Christopherson, 241
            Re:  CRG Presentation, 6/29/18

Exhibit 72  E-mail from Davis to Dalrymple       246
            Subject:  RE:  6/30/16

Exhibit 73  E-mail from Davis to Christopherson  248
            FW:  Wendy's Virginia Beach Materials,
            6/30/16

Exhibit 74  E-mail from Davis to Christopherson  251
            FW:  Wendy's Virginia Beach Materials,
            6/30/16

Exhibit 75  E-mail from Davis to Bryant,         253
            Re:  Topics for discussion, 7/12/16

Exhibit 76  E-mail from Davis to Christopherson, 255
            Re:  Cypress Transaction Update, 7/15/16

Exhibit 77  E-mail from Christopherson to Davis, 257
            Re:  Cypress Transaction Update, 7/16/16

Exhibit 78  E-mail from Davis to Christopherson, 261
            FW: PE List, 7/17/16

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**JAMES CHRISTOPHERSON - 5/14/2018**

**Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.**

---

### 5

Exhibit 79  E-mail from Davis to Christopherson    263
            Subject:  CRG Draft Engagement, 7/24/16

Exhibit 80  E-mail from Davis to Miller,        266
            Subject:  Engagement Agreement, 7/26/16
Exhibit 81  E-mail from Christopherson to Davis,   267
            Re:  Engagement Agreement, 7/27/16

Exhibit 82  E-mail from Christopherson to Davis,   269
            Subject:  #2 pitches, 10/19/16
Exhibit 83  E-mail from Davis to Christopherson,   272
            FW:  Testimonials, 10/26/16

Exhibit 84  E-mail from Davis to Christopherson,   274
            RE: 1st Draft of Pennant Foods Pitch,
            11/27/16

Exhibit 85  E-mail from Davis to Christopherson,   278
            Subject:  Brixx, 12/2/16
Exhibit 86  E-mail from Christopherson to Davis,   280
            Subject:  Constant Contact, 1/11/17

Exhibit 87  E-mail from Davis to Henneman,      281
            Subject:  List, 1/24/17
Exhibit 88  E-mail from Christopherson to Davis,   283
            Subject:  Race Coast Prospect List,
            3/8/17
Exhibit 89  Constant Contact Toolkit Customer    285
Exhibit 90  Filename:  Constant Contact        286
            Export.csv, Comments:  THIS FILE
            PRODUCED IN NATIVE FORMAT
Exhibit 91  E-mail from Christopherson to Davis,   287
            Subject:  Constant Contact bounced
            emails, 2/13/17
Exhibit 92  Declaration of Jim Christopherson    289

---

### 6

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

THE VIDEOGRAPHER:  We are on the record.  The time is 9:06 a.m., May 9, 2018.  We are at 1700 Lincoln Street, Suite 3200, Denver, Colorado 80203.  This case is being held in the United States District Court for the District of Colorado captioned Cypress Advisors, Inc. v. Davis Kent McCarty.  Case Number 16-cv-01935-MSK-MEH.  Our deponent today is James Christopherson.

My name is Houston Woodhouse.  I'm the legal videographer and our court reporter is Tracy Stonehocker.  We are both representing Hunter + Geist, Inc., Denver, Colorado.

Attorneys, starting with the plaintiffs, please state your appearances.

MR. DEMPSEY:  Good morning.  Brad Dempsey, Faegre Baker Daniels and Kellen Wittkop on behalf of the plaintiff, Cypress Advisors, Inc. and counterclaim-defendant, Dean Zuccarello.

MR. GROVES:  K.C. Groves with Ireland Stapleton appearing on behalf of the defendant.

MR. ROBINSON:  Jason Robinson and my colleague, Scott Rogers, of Fairfield and Woods on

---

### 7

behalf of third-party witness, Jim Christopherson.

            *     *     *     *

JAMES CHRISTOPHERSON,

having been first duly sworn to state the whole truth, testified as follows:

(Deponent's reply to oath:  I do.)

EXAMINATION

By MR. DEMPSEY:

Q.  Good morning, Mr. Christopherson.

A.  Good morning.

Q.  My name is Brad Dempsey and I'm with Fairfield -- Fairfield.

A.  You're trying to confuse me already.

Q.  No.  I know.  I'm with Faegre Baker Daniels and I represent Cypress Advisors and Mr. Zuccarello.  Would you please state your full name for the record.

A.  Full name, James Gerard Christopherson.

Q.  Okay.  And what's your date of birth?

A.  October 14, 1960.

Q.  And what's your current home address?

A.  12948 North 136 Street, Scottsdale, Arizona.

Q.  And do you have a current business address?

---

### 8

A.  I do not.

Q.  Do you have any other addresses?

A.  I do not.

Q.  Have you ever had your deposition taken before?

A.  No.

Q.  All right.  I want to go through some ground rules that will help us all today.  Help you as a witness, help our court reporter and help the attorneys.  All right?

Tracy is our court reporter here.  She's taking down everything we say, so that means we can't talk over one another.  Do you understand that?

A.  Yes.

Q.  All right.  So that means let me finish my question and I'll let you finish your answer before we move on.  Okay?

A.  Fair enough.

Q.  And then we need to have verbal answers.  I know we have the video going today, but we also have a transcript that doesn't really record head nodding or shaking.  So would you agree to give me verbal answers?

A.  Yes.

Q.  If you don't understand a question, will

---

**Hunter + Geist, Inc.**

scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**JAMES CHRISTOPHERSON - 5/14/2018**
**Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.**

---

### 17

```
09:19:43   1        Q.   And when did you do that?
09:19:45   2        A.   Monday and Tuesday.
09:19:46   3        Q.   And about how many hours did you spend
09:19:58          with them on Monday and Tuesday?
09:19:59   5        A.   10 hours, maybe.
09:20:06   6        Q.   Total over those two days?
09:20:08   7        A.   Yes.
09:20:09   8        Q.   Other than your counsel, did you meet
09:20:16          with anybody else to prepare for your deposition?
09:20:18   10       A.   No.
09:20:19   11       Q.   Did you meet with any of the lawyers at
09:20:22          Ireland Stapleton?
09:20:24   13       A.   I did not.
09:20:25   14       Q.   Did you discuss your deposition with
09:20:29          Mr. Davis?
09:20:29   16       A.   I did not.
09:20:30   17       Q.   Did you discuss your deposition with any
09:20:38          other person that you've known to have worked for
09:20:41          Cypress or worked with Cypress?
09:20:43   20       A.   No.
09:20:43   21       Q.   When you met with your counsel this
09:20:53          week, at Fairfield and Woods, who all was in the room?
09:20:58   23       A.   Jason Robinson mostly.  At times Scott
09:21:02          Rogers as well.
09:21:03   25       Q.   Anybody else?
```

### 18

```
09:21:05   1        A.   No.
09:21:06   2        Q.   So in preparing for this deposition
09:21:20          you've had no contact with Mr. Davis?
09:21:21   4        A.   That's correct.
09:21:22   5        Q.   And you've had no contact with
09:21:25          Mr. Davis' counsel?
09:21:26   7        A.   That's correct.
09:21:27   8        Q.   By e-mail?
09:21:28   9        A.   None.
09:21:29   10       Q.   Has Mr. Davis or his counsel made any
09:21:34          efforts to reach out to you to prepare for this
09:21:36          deposition?
09:21:36   13       A.   No.
09:21:36   14       Q.   All right.  So Mr. Christopherson, where
09:21:50          are you from?  Where did you grow up?
09:21:53   16       A.   I originally grew up in Minnesota.
09:21:58          Moved to Miami, Florida when I was 12 or 13 years old.
09:22:01   18       Q.   And then can you tell me about your
09:22:07          undergraduate degree?
09:22:09   20       A.   Yes, I attended Saint John's University
09:22:12          in Minnesota for undergraduate.
09:22:18   22       Q.   And what degree did you --
09:22:19   23       A.   I have a BA in psychology.
09:22:22   24       Q.   And what year did you graduate?
09:22:26   25       A.   1983.
```

### 19

```
09:22:27   1        Q.   All right.  Then what did you do after
09:22:34          that?
09:22:35   3        A.   I got my MBA from Columbia University.
09:22:39   4        Q.   When was that?
09:22:41   5        A.   I graduated in 1985.
09:22:43   6        Q.   So did you go straight from undergrad --
09:22:46   7        A.   I did.
09:22:47   8        Q.   -- to your --
09:22:48   9        A.   Correct.
09:22:48   10       Q.   -- MBA program?
09:22:50   11       A.   Correct.
09:22:50   12       Q.   All right.  What does the MBA mean?
09:22:56   13       A.   Master of business administration.
09:23:00   14       Q.   And what -- it's a two-year program?
09:23:03   15       A.   It is.
09:23:04   16       Q.   What does it require to earn an MBA?
09:23:12          What type of classes do you have to take?
09:23:15   18       A.   Well, there are core classes that
09:23:18          everyone takes and then there are electives, depending
09:23:20          on what your specialization is.
09:23:22   21       Q.   Okay.  So what are some of the core
09:23:24          classes?
09:23:24   23       A.   Accounting, marketing, economics,
09:23:28          management.
09:23:29   25       Q.   Any legal classes?
```

### 20

```
09:23:32   1        A.   I don't recall if they were core or if
09:23:37          they're elective, but I did have a business law class.
09:23:40   3        Q.   Okay.  You did?
09:23:41   4        A.   Yes.
09:23:41   5        Q.   All right.  What about your electives?
09:23:44          Did you have a particular area that you went into or
09:23:46          specialized in?
09:23:47   8        A.   Yes.
09:23:47   9        Q.   What was that?
09:23:48   10       A.   Finance and accounting.
09:23:49   11       Q.   Columbia is a top MBA program, right?
09:24:00   12       A.   Correct.
09:24:01   13       Q.   And do you have any other
09:24:03          certifications?
09:24:06   15       A.   I do not.
09:24:06   16       Q.   Okay.  Any other licenses or securities
09:24:15          licenses, any other --
09:24:16   18       A.   No.
09:24:16   19       Q.   -- registrations?
09:24:18   20       A.   No.
09:24:18   21       Q.   Have you ever held a real estate license
09:24:24          before?
09:24:24   23       A.   Yes.
09:24:24   24       Q.   You don't currently have that?
09:24:26   25       A.   It is inactive.
```

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

JAMES CHRISTOPHERSON - 5/14/2018
Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.

---

21

09:24:28  1      Q.  What states did you have a real estate
09:24:32  2  license?
09:24:32  3      A.  Arizona only.
09:24:34  4      Q.  So after you got your MBA, what did you
09:24:45  5  do?
09:24:46  6      A.  I was recruited to come work for Burger
09:24:50  7  King Corporation as a financial analyst.
09:24:52  8      Q.  What years did you work there?
09:25:00  9      A.  I started in 1985 and I worked through
09:25:05  10  1993.
09:25:06  11      Q.  And were you a financial analyst that
09:25:13  12  entire time?
09:25:13  13      A.  No.
09:25:13  14      Q.  What roles did you have at Burger King?
09:25:16  15      A.  I probably had six or so different jobs,
09:25:20  16  so I climbed the corporate ladder, financial analyst,
09:25:24  17  senior financial analyst, manager of finance, manager
09:25:28  18  of corporate finance.  I had an analyst, assistant
09:25:35  19  controllership position in one of the regions, and
09:25:38  20  when I left, I was director of business development.
09:25:51  21      (Deposition Exhibit 53 was marked.)
09:26:22  22      Q.  Mr. Christopherson, we've handed you
09:26:24  23  what's been marked as Exhibit 53, which is a printout
09:26:28  24  of what appears to be your LinkedIn profile.  Is this
09:26:33  25  your LinkedIn profile?

---

22

09:26:35  1      A.  Yes.
09:26:35  2      Q.  They never print out very well, but this
09:26:43  3  is our best effort at it.  It cuts off a little bit in
09:26:48  4  some places, but we tried our best.  Going to the
09:26:55  5  second page of this, the -- you have your Burger King
09:27:16  6  reference on here and among the items -- you wrote
09:27:23  7  this -- did you write all this?
09:27:24  8      A.  I did.
09:27:25  9      Q.  And just when was the last time you
09:27:29  10  updated your LinkedIn profile?
09:27:30  11      A.  I don't recall.
09:27:31  12      Q.  Was it in the last six months?
09:27:34  13      A.  I -- I don't recall.  I don't believe
09:27:42  14  so, but I don't recall.
09:27:43  15      Q.  All right.  So in your Burger King
09:27:49  16  description of items that you did or work that you
09:27:52  17  performed, in the middle there, you say you
09:27:56  18  spearheaded highly confidential acquisition projects
09:27:59  19  for top management; is that right?
09:28:00  20      A.  Yes.
09:28:01  21      Q.  When you say "highly confidential
09:28:03  22  acquisition projects," what does it mean to be "highly
09:28:07  23  confidential"?
09:28:07  24      A.  That a limited amount of people had
09:28:15  25  knowledge of it.

---

23

09:28:15  1      Q.  Okay.  What does it mean to be "highly
09:28:22  2  confidential"?
09:28:22  3      MR. ROBINSON:  Objection, foundation.
09:28:26  4      Q.  (BY MR. DEMPSEY) You can answer.
09:28:35  5      MR. ROBINSON:  Also calls for legal
09:28:36  6  conclusion.
09:28:42  7      A.  Confidential, to me, means that it
09:28:48  8  contains information that is not generally available
09:28:53  9  to a wide variety of people.
09:29:00  10      Q.  (BY MR. DEMPSEY) Okay.  Anything else?
09:29:07  11      MR. ROBINSON:  Objection, form.
09:29:08  12      A.  It may contain financial information
09:29:35  13  that -- from a client, for example, that's entrusted
09:29:41  14  to an advisor.  That would -- I would consider that
09:29:45  15  confidential information.
09:29:46  16      Q.  (BY MR. DEMPSEY) So information that a
09:29:47  17  client has provided to you as a financial advisor.
09:29:52  18  What can you do with that information if it's highly
09:29:55  19  confidential?
09:29:55  20      A.  Use it to assist in -- in -- in
09:30:04  21  accomplishing the project.
09:30:05  22      Q.  Okay.  So you can use the -- the
09:30:08  23  financial advisor can use the information, correct?
09:30:10  24      A.  Yes.
09:30:11  25      Q.  But can that information be shared with

---

24

09:30:15  1  other parties?
09:30:17  2      MR. ROBINSON:  Objection, foundation.
09:30:20  3  Improper hypothetical.
09:30:22  4      Q.  (BY MR. DEMPSEY) You can answer.
09:30:23  5      A.  So the answer is yes, it can be.
09:30:27  6      Q.  Okay.  Under what circumstances?
09:30:29  7      A.  Under the circumstances that's usually
09:30:32  8  provided in a confidentiality agreement.  That says
09:30:36  9  anyone who is helping you to do this, your advisors,
09:30:39  10  your CPA, your attorneys, your whatever, they're
09:30:43  11  covered under that confidentiality agreement.
09:30:45  12      Q.  Okay.  Can you take that information and
09:30:47  13  post it on the web?
09:30:49  14      A.  No.
09:30:49  15      Q.  Why not?
09:30:50  16      A.  Because in the confidentiality
09:30:55  17  agreement, you agreed not to.
09:30:56  18      Q.  What's the purpose of having
09:31:01  19  confidentiality?
09:31:02  20      A.  Sort of begs the question to keep
09:31:06  21  something confidential.
09:31:07  22      Q.  So -- so information is not disclosed to
09:31:09  23  other parties that shouldn't have it?
09:31:12  24      A.  Information specific to that client's
09:31:19  25  financials, for example, correct, you shouldn't

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

### JAMES CHRISTOPHERSON - 5/14/2018
### Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.

---

**25**

```
09:31:22   1   disclose that to other parties.
09:31:23   2       Q.  Okay.  So in -- you were entrusted in
09:31:28   3   first part of your career, back in the early or
09:31:31   4   mid-80's with understanding what highly confidential
09:31:37   5   information was; is that right?
09:31:38   6       A.  No.  I dealt with this towards the end
09:31:45   7   of my career.  The line you're referring to was
09:31:48   8   towards the end of my career at Burger King.
09:31:50   9       Q.  Okay.  So what year would that have
09:31:53  10   been, that project or those projects?
09:31:55  11       A.  Early 90's.
09:31:58  12       Q.  Okay.  So beginning in the early 90's,
09:32:03  13   then, you had an awareness of concepts of
09:32:08  14   confidentiality and what's highly confidential?
09:32:14  15       A.  So maybe we need to define what we're
09:32:20  16   talking about here.  What I'm referring to in this
09:32:25  17   line was there was a potential acquisition of a -- of
09:32:34  18   another burger chain that most people within the
09:32:42  19   company didn't know about, so that was confidential,
09:32:44  20   what I'm referring to as confidential was the fact
09:32:47  21   that we were looking at this company, and I was one of
09:32:51  22   the few that was tapped to work on that.
09:32:55  23       Q.  Why were you tapped to work on that?
09:32:58  24       A.  You'd have to ask the people who tapped
09:33:01  25   me.  I was probably suited to do it.
```

**26**

```
09:33:03   1       Q.  Was it because you understood what it
09:33:05   2   meant to maintain confidentiality?
09:33:08   3           MR. ROBINSON:  Objection, foundation.
09:33:09   4       A.  It was because I knew how to analyze and
09:33:13   5   value the company.
09:33:15   6       Q.  (BY MR. DEMPSEY) At the time that you
09:33:16   7   worked on that project, were you aware that it was a
09:33:18   8   confidential project?
09:33:18   9       A.  The project was only known -- the
09:33:25  10   existence of the project was known to a few people, so
09:33:28  11   I would consider that to be confidential.
09:33:29  12       Q.  But were you aware of that it was
09:33:31  13   confidential?
09:33:31  14       A.  Nobody stated to me that it was
09:33:39  15   confidential.  I just took the position or I acted
09:33:48  16   with the understanding that it wasn't my position to
09:33:51  17   talk to anyone about it.
09:33:52  18       Q.  Okay.  Why was that?
09:33:55  19       A.  Because --
09:34:04  20           MR. ROBINSON:  Objection, foundation.
09:34:06  21       A.  Because, again, the CFO had brought
09:34:10  22   together a very small group of people to pursue
09:34:14  23   looking at this project.
09:34:16  24       Q.  (BY MR. DEMPSEY) Are you disputing in
09:34:20  25   any way that you were aware of concepts of
```

**27**

```
09:34:23   1   confidentiality in the early 90's?
09:34:25   2       A.  I -- look, I'm not sure where you're
09:34:29   3   going with that.  I understand -- I'm familiar with
09:34:33   4   the word "confidential."  I'm trying to help you, but
09:34:39   5   I don't know where you're going.
09:34:40   6       Q.  Okay.  That's fair.  I can maybe help
09:34:43   7   answer the -- help you with the questions a little bit
09:34:45   8   more.  I just want to understand what -- what you knew
09:34:48   9   about concepts of confidentiality in the early 90's.
09:34:51  10   You were tapped by Burger King to work on this project
09:34:54  11   because it was a confidential project, apparently --
09:34:58  12       A.  Not --
09:34:58  13       Q.  I'm sorry?
09:34:59  14       A.  Not because it was a confidential
09:35:00  15   project.  I was tapped on it because I had the skills
09:35:03  16   to perform the valuation and to get in and assess the
09:35:08  17   company.
09:35:08  18       Q.  Okay.
09:35:10  19       A.  So whether or not --
09:35:12  20       Q.  But did you know -- you knew it was
09:35:16  21   confidential at the time, you could not share that
09:35:18  22   project with other parties?
09:35:20  23       A.  I did not share the project with other
09:35:22  24   parties.  It wasn't my position to.
09:35:25  25       Q.  And you said it wasn't your position to.
```

**28**

```
09:35:27   1   What do you mean by that?
09:35:27   2       A.  If the CFO spearheading it wanted to
09:35:34   3   bring more people, more team members into it, that was
09:35:37   4   his position to do, it wasn't mine to do.
09:35:39   5       Q.  Okay.
09:35:39   6       A.  I was brought in for a specific role and
09:35:42   7   that's what I did.
09:35:42   8       Q.  All right.  You've put this on your
09:35:47   9   LinkedIn profile.  You specifically reference this as
09:35:50  10   a highly confidential acquisition.  Why did you add
09:35:54  11   that language into your LinkedIn profile?
09:35:55  12       A.  Because it showed that I was selected
09:35:57  13   for a project because of the skill set that I had.
09:36:00  14       Q.  And because you could maintain
09:36:03  15   confidentiality?
09:36:03  16       A.  No.  That's not the reason.
09:36:04  17       Q.  But, again, are you disputing in any way
09:36:09  18   that you were aware of the principal of
09:36:12  19   confidentiality in the early 90's?
09:36:15  20       A.  I don't dispute that.
09:36:16  21       Q.  Okay.  And then after you -- what -- all
09:36:33  22   right.  Why did you leave Burger King?
09:36:35  23       A.  I was ready to do something else.  I
09:36:39  24   wanted to run my own business.
09:36:40  25       Q.  And what did you do?
```

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**JAMES CHRISTOPHERSON - 5/14/2018**
**Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.**

---

### 29

```
09:36:49  1      A.  I owned and operated car washes.
09:36:58  2      Q.  Was that in Arizona?
09:36:59  3      A.  It was.
09:36:59  4      Q.  Okay.  And what was your role with or
09:37:11  5  what was the name of the company?
09:37:12  6      A.  Desert Mountain Holdings, Inc.
09:37:14  7      Q.  How many locations did it have?
09:37:17  8      A.  We had two.
09:37:18  9      Q.  How many employees?
09:37:19 10      A.  If fluctuated by season.
09:37:27 11      Q.  So tell me about that.
09:37:29 12      A.  Summer is very slow in Arizona, you have
09:37:32 13  fewer employees.  Winter is very busy and you have a
09:37:34 14  lot more employees.
09:37:35 15      Q.  How did it fluctuate in terms of
09:37:38 16  numbers?
09:37:38 17      A.  I could have 100 in winter and 60 in the
09:37:48 18  summer.
09:37:48 19      Q.  Okay.  Did you own Desert Mountain
09:37:54 20  Holdings?
09:37:54 21      A.  I did.
09:37:54 22      Q.  Were you the sole owner?
09:37:56 23      A.  Yes.
09:37:57 24      Q.  And what was your title?
09:37:58 25      A.  President.
```

### 30

```
09:38:00  1      Q.  And what kind of a company was it, was
09:38:05  2  it a corporation, LLC?
09:38:08  3      A.  It was -- I think we had it set up as
09:38:12  4  a -- I think it was a C corporation.  Desert Mountain
09:38:22  5  Holdings, Inc.  I believe it was a C.
09:38:23  6      Q.  And as the owner, did you set your title
09:38:34  7  as president?
09:38:34  8      A.  Yes.
09:38:35  9      Q.  What happened to Desert Mountain
09:38:40 10  Holdings?
09:38:40 11      A.  I sold it.
09:38:41 12      Q.  About when?
09:38:43 13      A.  1998.
09:38:45 14      Q.  And while you were running Desert
09:38:57 15  Mountain Holdings, were you also working for any other
09:38:59 16  companies?
09:38:59 17      A.  I began working for Cypress in 1995
09:39:04 18  while I had Desert Mountain Holdings.
09:39:06 19      Q.  And what was your position with Cypress
09:39:10 20  at that time in 1995 to 1998?
09:39:12 21      A.  I did the grunt work.  I was the -- I
09:39:21 22  did the analytical work, I did the production.  I did
09:39:24 23  the models.  I did the offering books.
09:39:33 24      Q.  Okay.  So you were doing that at the
09:39:35 25  same time you were running the car washes?
```

### 31

```
09:39:42  1      A.  Correct.
09:39:43  2      Q.  What was your title with the Cypress
09:39:47  3  Advisors during that period?
09:39:49  4      A.  It was never clear.  At one point,
09:39:54  5  Mr. Zuccarello said I should be a managing director or
09:39:56  6  something like that, but at the same time or at
09:40:00  7  another point, I was held out as a partner.  I was
09:40:03  8  referred to as a partner.
09:40:06  9      Q.  During that period of 1995 to 1998?
09:40:09 10      A.  Yes.
09:40:09 11      Q.  And you said you were referred to as a
09:40:13 12  partner during that period.  Who referred to you as a
09:40:18 13  partner?
09:40:18 14      A.  Mr. Zuccarello.
09:40:20 15      Q.  Anybody else?
09:40:25 16      A.  There was no one else in the company at
09:40:29 17  the time.
09:40:29 18      Q.  Okay.  Did you refer to yourself as a
09:40:32 19  partner of The Cypress Group at that time?
09:40:36 20      A.  I didn't call myself anything.
09:40:37 21      Q.  And what did you understand that title
09:40:41 22  to mean?
09:40:42 23      A.  The title of "partner"?
09:40:44 24      Q.  Right.
09:40:44 25      A.  You know, it -- I was held out to be a
```

### 32

```
09:40:56  1  partner, I believe because it's -- it's for reasons of
09:41:03  2  puffery, for hype, for promotion.  It -- companies in
09:41:08  3  this industry seem to do that where they call someone
09:41:12  4  a partner or a principal or whatever to lend
09:41:15  5  credibility to the company, to make it look bigger
09:41:18  6  than it was.  Was I a partner in Cypress?  Did I share
09:41:21  7  in the revenues?  Did I share in the risks?  Did I
09:41:26  8  have equity at stake?  Did I control the company?  Did
09:41:29  9  I make the managerial decisions?  No.  So was I a
09:41:33 10  partner?  No.  Was I called a partner?  Yes.
09:41:35 11      Q.  In your LinkedIn profile, you use the
09:41:41 12  title "managing director"?
09:41:43 13      A.  Correct.
09:41:43 14      Q.  That was one of the titles you used
09:41:45 15  during that period?
09:41:46 16      A.  That was the first title that I used or
09:41:48 17  that was the title that I used.  I believe that's what
09:41:50 18  he had printed on my cards.
09:41:51 19      Q.  And who decided the titles?
09:41:56 20      A.  Mr. Zuccarello.
09:41:57 21      Q.  Was the work that you did for The
09:42:09 22  Cypress Group during that first period, 1998 to 2000,
09:42:11 23  would you say that's like the Burger King work, was
09:42:14 24  that confidential work?
09:42:14 25      A.  So I would consider the information that
```

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

JAMES CHRISTOPHERSON - 5/14/2018
Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.

---

### 33

```
09:42:20   1   we received from clients, their financial information,
09:42:23   2   I would consider that to be confidential to a project.
09:42:28   3   But at no time was the -- the models that I worked on
09:42:33   4   or the offering books or any of the forms we used, at
09:42:39   5   no time was that ever identified or communicated to me
09:42:43   6   as being either, you know, confidential or limited or
09:42:50   7   so-called trade secret.
09:42:53   8       Q.   Then with -- after you left The Cypress
09:43:08   9   Group in, what, 1998; is that right?
09:43:09   10      A.   Well, put it this way, there was --
09:43:16   11  there was very little work in '98 for me and I got no
09:43:19   12  work in '99, so while I had available time, I had no
09:43:24   13  work, so I didn't work for them in '99.
09:43:27   14      Q.   So what did you do between -- so you
09:43:31   15  were -- you sold Desert Mountain in '98 and you didn't
09:43:36   16  have any work from Cypress in '98, '99.
09:43:39   17      A.   I had a little work from Cypress in '98.
09:43:41   18      Q.   Okay.  So then what did you do there
09:43:44   19  after that?
09:43:44   20      A.   So in -- in 2000, I became CFO for a
09:43:54   21  startup triathlon sporting goods company in San Diego.
09:44:06   22      Q.   What was the name of that group?
09:44:08   23      A.   B and L Bike and Sports.
09:44:11   24      Q.   Okay.  Before we get to that, there's a
09:44:16   25  gap between, say, 1998 and 2000.  What were you doing
```

### 34

```
09:44:21   1   during that period?
09:44:22   2       A.   I was training for and racing
09:44:24   3   triathlons.
09:44:26   4       Q.   Oh, wow.  You're a triathlete?
09:44:28   5       A.   I was.
09:44:28   6       Q.   That's impressive.
09:44:30   7       A.   Thank you.
09:44:31   8       Q.   And did you compete in a triathlon
09:44:36   9   during that period?
09:44:36   10      A.   I competed in a lot of triathlons during
09:44:40   11  that period.
09:44:41   12      Q.   And then the startup, B and L Bike and
09:44:46   13  Sports -- B and L Bike Sports?
09:44:48   14      A.   B and L Bike and Sports.  Something like
09:44:51   15  that.
09:44:51   16      Q.   Okay.  And that's not on your LinkedIn
09:44:53   17  profile?
09:44:54   18      A.   Correct.
09:44:54   19      Q.   Is there a reason why?
09:44:55   20      A.   It -- since I was active in that for
09:45:01   21  less than a year, I didn't think it warranted a
09:45:03   22  separate entry.
09:45:05   23      Q.   And you were a CFO?
09:45:10   24      A.   Yes.
09:45:11   25      Q.   That's chief financial officer?
```

### 35

```
09:45:14   1       A.   That's correct.
09:45:14   2       Q.   And why were you there less than a year?
09:45:21   3       A.   I wasn't comfortable with the direction
09:45:25   4   that the owner was taking it.  And I decided it wasn't
09:45:31   5   the right place for me to be.
09:45:33   6       Q.   Did you have a dispute with the owner?
09:45:35   7       A.   Nope.
09:45:36   8       Q.   Were you terminated?
09:45:37   9       A.   Nope.
09:45:37   10      Q.   Did you leave voluntarily?
09:45:40   11      A.   Yep.
09:45:41   12      Q.   Then after -- you were there 2000 --
09:45:49   13  during the year 2000.  Where did you go after that?
09:45:52   14      A.   Then I returned to Scottsdale in late
09:45:55   15  2000, started working with Cypress again.
09:46:05   16      Q.   We'll come back to that.  You were there
09:46:08   17  at Cypress between 2000 and/or 2000 -- 2000 and 2001?
09:46:14   18      A.   Correct.
09:46:15   19      Q.   And then what -- what did you do after
09:46:17   20  that?
09:46:17   21      A.   Then I owned and operated the restaurant
09:46:22   22  company that we referred to earlier.
09:46:26   23      Q.   It was Aztonka?
09:46:28   24      A.   Correct.
09:46:29   25      Q.   Did you move to Minnesota for that?
```

### 36

```
09:46:35   1       A.   Yes.
09:46:36   2       Q.   And how long did that run?
09:46:39   3       A.   From 2002 until early 2005.
09:46:51   4       Q.   And then how did your work there come to
09:47:00   5   an end?
09:47:01   6       A.   With the settlement with the company.
09:47:04   7       Q.   You had sued the company?
09:47:10   8       A.   Yes.
09:47:11   9       Q.   Okay.  What claims did you bring?
09:47:15   10      A.   There were -- I don't have a list of
09:47:26   11  them now, but there were a list of claims that -- that
09:47:32   12  had to do with violations of certain franchise laws.
09:47:44   13      Q.   So I mean, if you were to tell the jury,
09:47:49   14  you know, what your lawsuit was about in layman's
09:47:52   15  terms, what was it about?
09:47:53   16      A.   It was about a franchiser failing to do
09:48:04   17  things and failing to live up to commitments and
09:48:10   18  promises that they made.
09:48:11   19      Q.   How long did the litigation last?
09:48:20   20      A.   Two, three months.
09:48:28   21      Q.   Were there counterclaims from the
09:48:36   22  franchiser?
09:48:36   23      A.   None.
09:48:37   24      Q.   What are the terms of the settlement?
09:48:44   25      MR. ROBINSON:  Objection to the extent
```

Hunter + Geist, Inc.

scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**JAMES CHRISTOPHERSON - 5/14/2018**
**Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.**

---

### 37

```
09:48:45   1   it calls for confidentiality.
09:48:47   2        Q.  (BY MR. DEMPSEY) Is it confidential?
09:48:48   3        A.  It is.  I'm precluded from saying.
09:48:50   4        Q.  After your departure from the -- so as a
09:49:00   5   result of this, did your franchise terminate?
09:49:05   6        A.  Yes, it did.
09:49:09   7        Q.  And then what did you do after your
09:49:18   8   franchise was terminated?
09:49:19   9        A.  So we moved back to Arizona.  And I
09:49:23   10  became a self-employed real estate agent.
09:49:26   11       Q.  Okay.  And that was between, what, 2005
09:49:35   12  and 2010?
09:49:36   13       A.  2006 to around 2012.  I still had my
09:49:41   14  license, I believe.
09:49:41   15       Q.  So as a real estate broker, were you
09:49:49   16  doing commercial or residential?
09:49:50   17       A.  Residential.
09:49:51   18       Q.  And as a real estate broker, were you
09:49:59   19  familiar with concepts of confidentiality?
09:50:04   20       MR. ROBINSON:  Objection, foundation.
09:50:06   21       A.  So first of all, I was not a real estate
09:50:09   22  broker.
09:50:09   23       Q.  (BY MR. DEMPSEY) Okay.  What were you?
09:50:10   24       A.  Agent.  An agent acts as an agent for
09:50:15   25  the broker, as you know.
```

### 38

```
09:50:16   1        Q.  Thank you for clarifying.  So as a real
09:50:19   2   estate agent of a broker, were you aware of concepts
09:50:24   3   of confidentiality with respect to your clients?
09:50:28   4        MR. ROBINSON:  Objection, form.  Are we
09:50:33   5   talking about specific engagements?
09:50:35   6        THE DEPONENT:  Right.
09:50:36   7        A.  Because some require
09:50:38   8   confidential agreements.  And so I mean, I'm not sure
09:50:39   9   what you're getting at here, but you're talking --
09:50:42   10  asking about things in the abstract.
09:50:44   11       MR. DEMPSEY:  Right.  I understand
09:50:46   12  you're confused, Counsel, but I'm asking the questions
09:50:48   13  of the witness.
09:50:49   14       MR. ROBINSON:  Okay.
09:50:50   15       MR. DEMPSEY:  So I registered your
09:50:51   16  objection, and I appreciate not having any coaching
09:50:55   17  objections.
09:50:56   18       MR. ROBINSON:  Okay.  I'm just trying to
09:50:58   19  clarify your question.
09:50:59   20       MR. DEMPSEY:  I'll ask if I want to
09:51:01   21  clarify the objection.
09:51:02   22       MR. ROBINSON:  Okay.
09:51:03   23       Q.  (BY MR. DEMPSEY) But if you can answer
09:51:05   24  the question.
09:51:06   25       A.  Please ask again.
```

### 39

```
09:51:07   1        Q.  Yeah.  When you were acting as a real
09:51:10   2   estate agent for a broker, were you aware of concepts
09:51:14   3   of confidentiality that you had to employ with your
09:51:17   4   clients?
09:51:18   5        MR. ROBINSON:  Objection, form.
09:51:20   6        A.  I -- I don't recall.  I'm not aware that
09:51:27   7   there were any specific requirements, discussions of
09:51:34   8   confidentiality in that regard.
09:51:37   9        Q.  (BY MR. DEMPSEY) When clients would hire
09:51:38   10  you, did you have any agreements of confidentiality?
09:51:43   11       A.  No.
09:51:44   12       Q.  So how would you do business, then, if
09:51:47   13  you -- were you able to share information -- client's
09:51:51   14  information with -- about what they were looking for,
09:51:54   15  what their asking price was, what their sales price
09:51:56   16  would be?
09:51:57   17       A.  That wouldn't be serving the client very
09:52:01   18  well, so, no, I wouldn't do that.
09:52:04   19       Q.  Would you keep it confidential?
09:52:05   20       A.  As opposed to letting the other side --
09:52:10   21  the buyer or the seller, for example, know.  Of
09:52:14   22  course.
09:52:14   23       Q.  And you worked -- you had clients during
09:52:18   24  that period you were a real estate agent?
09:52:21   25       A.  Correct.
```

### 40

```
09:52:21   1        Q.  And did they expect you to maintain
09:52:26   2   confidentiality of their information?
09:52:27   3        MR. ROBINSON:  Objection, foundation.
09:52:28   4        A.  I'm not sure how I speak to what their
09:52:37   5   expectations were.
09:52:38   6        Q.  (BY MR. DEMPSEY)  Did you have
09:52:39   7   engagement agreements with these clients?
09:52:41   8        A.  There was an agreement with the
09:52:43   9   brokerage.
09:52:43   10       Q.  Okay.  Did those brokerage agreements
09:52:46   11  with clients contain obligations to maintain
09:52:50   12  confidentiality?
09:52:50   13       A.  I don't recall.
09:52:51   14       Q.  Okay.  But even if they didn't, would
09:52:55   15  you, as the real estate agent working for a client,
09:52:59   16  believe that you have an expectation to maintain the
09:53:02   17  confidentiality of your client's information?
09:53:04   18       A.  I would maintain their confidential
09:53:09   19  information.
09:53:10   20       Q.  After you were selling real estate, did
09:53:16   21  you get another job?  Let me strike that.
09:53:20   22  You went back and worked at Cypress
09:53:23   23  Group, right?
09:53:25   24       A.  That's correct.
09:53:25   25       Q.  And that was 2010 to 2014?
```

10 (Pages 37 to 40)

**JAMES CHRISTOPHERSON - 5/14/2018**
**Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.**

---

**41**

```
09:53:28   1        A.  Correct.
09:53:29   2        Q.  All right.  Then after that, did you
09:53:35   3    work for another company?
09:53:36   4        A.  I did.
09:53:37   5        Q.  What was that company?
09:53:39   6        A.  JAE Restaurant Group.
09:53:41   7        Q.  What is JAE Restaurant Group?
09:53:44   8        A.  It is a franchisee of Wendy's
09:53:49   9    restaurants.
09:53:49  10        Q.  How did you get that job?
09:53:52  11        A.  I was recruited by the CEO of the
09:53:58  12    company.
09:53:58  13        Q.  This is your -- you were recruited at
09:54:06  14    the time you were working with Cypress?
09:54:08  15        A.  Correct.
09:54:09  16        Q.  And was Cypress aware of that?
09:54:13  17        MR. ROBINSON:  Objection, foundation.
09:54:15  18        A.  Not from me they weren't.
09:54:21  19        Q.  (BY MR. DEMPSEY)  Do you believe you had
09:54:22  20    an obligation to inform Cypress or Mr. Zuccarello
09:54:26  21    about --
09:54:28  22        A.  That I had been approached --
09:54:29  23        Q.  Right.
09:54:29  24        A.  -- for a job?  No, absolutely not.
09:54:32  25        Q.  Is that because you were an independent
```

**42**

```
09:54:35   1    contractor at the time?
09:54:36   2        A.  When you're an employee or an
09:54:38   3    independent contractor, whatever, people get recruited
09:54:41   4    for jobs.
09:54:42   5        Q.  Okay.  And how many locations did JAE
09:54:45   6    have at the time you were recruited?
09:54:47   7        A.  Around 75 or so.
09:54:51   8        Q.  Did it have employees?
09:54:53   9        A.  Of course.
09:54:54  10        Q.  How many?
09:54:55  11        A.  At the time, it probably had 1,000,
09:55:11  12    1,500.
09:55:11  13        Q.  Okay.  And then were you -- you were
09:55:16  14    recruited to be the CFO?
09:55:17  15        A.  Correct.
09:55:18  16        Q.  Chief financial officer?
09:55:19  17        A.  Correct.
09:55:19  18        Q.  And in that, did you also expect to play
09:55:22  19    a human resources role?
09:55:23  20        A.  No.
09:55:24  21        Q.  Did you separate from JAE?
09:55:27  22        A.  I did.
09:55:28  23        Q.  When was that?
09:55:30  24        A.  It was in October of 2016.
09:55:35  25        Q.  Okay.  And why did you separate from
```

**43**

```
09:55:39   1    them?
09:55:40   2        A.  Frankly, I was quite burned out.  My
09:55:43   3    first year at JAE, I was working seven days a week.  I
09:55:48   4    would try to take some time off Sunday afternoons and
09:55:53   5    sometimes I could and sometimes I didn't.  My second
09:55:55   6    year, I dialed it back to about six days a week.  I
09:55:58   7    would start at -- with a cup of coffee on my computer
09:56:02   8    at home at 5:15 in the morning, get my first batch of
09:56:06   9    e-mails done.  I would get 200-plus e-mails a day.
09:56:12  10    This went on for two years.  We missed our lifestyle
09:56:18  11    in Arizona.  I missed working from home and not being
09:56:21  12    in an office every day.  And quite frankly, we -- we
09:56:28  13    did not like living in South Florida.
09:56:31  14        Q.  So your job required you to be in South
09:56:34  15    Florida?
09:56:35  16        A.  Correct.
09:56:35  17        Q.  And then so how did the separation
09:56:40  18    occur?  Did you quit?
09:56:41  19        A.  I did.  I went to them.  I gave my
09:56:44  20    notice.  We talked about it.  I gave them three
09:56:46  21    months' notice.  I helped recruit the new CFO.  I
09:56:50  22    spent a whole month with him training him, showing him
09:56:53  23    the ropes.
09:56:54  24        Q.  Were you given any sort of severance
09:56:58  25    package?
```

**44**

```
09:56:58   1        A.  I had a long-term incentive package that
09:57:03   2    they paid me out.
09:57:04   3        Q.  Did it include a bonus, year-end bonus?
09:57:09   4        A.  It did.
09:57:10   5        Q.  That was a year end of 2016?
09:57:14   6        A.  Correct.
09:57:14   7        Q.  And were you paid that bonus?
09:57:16   8        A.  Yes, I was.
09:57:17   9        Q.  Did you have any disputes with JAE after
09:57:25  10    you left?
09:57:25  11        A.  I did not.  We're still friends.  I
09:57:28  12    worked for them.  I did some consulting for them.  I
09:57:31  13    helped them through a few projects after I left.
09:57:34  14        Q.  Okay.  And then after you left JAE, what
09:57:39  15    did you do?
09:57:40  16        A.  I began to work with C Squared.
09:57:46  17        Q.  So you began to work with C Squared.
09:57:59  18    Was C Squared already formed?
09:58:03  19        A.  Yes.
09:58:03  20        Q.  Okay.  When did you begin to work for C
09:58:10  21    Squared?
09:58:10  22        A.  I would consider my -- myself to be
09:58:16  23    fully on board with them the beginning of November
09:58:20  24    2016.
09:58:20  25        Q.  You said you would consider yourself
```

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

JAMES CHRISTOPHERSON - 5/14/2018
Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.

---

85

```
10:52:16   1   exchange between Zuccarello and me.
10:52:19   2      Q.  Is there anything else from that iMac
10:52:22   3   that --
10:52:22   4      A.  No.
10:52:23   5      Q.  -- you intend to produce?
10:52:24   6      A.  No.  There was nothing else responsive.
10:52:27   7         MR. DEMPSEY:  All right.  Let's take a
10:52:29   8   break.
10:52:29   9         THE VIDEOGRAPHER:  Going off the record.
10:52:30  10   The time is 10:52.
10:52:33  11         (Recess taken, 10:52 a.m. to 11:06 a.m.)
11:06:44  12         THE VIDEOGRAPHER:  We are back on the
11:06:48  13   record.  The time is 11:06.
11:06:51  14      Q.  (BY MR. DEMPSEY) Mr. Christopherson, I
11:06:54  15   want to go back to your time with Cypress, and talk
11:07:01  16   about the different periods that you were working with
11:07:04  17   Cypress.  Okay?
11:07:05  18      A.  Okay.
11:07:06  19      Q.  You had a business arrangement with
11:07:13  20   Cypress in the 1990's, correct?
11:07:15  21      A.  I didn't have an official business
11:07:24  22   arrangement with Cypress.  I just started working --
11:07:27  23      Q.  Okay.
11:07:27  24      A.  -- for Mr. Zuccarello.
11:07:28  25      Q.  That was between 1995 to '98, I think we
```

---

86

```
11:07:32   1   said?
11:07:32   2      A.  Correct.  Yeah.
11:07:32   3      Q.  Okay.  Who initiated that relationship?
11:07:35   4      A.  Mr. Zuccarello did.
11:07:36   5      Q.  Okay.  And how did it develop?
11:07:37   6      A.  Well, I was working my car wash
11:07:43   7   business.  He said, hey, I've -- I've started this
11:07:47   8   consulting business and I could use your help in -- I
11:07:52   9   got this deal I want you to do a valuation for me and
11:07:56  10   help me get the marketing materials out and we'll go
11:08:00  11   from there.  And I said, I'm sorry, I can't do it.
11:08:03  12   I'm working really hard on my car wash business, I
11:08:06  13   can't do it.  He called me back a few weeks later or a
11:08:09  14   week later, whatever it was, and said, listen, I
11:08:11  15   really need you to help me with this.  Can you do
11:08:14  16   this?  I said no again.  He called me back again,
11:08:17  17   said, look, come on, help me out with this one.  I did
11:08:20  18   it and that deal got closed and soon thereafter, he
11:08:26  19   was calling me with more transactions he wanted me to
11:08:28  20   work on.
11:08:29  21      Q.  Okay.  That first deal, did you get
11:08:32  22   paid?
11:08:33  23      A.  I did.
11:08:33  24      Q.  And during this first -- I'll just --
11:08:37  25   can we call that first period from '95 to '98 your
```

---

87

```
11:08:40   1   first engagement with Cypress?
11:08:42   2      A.  Any reason not to?  I mean --
11:08:47   3      Q.  Okay.
11:08:47   4      A.  The first period with Cypress.
11:08:49   5      Q.  First period with Cypress?
11:08:50   6      A.  Sure.
11:08:50   7      Q.  Just to make it easy to refer to it.
11:08:55   8   And so were you able to work in Arizona?
11:08:58   9      A.  Yes.
11:08:59  10      Q.  During that period?
11:09:00  11      A.  Yes.
11:09:00  12      Q.  And what was the arrangement that you
11:09:03  13   had with Cypress during that first period?
11:09:06  14      A.  There was no official arrangement.  I
11:09:10  15   would work on a deal.  When it closed, Mr. Zuccarello
11:09:13  16   would send me a check for some amount that he
11:09:17  17   determined and then we go to the next one.
11:09:21  18      Q.  So you didn't have any set expectation
11:09:27  19   for what the deal -- any particular deal with result
11:09:31  20   for compensation for you before the deal would close?
11:09:34  21      A.  I didn't really know what it was -- what
11:09:37  22   he would pay me.
11:09:38  23      Q.  Okay.  And then so if he didn't pay you
11:09:42  24   enough for a particular deal during that first period,
11:09:45  25   did you have to continue working for him?
```

---

88

```
11:09:47   1      A.  I did not have to.
11:09:49   2      Q.  And so on that first deal he paid you,
11:09:55   3   did you continue to do further deals with
11:09:58   4   Mr. Zuccarello or Cypress Advisors?
11:10:00   5      A.  Yes.
11:10:01   6      Q.  So is it fair to say that you felt like
11:10:05   7   you were being compensated adequately for those deals?
11:10:08   8      A.  At the time I was, yes.
11:10:09   9      Q.  During that first period, between '95
11:10:12  10   and '98, were you aware of the type of entity that
11:10:16  11   Cypress was?
11:10:16  12      A.  I was not privy to that.  I did not
11:10:19  13   know.
11:10:19  14      Q.  Did you know who owned Cypress?
11:10:21  15      A.  I didn't -- I wasn't privy to that.  I
11:10:25  16   don't know.  I assumed that Mr. Zuccarello did.  But I
11:10:29  17   hadn't seen any ownership documents or anything like
11:10:31  18   that.
11:10:31  19      Q.  Why did you assume that he owned it?
11:10:34  20      A.  Because there were two guys involved.
11:10:36  21   It was Mr. Zuccarello and me.  And I didn't own it.
11:10:40  22      Q.  During that period, the first period
11:10:45  23   were you an employee of Cypress?
11:10:47  24      A.  I acted under the understanding that I
11:10:54  25   was an independent contractor.
```

---

JAMES CHRISTOPHERSON - 5/14/2018
Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.

89

11:10:55  1   Q.  Did you become a shareholder of Cypress
11:11:01  2   during that first period?
11:11:02  3   A.  I did not.
11:11:02  4   Q.  Did you become an owner of Cypress
11:11:04  5   during that first period?
11:11:05  6   A.  I did not.
11:11:06  7   Q.  And after that first -- well, we talked
11:11:12  8   about that first deal and then there were other deals.
11:11:15  9   Did you get paid on the other deals?
11:11:16  10   A.  I did.
11:11:17  11   Q.  And who paid you?
11:11:19  12   A.  Mr. Zuccarello.
11:11:20  13   Q.  Was it Cypress that paid you or
11:11:23  14   Mr. Zuccarello?
11:11:24  15   A.  I can't -- I don't remember.
11:11:25  16   Q.  Okay.  But who signed the checks?
11:11:28  17   A.  Mr. Zuccarello.
11:11:28  18   Q.  Did anybody else sign the checks?
11:11:34  19   A.  No.
11:11:35  20   Q.  During your first period, who set or
11:11:46  21   decided your compensation during your first period?
11:11:48  22   A.  Mr. Zuccarello.
11:11:49  23   Q.  Did Cypress provide you with tax forms
11:11:54  24   for reporting your compensation during that first
11:11:58  25   period?

90

11:11:58  1   A.  Yes.
11:11:58  2   Q.  What kind of tax forms did you receive
11:12:01  3   for compensation during the first period?
11:12:02  4   A.  1099s.
11:12:06  5   Q.  During that first period, who did you
11:12:08  6   report to?
11:12:09  7   A.  There were two people in the company.
11:12:12  8   There was no formal reporting relationship, but
11:12:18  9   Mr. Zuccarello provided the guidance in terms of what
11:12:21  10   project we'd work on and what he wanted me to do and
11:12:24  11   such, so you could say there was a -- de facto or
11:12:29  12   informal reporting relationship.
11:12:30  13   Q.  With Mr. Zuccarello?
11:12:31  14   A.  Yes.
11:12:32  15   Q.  Do you know, to your knowledge, during
11:12:38  16   that first period who managed the Cypress books?
11:12:41  17   A.  Mr. Zuccarello did.
11:12:42  18   Q.  Do you know -- to your knowledge, do you
11:12:49  19   know who controlled the execution of Cypress'
11:12:52  20   engagement agreements?
11:12:52  21   A.  Mr. Zuccarello did.
11:12:54  22   Q.  During that first period, do you know
11:12:57  23   who had the final decision-making authority at
11:12:59  24   Cypress?
11:13:00  25   A.  Mr. Zuccarello did.

91

11:13:01  1   Q.  Again, we talked briefly about it
11:13:17  2   before, but when you separated from Cypress in 1998,
11:13:20  3   how did that take place?  Did you just stop doing
11:13:23  4   deals together?
11:13:24  5   A.  There -- what I recall is the work just
11:13:26  6   sort of dried up.  There was no more work to do.  I
11:13:29  7   wasn't getting any more work.
11:13:32  8   Q.  Were you expecting any sort of year-end
11:13:35  9   bonus from Cypress?
11:13:35  10   A.  No.  The compensation worked differently
11:13:39  11   then from what it did later on -- in the later years.
11:13:43  12   Q.  And then you connected with Cypress and
11:13:47  13   Mr. Zuccarello again in, what, 2000?
11:13:50  14   A.  Late 2000.
11:13:51  15   Q.  Okay.  And what arrangement did you have
11:13:55  16   with Cypress in 2000?
11:13:58  17   A.  Pretty much the same arrangement as
11:14:00  18   previously.  No formal arrangement.
11:14:02  19   Q.  Can we call that your second period --
11:14:04  20   A.  Yes.
11:14:05  21   Q.  -- at Cypress?
11:14:05  22   A.  Yes.
11:14:06  23   Q.  And how did the second period come
11:14:10  24   together?  Who initiated it?
11:14:12  25   A.  Mr. Zuccarello did.

92

11:14:13  1   Q.  And how did it develop?
11:14:15  2   A.  Cypress had gone through, what I recall,
11:14:24  3   a very slow period and Mr. Zuccarello came up with the
11:14:28  4   idea to bring in a couple of outside parties,
11:14:35  5   dealmakers, rainmakers to kick-start the business, to
11:14:41  6   bring new contacts, to bring new blood, to bring new
11:14:45  7   transactions, to introduce new systems, that kind of
11:14:49  8   thing to Cypress to transform Cypress from what was a
11:14:57  9   mostly Burger King-focused investment bank to a
11:15:07  10   broader-based entity.
11:15:08  11   Q.  You mentioned Burger King.  I want to go
11:15:10  12   back.  Did you work with Mr. Zuccarello at Burger
11:15:13  13   King?
11:15:13  14   A.  He was my first boss at Burger King.
11:15:15  15   Q.  How many years did you work with
11:15:18  16   Mr. Zuccarello at Burger King?
11:15:20  17   A.  Maybe three years total, maybe four.
11:15:28  18   Q.  Was it the final four years of your
11:15:30  19   time --
11:15:31  20   A.  No.
11:15:31  21   Q.  -- at Burger King?
11:15:33  22   A.  No.  No.  He had been fired from Burger
11:15:35  23   King in 1990 and I continued on through '93.  So I
11:15:40  24   didn't report to him then.
11:15:41  25   Q.  Okay.  So when you -- you don't have any

23 (Pages 89 to 92)

**JAMES CHRISTOPHERSON - 5/14/2018**
**Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.**

---

93

```
11:15:43   1   personal knowledge of his termination with Burger
11:15:46   2   King, do you?
11:15:47   3        A.  I have knowledge of that with respect to
           4   what he told me.
11:15:50   5        Q.  So it's just what he told you?
11:15:52   6        A.  Correct.
11:15:52   7        Q.  All right.  But you did not -- have any
11:15:55   8   information from Burger King?
11:15:56   9        A.  Not from Burger King.
11:15:57  10        Q.  And when you -- so he was your boss for
           11  how many years at Burger King?
11:16:01  12        A.  The first two years.  I want to say
11:16:02  13  three or four years.  That might not be exact, but
11:16:08  14  it's about that.
11:16:12  15        Q.  Okay.  And were you aware of the type of
11:16:13  16  entity that Cypress was during that second period?
11:16:18  17        A.  I was not.
11:16:21  18        Q.  During the second period, did you know
11:16:21  19  who owned Cypress?
11:16:24  20        A.  I did not.
11:16:25  21        Q.  How many people were working with
11:16:26  22  Cypress during that second period?
11:16:33  23        A.  Well, as it -- when it started in 2000,
11:16:34  24  there would have been four of us, if I recall
11:16:44  25  correctly, so there were the two dealmakers that
11:16:47
```

94

```
11:16:51   1   Mr. Zuccarello brought in, Mr. Zuccarello himself and
11:16:53   2   then me.
11:16:54   3        Q.  Who were the dealmakers that you're
11:16:58   4   referring to?
11:16:58   5        A.  Carty Davis and Tom Schuldt.
11:17:03   6        Q.  Do you have any personal knowledge of
11:17:14   7   how Mr. Zuccarello made any relationship with
11:17:23   8   Mr. Davis at that time?
11:17:23   9        A.  I do not.
11:17:24  10        Q.  With Mr. Schuldt?
11:17:26  11        A.  I do not.
11:17:27  12        Q.  You weren't a party to -- you don't have
11:17:32  13  any personal knowledge of any discussions that those
11:17:36  14  two, Mr. Davis and Mr. Schuldt, had with
11:17:38  15  Mr. Zuccarello about their affiliation with Cypress at
11:17:40  16  that time?
11:17:41  17        A.  I was not involved in those discussions
11:17:43  18  with them.
11:17:43  19        Q.  What did you understand Mr. Zuccarello's
11:17:48  20  role to be during that second period?
11:17:50  21        A.  I understood it to be the same as in the
11:17:56  22  first period.  The leader, then CEO.
11:17:59  23        Q.  What about Mr. Schuldt's role?
11:18:04  24        A.  A rainmaker, a dealmaker.
11:18:07  25        Q.  Anything else?
```

95

```
11:18:09   1        A.  No.
11:18:10   2        Q.  What about Mr. Davis' role?
11:18:12   3        A.  Same as Mr. Schuldt.  A dealmaker, a
           4   rainmaker.
11:18:15   5        Q.  You've put Mr. Zuccarello in a different
11:18:16   6   category than Mr. Davis and Mr. Schuldt.  Can you
11:18:19   7   expand on that?
11:18:23   8        A.  You asked what my understanding was and
11:18:24   9   that's my understanding.  Mr. Zuccarello was the CEO
11:18:29  10  and he brought in rainmakers to grow the business.
11:18:32  11        Q.  Did Mr. Zuccarello -- he also was a
11:18:35  12  rainmaker?
11:18:39  13        A.  Yes.
11:18:39  14        Q.  Okay.  But he had extra roles as the
11:18:44  15  leader and CEO?
11:18:45  16        A.  Yes.
11:18:46  17        Q.  To your understanding, was
11:18:51  18  Mr. Zuccarello the owner of Cypress during the second
11:18:53  19  period?
11:18:53  20        A.  That's my understanding.
11:18:54  21        Q.  During the second period, were you an
11:18:58  22  employee or an independent contractor of Cypress?
11:19:03  23        A.  I operated under the assumption that I
11:19:05  24  was an independent contractor.
11:19:07  25        Q.  And during that second period, you set
```

96

```
11:19:09   1   up a limited liability company to support your work
11:19:11   2   for Cypress?
11:19:12   3        A.  I did.
11:19:12   4        Q.  And was that Cypress Scottsdale?
11:19:15   5        A.  LLC, correct.
11:19:16   6        Q.  And that was formed in February or March
11:19:19   7   of 2001?
11:19:20   8        A.  About that time.
11:19:21   9        Q.  So you had worked there individually and
11:19:24  10  then you formed your LLC a little bit later?
11:19:27  11        A.  Correct.
11:19:28  12        Q.  You formed it, the Cypress Scottsdale
11:19:32  13  entity?
11:19:32  14        A.  As opposed to?
11:19:34  15        Q.  Mr. Davis didn't form it for you?
11:19:37  16        A.  Oh, no, no, no, I did it.  That was
           17  mine.
11:19:39  18        Q.  Okay.  You're the registered agent for
11:19:42  19  that entity?
11:19:42  20        A.  I don't believe it's in existence any
11:19:45  21  more.  I believe it was dissolved, but I was the
11:19:47  22  registered agent.
11:19:48  23        Q.  Were you the sole member?
11:19:49  24        A.  Yes.
11:19:50  25        Q.  Manager?
```

24 (Pages 93 to 96)

**JAMES CHRISTOPHERSON - 5/14/2018**
**Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.**

101

```
11:23:45   1
```
engagement agreements for Cypress?
```
11:23:47   2
```
A.  As an independent contractor, I don't
believe so, no.
```
11:23:51   3
```
Q.  Okay.  At the time you didn't believe
you had authority?
```
11:23:53   5
```
A.  I didn't -- it never came across my
plate.
```
11:23:58   8
```
Q.  Okay.  And you didn't sign any?
```
11:24:00   9
```
A.  I did not.
```
11:24:01   10
```
Q.  Did you ever see any engagement
agreements signed by anybody other than
Mr. Zuccarello?
```
11:24:06   12
```
A.  In general, I didn't see engagement
agreements, so I mostly didn't even see them signed by
him.
```
11:24:12   17
```
Q.  During your second period with Cypress,
who, in your view, had the final decision-making
authority at Cypress?
```
11:24:19   19
```
A.  I believe it was Mr. Zuccarello.
```
11:24:23   20
```
Q.  Did you play the same role with Cypress
during that second period?
```
11:24:28   22
```
A.  I did.
```
11:24:29   23
```
Q.  And you prepared materials in connection
with your work during that second period with Cypress,
correct?

102

```
11:24:42   1
```
A.  Correct.
```
11:24:42   2
```
Q.  Models?
```
11:24:44   3
```
A.  Yes.
```
11:24:44   4
```
Q.  Financial analysis?
```
11:24:48   5
```
A.  Yes.
```
11:24:49   6
```
Q.  What else?
```
11:24:49   7
```
A.  Offering memoranda.  I mean, that was
the bulk of it.
```
11:25:02   9
```
Q.  Any confidential information memoranda,
is it CIM?
```
11:25:08   10
```
A.  It's a CIM, but we didn't call it that
back then.
```
11:25:11   13
```
Q.  What did you call it?
```
11:25:13   14
```
A.  Offering memorandum.
```
11:25:14   15
```
Q.  Same thing as a CIM?
```
11:25:15   16
```
A.  Correct.
```
11:25:16   17
```
Q.  What about prospect lists?
```
11:25:19   18
```
A.  I don't recall working on prospect lists
then.
```
11:25:23   20
```
Q.  And were these materials -- I'm calling
them materials, that we just talked about, would these
be used for Cypress clients?
```
11:25:37   23
```
A.  They were used for Cypress clients.
```
11:25:40   24
```
Q.  Serving those clients was Cypress'
business?

103

```
11:25:44   1
```
A.  Correct.
```
11:25:45   2
```
Q.  And was there an expectation that your
work that you did for Cypress would be confidential?
```
11:25:58   4
```
MR. ROBINSON:  Objection, foundation.
```
11:25:59   5
```
A.  Yeah.  I mean, no, there was never any
discussion, communication, expectation in terms of
confidentiality of materials.
```
11:26:11   8
```
Q.  (BY MR. DEMPSEY) Really?
```
11:26:12   9
```
A.  Yeah.  You mean from Cypress saying this
is -- this is confidential information?
```
11:26:20   11
```
Q.  Right.
```
11:26:21   12
```
A.  Correct.  I think we talked about this
before.  So if we're talking about client financial
information, that was kept confidential because we
owed that duty to the client.  If we're talking about
generic models and generic presentation packages,
there was never any discussion, communication or known
expectation that was confidential.
```
11:26:49   19
```
Q.  So in your view, you could share any of
these models, financial analysis, offering memorandum,
CIMs, with the outside world?
```
11:27:03   22
```
A.  There was no -- there was no restriction
on that.  There was no stated limitation.  There was
no stated expectation of that.  And, look, besides
this, these models, presentation packages, they're

104

```
11:27:19   1
```
very generic.  Anyone with a financial -- some kind of
finance background or some kind of Excel background
can build this model.  It's basic arithmetic.  What we
were using then.  Similar to the presentation
packages, a PowerPoint is a PowerPoint and almost
every one I've ever seen looks the same and does the
same thing.
```
11:27:41   8
```
Q.  So these financial or these models that
you're talking about, you say they're generic.  I
mean, were these models that were purchased from --
from some sort of vendor?
```
11:27:55   12
```
A.  Not that I know of.
```
11:27:56   13
```
Q.  So where did they come from?
```
11:27:58   14
```
A.  Somebody built them.  So each time you
do a project, you build a model for it.  It's basic
math.  You take a number from this tab, add it to a
number on that tab and you put the result on this tab.
That's what Excel is made to do.  That's what its
purpose is.
```
11:28:16   20
```
Q.  Right.  So the -- I mean, really, if you
were starting a new business, there would be no need
to rely on somebody else's models?
```
11:28:32   23
```
A.  There would be no need to rely on it.
Anyone with some experience in this and some Excel
experience could build these.

**Hunter + Geist, Inc.**
**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**

JAMES CHRISTOPHERSON - 5/14/2018
Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.

---

105

```
11:28:43   1        Q.  Really.  Okay.  We're talking about the
11:28:46   2   models that you used at Cypress during this second
11:28:48   3   period?
11:28:48   4        A.  During the second period, correct.
11:28:51   5        Q.  Who built those models?
11:28:53   6        A.  So Zuccarello may have built previous
11:28:59   7   models, but each time you had a new project, you built
11:29:03   8   a new model for it.
11:29:04   9        Q.  But wasn't there a template or some sort
11:29:07  10   of --
11:29:07  11        A.  There could be a template.
11:29:08  12        Q.  Yeah?
11:29:09  13        A.  Yeah.  But the template could be --
11:29:12  14   listen, before I first worked for Cypress, I'd been
11:29:16  15   building financial models for 10 years.  I had been
11:29:19  16   doing restaurant valuations for 10 years.  I knew this
11:29:22  17   cold.  Anyone with some experience can do this.  And
11:29:25  18   not even that much experience.
11:29:27  19        Q.  Okay.
11:29:29  20        A.  So there's nothing complex or unique or
11:29:33  21   proprietary about Cypress' models.
11:29:35  22        Q.  Okay.  So on -- but you don't know who
11:29:38  23   made them?
11:29:39  24        A.  Well, I made some.  If I worked a
11:29:41  25   project, I would have built the model for it.
```

---

106

```
11:29:44   1   Zuccarello probably made some for previous projects
11:29:47   2   that he worked on.
11:29:48   3        Q.  Okay.  So if Mr. Zuccarello made a model
11:29:50   4   for one of the projects that he worked on, who owned
11:29:52   5   it?
11:29:54   6        MR. ROBINSON:  Objection, calls for a
11:29:55   7   legal conclusion.
11:29:56   8        MR. GROVES:  Same objection.
11:29:56   9        A.  I don't know.
11:30:00  10        Q.  (BY MR. DEMPSEY) Well, what's your
11:30:02  11   understanding of who would own that?
11:30:05  12        A.  My understanding is if he -- if he chose
11:30:09  13   to -- if he chose to make that available to people, if
11:30:16  14   he did not indicate it as a trade secret or
11:30:20  15   confidential, if he didn't have an agreement that it's
11:30:23  16   a trade secret, if it's easily replicable, it's --
11:30:31  17   who owns it?  To the extent the model is sent out to
11:30:38  18   clients to review the valuation and now it's been put
11:30:41  19   out to other parties as well.
11:30:43  20        Q.  So what models did you make during that
11:30:45  21   second engagement, second period with Cypress?
11:30:49  22        A.  I don't recall.  I don't recall which
11:30:52  23   specific engagements we worked on or what models I
11:30:56  24   worked on.
11:30:56  25        Q.  During your second period with Cypress,
```

---

107

```
11:31:13   1   did Cypress have a contact database for its clients?
11:31:17   2        A.  Not that I'm aware of.
11:31:19   3        Q.  Cypress didn't have any lists of clients
11:31:24   4   or prospects or --
11:31:27   5        A.  Not that I'm aware of.  I know that
11:31:30   6   early on in the first period, I had provided
11:31:33   7   Mr. Zuccarello with a three-ring binder about an inch
11:31:37   8   and a half thick full of the current Burger King
11:31:42   9   franchisee contact information, along with their
11:31:45  10   stores and such, so I assume he had that.  But -- but
11:31:51  11   I don't recall there being a contact list or anything
11:31:53  12   like that during that second period.
11:31:54  13        Q.  During your second period, which again
11:31:57  14   is what, about, less than a two-year period?
11:32:00  15        A.  Right.
11:32:00  16        Q.  You had never used a contact database
11:32:02  17   that Cypress had?
11:32:03  18        A.  No.  No.
11:32:04  19        Q.  You didn't know about it?
11:32:05  20        A.  I don't -- I didn't know there was one.
11:32:08  21        Q.  You didn't contribute to any --
11:32:11  22        A.  I --
11:32:13  23        Q.  -- contact database?
11:32:14  24        A.  Absolutely, I did.  I gave Zuccarello
11:32:16  25   the Burger King list in the first period.
```

---

108

```
11:32:19   1        Q.  Okay.  But during the second period, you
11:32:21   2   didn't contribute any contacts?
11:32:22   3        A.  No.  Not that I recall.
11:32:23   4        Q.  Okay.  We've got to stop talking over
11:32:26   5   each other.  I'm sorry.
11:32:28   6        A.  Sorry.
11:32:28   7        Q.  So you don't recall contributing any of
11:32:30   8   your own contacts to the Cypress database during that
11:32:34   9   second period?
11:32:34  10        A.  During the second period, correct.
11:32:37  11        Q.  So if Cypress had a contact database
11:32:49  12   during that second period, and you didn't know about
11:32:52  13   it, you must not have been granted permission to use
11:32:56  14   it?
11:32:57  15        MR. ROBINSON:  Objection, foundation.
11:32:58  16        A.  I simply didn't know about it.  We --
11:33:01  17   I didn't -- listen, we didn't have -- I don't believe we
11:33:05  18   had Cypress e-mails at that time.  And so if -- if
11:33:11  19   Mr. Zuccarello had a database that he used, I don't
11:33:13  20   think I was aware of it.
11:33:15  21        Q.  (BY MR. DEMPSEY) Okay.  During that
11:33:16  22   second period, how many hours a week were you devoting
11:33:19  23   to Cypress' work?
11:33:20  24        A.  I don't recall.  I really don't know.
11:33:25  25        Q.  Was it more than half your time?
```

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**JAMES CHRISTOPHERSON - 5/14/2018**
**Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.**

## 109

| | | |
|---|---|---|
| 11:33:30 | 1 | A.  Maybe half my time. |
| 11:33:31 | 2 | Q.  Maybe or -- |
| 11:33:34 | 3 | A.  I don't know.  I told you I don't |
| 11:33:36 | 4 | recall.  I really -- I didn't -- I didn't log hours |
| 11:33:39 | 5 | then and I was paid by the deal, so I -- I just can't |
| 11:33:44 | 6 | recall what hours I was working. |
| 11:33:46 | 7 | Q.  You weren't working anywhere else? |
| 11:33:49 | 8 | A.  During the second period, no. |
| 11:33:53 | 9 | Q.  All right.  During that second period, |
| 11:33:57 | 10 | what was your title with Cypress? |
| 11:33:58 | 11 | A.  I believe -- I don't recall what the |
| 11:34:03 | 12 | title was.  I don't think I had a business card.  I |
| 11:34:08 | 13 | don't know what I was referred to as. |
| 11:34:10 | 14 | Q.  Your LinkedIn profile, which was Exhibit |
| 11:34:15 | 15 | 55, I think you still referenced your title as the |
| 11:34:17 | 16 | managing director? |
| 11:34:18 | 17 | A.  Which was the -- which was an early |
| 11:34:20 | 18 | title, yes.  So I may have been referred to that at |
| 11:34:23 | 19 | that time period.  I just don't recall. |
| 11:34:25 | 20 | Q.  During that period, you mentioned |
| 11:34:33 | 21 | Mr. Schuldt and Mr. Davis.  Do you recall what their |
| 11:34:40 | 22 | titles were at the time? |
| 11:34:41 | 23 | A.  I do not. |
| 11:34:41 | 24 | Q.  Do you recall who conferred titles on |
| 11:34:47 | 25 | different people? |

## 110

| | | |
|---|---|---|
| 11:34:47 | 1 | A.  I assume Mr. Zuccarello. |
| 11:34:48 | 2 | Q.  During your second period with Cypress, |
| 11:34:55 | 3 | did you enter into any contracts to acquire any |
| 11:34:58 | 4 | ownership interest in Cypress? |
| 11:35:00 | 5 | A.  No. |
| 11:35:00 | 6 | Q.  You didn't enter into any equity |
| 11:35:04 | 7 | agreement with Cypress? |
| 11:35:04 | 8 | A.  No. |
| 11:35:05 | 9 | Q.  You did not enter into any equity |
| 11:35:08 | 10 | agreement with Thomas Schuldt? |
| 11:35:10 | 11 | A.  No. |
| 11:35:10 | 12 | Q.  During your second period with Cypress, |
| 11:35:14 | 13 | did you enter into any equity agreement with |
| 11:35:17 | 14 | Mr. Davis? |
| 11:35:17 | 15 | A.  No. |
| 11:35:17 | 16 | Q.  During your second period with Cypress, |
| 11:35:21 | 17 | did you become a shareholder of Cypress? |
| 11:35:23 | 18 | A.  No. |
| 11:35:23 | 19 | Q.  Did you become an owner of Cypress? |
| 11:35:27 | 20 | A.  No. |
| 11:35:27 | 21 | Q.  Did you form a partnership with Cypress? |
| 11:35:29 | 22 | A.  No. |
| 11:35:30 | 23 | Q.  During your second period with Cypress, |
| 11:35:33 | 24 | did you personally observe anyone else become an owner |
| 11:35:37 | 25 | of Cypress? |

## 111

| | | |
|---|---|---|
| 11:35:38 | 1 | A.  I'm not sure what it looks like to |
| 11:35:46 | 2 | observe someone become an owner, so did I see anyone |
| 11:35:51 | 3 | sign contracts to become an owner?  No. |
| 11:35:55 | 4 | Q.  You separated from Cypress again in |
| 11:36:01 | 5 | 2001.  Wasn't Mr. Davis' involvement at Cypress one of |
| 11:36:06 | 6 | the reasons you elected to leave? |
| 11:36:10 | 7 | A.  No, it was not. |
| 11:36:11 | 8 | Q.  You had no discussions with |
| 11:36:16 | 9 | Mr. Zuccarello about Mr. Davis at that time? |
| 11:36:17 | 10 | A.  I -- I don't -- not that I recall. |
| 11:36:21 | 11 | I -- that wasn't -- there was not an issue with Davis |
| 11:36:25 | 12 | if that's what you're implying. |
| 11:36:30 | 13 | Q.  Is it possible you don't recall that |
| 11:36:32 | 14 | conversation? |
| 11:36:32 | 15 | A.  It's possible I don't recall that |
| 11:36:33 | 16 | conversation.  Look, the reason I left is I was making |
| 11:36:40 | 17 | $42,000 or $40,000 in 2000 -- there -- I wasn't making |
| 11:36:46 | 18 | any money, so I needed to go do something else. |
| 11:36:49 | 19 | Q.  Okay.  And did you have any terms for |
| 11:36:51 | 20 | separation? |
| 11:36:52 | 21 | A.  Nope. |
| 11:36:53 | 22 | Q.  Were you expecting a year-end bonus from |
| 11:36:57 | 23 | Cypress? |
| 11:36:57 | 24 | A.  Not at that time. |
| 11:37:02 | 25 | Q.  Then, did you reconnect again with |

## 112

| | | |
|---|---|---|
| 11:37:07 | 1 | Cypress later on in 2010? |
| 11:37:08 | 2 | A.  Correct. |
| 11:37:08 | 3 | Q.  What arrangements did you have with |
| 11:37:10 | 4 | Cypress in 2010? |
| 11:37:11 | 5 | A.  So Mr. Zuccarello called me and |
| 11:37:14 | 6 | said -- and said, listen, I want to make a change to |
| 11:37:17 | 7 | my company.  I've had all these young MBAs working for |
| 11:37:22 | 8 | me.  They're millennials.  They're so needy.  They |
| 11:37:25 | 9 | need coddling and they need feedback, and he said I'm |
| 11:37:29 | 10 | just tired of it.  I need someone who is a self- |
| 11:37:34 | 11 | starter and who can -- who is more mature and can take |
| 11:37:38 | 12 | the ball and run with it, so what he told me was he |
| 11:37:41 | 13 | was going to change his company, get rid of his |
| 11:37:44 | 14 | employees and he wanted to bring me on as a contractor |
| 11:37:47 | 15 | to do his analysis and other work again. |
| 11:37:51 | 16 | Q.  Okay.  Because of all your experience |
| 11:37:56 | 17 | that we talked about before? |
| 11:37:57 | 18 | A.  He -- he knew I was pretty good at what |
| 11:38:01 | 19 | I did. |
| 11:38:01 | 20 | Q.  Okay.  Can we call -- this is between |
| 11:38:05 | 21 | 2010 and 2014? |
| 11:38:06 | 22 | A.  Correct. |
| 11:38:06 | 23 | Q.  Can we call this your third period with |
| 11:38:08 | 24 | Cypress? |
| 11:38:09 | 25 | A.  Let's do that. |

JAMES CHRISTOPHERSON - 5/14/2018
Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.

---

**121**

11:48:35  1  something that I worked on, so.
11:48:39  2      Q.  You didn't prepare draft engagement
11:48:43  3  agreements or modify them?
11:48:44  4      A.  No.  If so, rarely.  I don't recall
11:48:47  5  doing that.  That was mostly something that
11:48:49  6  Mr. Zuccarello took care of.
11:48:50  7      Q.  Did you ever see any engagement
11:48:52  8  agreements signed by Mr. Davis during that third
11:48:55  9  period?
11:48:55 10      A.  Nope.
11:48:55 11      Q.  During your third period with Cypress,
11:48:57 12  who had the final decision-making authority at
11:49:00 13  Cypress?
11:49:00 14      A.  I'm not sure who had the final
11:49:06 15  authority.  I know that Zuccarello and Davis conferred
11:49:09 16  a lot.  I don't know if they ended up agreeing or what
11:49:14 17  happened when they disagreed who made the decision.
11:49:16 18      Q.  During your third period with Cypress,
11:49:23 19  did you perform work or did you perform -- I'm sorry.
11:49:28 20  Strike that.
11:49:30 21      For the materials you prepared in
11:49:32 22  connection with your work during your third period
11:49:34 23  with Cypress, were such materials prepared for
11:49:37 24  Cypress?
11:49:37 25      A.  Actually, no.  So my third time at

---

**122**

11:49:48  1  Cypress, I -- while working as an independent
11:49:55  2  contractor, but on my own time, I created certain
11:49:58  3  technology, certain formulas, certain functions, that
11:50:03  4  I incorporated in the models that I used that Cypress
11:50:06  5  had never used before, and so I consider that my work
11:50:12  6  product.
11:50:12  7      Q.  Okay.  So tell me about that.  What
11:50:39  8  certain technologies did you create?
11:50:43  9      A.  Well, I spent about a year and a half or
11:50:47 10  two years researching and experimenting and doing
11:50:52 11  trial and error on certain functions and formulas in
11:50:58 12  Excel and then figuring out how to nest those
11:51:02 13  functions one inside of another which is inside of
11:51:04 14  another, which was technology, an invention, a
11:51:13 15  creation that I had never seen anyone use before and
11:51:16 16  I'm pretty experienced in Excel.  I also -- I never
11:51:24 17  ran across anyone who -- who had seen that same
11:51:28 18  technology used that I had put together.  So
11:51:31 19  essentially what it did was the old way -- the old
11:51:37 20  Cypress way of doing a model, which is the same way
11:51:41 21  anyone would put together a model, which is what I
11:51:43 22  called the hunt and peck approach.  So let's -- let me
11:51:48 23  walk you through this.
11:51:48 24      You start with source documents,
11:51:51 25  detailed source documents in the back of the model.

---

**123**

11:51:53  1  And then they move into what becomes a summary P and
11:51:58  2  L.  And that's -- that is going to be more convenient
11:52:03  3  and easier for a buyer, let's say, if he's looking at
11:52:07  4  a transaction, to do his analysis, to understand what
11:52:12  5  the financials of the stores look like.
11:52:15  6      So the old way of doing it was the
11:52:20  7  analyst would go to the cell on the summary P and L
11:52:26  8  and he would pick up all the lines in the detailed P
11:52:31  9  and L for that particular store, for that particular
11:52:35 10  date, that period, add those up in a formula and drop
11:52:39 11  them back into this formula.  So you do that for every
11:52:42 12  line item, every column, which is a time period and
11:52:46 13  then every store.  Very tedious.  Very manual.  Very
11:52:51 14  prone to mistakes.
11:52:54 15      A similar situation happened with what
11:52:56 16  we would call our -- they were summary charts of store
11:53:03 17  information that was non-financial.  What do I mean by
11:53:07 18  that?  Store number.  Store physical address, city,
11:53:10 19  state, store nickname if it had it.  We might have
11:53:16 20  square footage, parking spaces.  Last time remodeled.
11:53:21 21  So on and so on.
11:53:22 22      So what I set out to do was to get rid
11:53:25 23  of the inaccuracies in a manual hunt and peck method
11:53:34 24  and to significantly reduce the time that it takes to
11:53:39 25  prepare a model on a project.  So, in short, I was

---

**124**

11:53:45  1  able to -- and it took about a year and a half or two
11:53:48  2  years' worth of research and trial and error
11:53:50  3  and -- and just playing around with the functions
11:53:58  4  inside of the functions inside of the functions, I was
11:54:00  5  able to essentially automate the population of the
11:54:05  6  store summary charts and the summary P and L charts
11:54:09  7  from the data we had.  One from the source P and Ls
11:54:12  8  and one from an array of store information that we
11:54:15  9  received from the client.
11:54:18 10      So as I said, this is technology that I
11:54:20 11  had never seen used before.  When I finally finished
11:54:24 12  it, I showed it to Dillsaver and he told me, wow, I
11:54:28 13  have never seen anything like this before.  How the
11:54:31 14  heck did you ever come up with this?  And I walked him
11:54:35 15  through how it worked and what I did and whatnot.
11:54:38 16      Q.  What do you call this technology?
11:54:41 17      A.  I don't -- you want a name for it?
11:54:46 18      Q.  Do you have a name for it?
11:54:46 19      A.  I don't have a name for it, no.
11:54:48 20      Q.  I mean, you spent a year and a half on
11:54:50 21  this project and a lot of research, development and
11:54:54 22  trial and error.  I mean, did you have a -- like a
11:54:58 23  project notebook or did you have a project name for
11:55:01 24  it?
11:55:01 25      A.  I don't have a project name for it.  I

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**JAMES CHRISTOPHERSON - 5/14/2018**
**Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.**

---

125

11:55:04   1    didn't think it needed a name.
11:55:05   2         Q.  Did you talk to anybody about this
11:55:06   3    project?
11:55:06   4         A.  No, no, this is my creation.  I didn't
11:55:09   5    talk to anyone about it.
11:55:10   6         Q.  And so --
11:55:11   7         A.  Until I showed it to Mr. Dillsaver.
11:55:14   8    Even the other guys in Cypress didn't know about it.
11:55:17   9    They wouldn't understand it anyway.
11:55:18  10         Q.  They wouldn't?
11:55:19  11         A.  They would not.
11:55:20  12         Q.  So where was this technology developed?
11:55:27  13         A.  Where was it developed?  In my home
11:55:31  14    office in Arizona.
11:55:32  15         Q.  On your computer?
11:55:33  16         A.  Yes.
11:55:34  17         Q.  Did you need any other tools to create
11:55:37  18    this other than your computer and, perhaps, Excel?
11:55:39  19         A.  My computer, my Excel, my ability to
11:55:45  20    research, my intelligence, my skills.
11:55:48  21         Q.  Okay.  So -- but there's no project name
11:55:50  22    or you don't have a name for this technology?
11:55:52  23         A.  I didn't name it.  Sorry.
11:55:54  24         Q.  Okay.  You mentioned a year and a half
11:56:07  25    of research.  What did you research?  Did you look at

126

11:56:16   1    books or articles?
11:56:16   2         A.  All of the above.  Excel books, Google.
11:56:19   3    You can find -- there's Excel experts that you can
11:56:24   4    pick up hints from or try and I looked at all kind of
11:56:29   5    things to make this work.
11:56:30   6         Q.  Did you keep a log of everything you
11:56:33   7    looked at or searched?
11:56:34   8         A.  No.  No.
11:56:35   9         Q.  Why not?
11:56:36  10         A.  Why would I?  Once I -- once I figured
11:56:39  11    out one piece of the -- of the puzzle, the first
11:56:42  12    function, for example, and I got it to work, when I'm
11:56:47  13    messing around with it on a Sunday morning or
11:56:49  14    something, then -- and I'm good with it, I didn't need
11:56:52  15    to log that.
11:56:53  16         Q.  Okay.  Did you file for any sort of
11:56:55  17    patent?
11:56:56  18         A.  I did not.
11:56:56  19         Q.  Why not?
11:56:57  20         A.  I didn't think to.
11:57:00  21         Q.  Do you plan to?
11:57:01  22         A.  I haven't given it any thought.  Should
11:57:04  23    I?
11:57:04  24         Q.  You know, you haven't filed a patent
11:57:12  25    application of any sort?

127

11:57:13   1         A.  I have not.
11:57:14   2         Q.  Have you contacted counsel to -- to go
11:57:20   3    see about what it would take to patent something like
11:57:20   4    this?
11:57:23   5         A.  I have not.
11:57:24   6         Q.  And you say the benefit to the user here
11:57:34   7    is that it -- it automates the system and makes for a
11:57:40   8    better -- is it a visual demonstration of the data?
11:57:45   9         A.  No, the visual demonstration was the
11:57:48  10    same the old way as it is the new way.  The difference
11:57:51  11    is a tremendous improvement in accuracy and a
11:57:54  12    tremendous improvement in efficiency.  So, for
11:57:57  13    example, let's say we had a 50 store deal, model we're
11:58:01  14    working on.  I get the technology, my formulas in and
11:58:06  15    all working on the first store, I can then --
11:58:09  16    everything ties out and checked, and I can copy that
11:58:12  17    tab, save it as the next tab, save it as the next
11:58:17  18    store and all I had to do was put in the store number
11:58:20  19    and it would autopopulate all my fields.
11:58:24  20         Q.  You said you did a lot of trial and
11:58:26  21    error on this.  How did that -- what data were you
11:58:29  22    using to do the trial and error process?
11:58:32  23         A.  I just did it on my own computer with a
11:58:36  24    blank Excel spreadsheet and I might be sitting there
11:58:38  25    on a quiet Sunday morning and get an idea and try to

128

11:58:42   1    work something and sometimes it worked and sometimes
11:58:45   2    it didn't, and then you tweak it and then I get busy
11:58:48   3    doing something else and I come back to it later.
11:58:51   4         Q.  But what -- what data?  I mean, you had
11:58:54   5    to apply this to some data.
11:58:55   6         A.  You can use dummy data.
11:58:57   7         Q.  Where did you get the dummy data?
11:58:59   8         A.  You make it up.  You can use anything.
11:59:01   9    You're just trying to get a formula to work.  Once I
11:59:04  10    got it to work, then I could put it in the next
11:59:07  11    model I'm working on.
11:59:09  12         Q.  Did you apply this -- did you use any
11:59:11  13    client data from Cypress clients as dummy data for
11:59:15  14    your trial and error process?
11:59:16  15         A.  No.
11:59:17  16         Q.  Never?
11:59:17  17         A.  I wouldn't need to.  I don't need their
11:59:22  18    data to make the formula work.  It's the opposite.
11:59:24  19    Once I got the formula to work, I could take that to
11:59:26  20    the model and start -- take the first step towards the
11:59:30  21    efficiency and the accuracy.
11:59:32  22         Q.  Okay.  Any other technology that you've
11:59:35  23    created here?
11:59:36  24         A.  Well, there was -- there was additional
11:59:39  25    technology that I put into place recognizing that I

JAMES CHRISTOPHERSON - 5/14/2018
Cypress Advisors, Inc. v. Kent McCarty Davis, et al.

129

```
11:59:46  1   put a lot of work into this and it was valuable, I
11:59:50  2   didn't want anyone to just see what I had done and
11:59:54  3   piggyback after my work and take it for their own, so
11:59:57  4   I came up with macros in Excel which would lock down
12:00:05  5   or protect all the sheets and then with a password and
12:00:08  6   then unprotect all the sheets, so that I created. And
12:00:12  7   then with respect to one particular transaction, which
12:00:15  8   was the Wendy's transaction, they had source data that
12:00:20  9   was in -- in not usable form, so I had to write two
12:00:27 10   macros, one to unmerge several lines for each store
12:00:31 11   that were -- that were merged between the two cells,
12:00:36 12   which meant my formulas couldn't pick it up. It had
12:00:40 13   to be residing in one cell and Wendy's also provided
12:00:44 14   information in their summary P and L's that had
12:00:47 15   formulas instead of dollar amounts, and if you pull
12:00:49 16   the formula, it pulls the formula instead of the
12:00:52 17   dollar amount, so I did a fairly large pace values.
12:00:58 18   It was called pace values macro. So those I wrote as
12:01:02 19   well.
12:01:03 20        Q.  During the time you were at Cypress,
12:01:05 21   during the third period?
12:01:06 22        A.  During the time I was an independent
12:01:08 23   contractor, working for Cypress, yes.
12:01:09 24        Q.  You mentioned early on, you mentioned
12:01:11 25   you did this all while you were an independent
```

130

```
12:01:16  1   contractor for Cypress, and you mentioned work for
12:01:23  2   hire?
12:01:23  3        A.  I mentioned work for hire.
12:01:25  4        Q.  I believe you did.
12:01:25  5        A.  I don't believe I did.  I believe
12:01:28  6   you -- I believe you heard "work product."
12:01:56  7        Q.  Okay.  You said you considered that your
12:01:58  8   work product?
12:01:59  9        A.  Right.  Which is very different from
12:02:01 10   work for hire.
12:02:01 11        Q.  You know what the concept is?
12:02:03 12        A.  I've heard of it.
12:02:05 13        Q.  Okay.  What does work for hire mean?
12:02:07 14        A.  Well, so, I -- I know of the concept at
12:02:12 15   least for one reason because -- because, look,
12:02:18 16   you -- you tried to back door a bunch of conditions
12:02:22 17   and restrictions on me in the March 20, 2015
12:02:26 18   contractor termination agreement that you sent me.
12:02:28 19   You remember that, right?
12:02:31 20        Q.  I'm asking the questions today.
12:02:34 21        A.  Okay.  Well, you don't have to answer.
12:02:36 22   I assume you remember because you sent it to me.  So
12:02:39 23   in that, you tried to back door a non-compete
12:02:44 24   agreement against -- you know, in favor of Cypress to
12:02:47 25   try to keep me from working in the industry.  You
```

131

```
12:02:51  1   also -- you also tried to back door an agreement by
12:02:57  2   which all of my technology, my creation, my invention,
12:03:04  3   my formulas, my functions, my programming, my work
12:03:09  4   product, everything was taken from me and magically
12:03:13  5   became the property of Cypress.  I believe you
12:03:15  6   called -- you referenced work for hire in that.  If I
12:03:18  7   remember right, too, you wanted me to turn over my
12:03:21  8   personal computer with all my personal data on it to
12:03:26  9   you guys, so you could go and erase anything that had
12:03:29 10   to with Cypress on it.
12:03:30 11        And, finally, I remember it struck me
12:03:32 12   odd that my impression was you tried to bully me into
12:03:39 13   these restrictions and conditions knowing full well I
12:03:42 14   wasn't represented by an attorney.  So I've heard of
12:03:47 15   work for hire.
12:03:49 16        Q.  Okay.  So respectfully disagree with
12:03:58 17   much of what you just said.
12:04:03 18        But you're familiar with the concept of
12:04:04 19   work for hire.  The -- your position today is that you
12:04:10 20   were an independent contractor during the third period
12:04:14 21   with Cypress?
12:04:15 22        A.  Correct.
12:04:16 23        Q.  Okay.  During the third period with
12:04:26 24   Cypress, did Cypress already have a contact database
12:04:29 25   of its clients?
```

132

```
12:04:29  1        A.  It did.
12:04:30  2        Q.  Let me go back just on the technology
12:04:35  3   issue.  Did we get all the technology that you created
12:04:38  4   during that period?
12:04:40  5        A.  I also redesigned PowerPoint
12:04:49  6   presentations with updated templates, graphics,
12:04:57  7   colors, made them pop a little bit compared to what I
12:05:00  8   found to be somewhat boring ones that Cypress used
12:05:03  9   previously, so I don't know if that's -- it's not from
12:05:10 10   a technological standpoint, that is not on the same
12:05:14 11   level as the programming in Excel, but that is
12:05:17 12   something else that I did.
12:05:18 13        Q.  Okay.  I think you said marketing wasn't
12:05:21 14   one of your fortes?
12:05:23 15        A.  I'm not an expert in marketing.
12:05:26 16        Q.  Okay.  All right.  But so you consider
12:05:28 17   that to be technology, changing PowerPoints?
12:05:30 18        A.  As I said, it's a much lower level of
12:05:35 19   technology, but that is something else that I did.
12:05:37 20        Q.  Okay.  And did you approach
12:05:40 21   Mr. Zuccarello or Cypress about licensing this
12:05:42 22   technology from you?
12:05:45 23        A.  About which technology?
12:05:47 24        Q.  This --
12:05:48 25        A.  The Excel?
```

33 (Pages 129 to 132)

JAMES CHRISTOPHERSON - 5/14/2018
Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.

---

**133**

```
12:05:49   1     Q.  The one that we didn't have a name for.
12:05:51   2     A.  The no name.
12:05:52   3     Q.  The no name project.
12:05:53   4     A.  No.  In fact, he didn't even know I was
12:05:56   5   doing it.  He didn't know I did it.
12:05:58   6     Q.  Were you using it at Cypress?
12:05:59   7     A.  I used it in the work that I did with
12:06:02   8   Cypress.
12:06:02   9     Q.  Okay.  How many -- how often did you use
12:06:04  10   it?
12:06:04  11     A.  Once I got it working, I used it in
12:06:08  12   everything.
12:06:09  13     Q.  Did you -- you said you shared it with
12:06:11  14   Mr. Dillsaver?
12:06:12  15     A.  One person.  Dillsaver.  He's the only
12:06:14  16   one I showed it to.  He's the only one I ever gave the
12:06:19  17   password to, and I actually told him don't show this
12:06:22  18   to anyone else.
12:06:22  19     Q.  So he has that technology?
12:06:24  20     A.  He has access to the technology that I
12:06:26  21   created.
12:06:26  22     Q.  And did you require a license from him?
12:06:29  23     A.  I did not.
12:06:30  24     Q.  Are you -- do you expect a license from
12:06:38  25   Cypress for using that technology?
```

---

**134**

```
12:06:41   1     A.  Probably would be a good idea.  It's not
12:06:48   2   something I pursued.
12:06:49   3     Q.  Okay.  And but I just -- we have
12:06:54   4   formulas and functions, PowerPoints, we got it all?
12:06:57   5     A.  That's what I can think of right now.
12:07:00   6     Q.  All right.  Going back to the contact
12:07:02   7   database.  You said you were -- Cypress did have a
12:07:08   8   contact database?
12:07:08   9     A.  Yes.
12:07:09  10     Q.  Were you able to use it?
12:07:11  11     A.  Yes.
12:07:11  12     Q.  And did Mr. Zuccarello give you
12:07:14  13   permission to use it?
12:07:15  14     A.  Mr. Zuccarello set up the e-mail
12:07:18  15   accounts such that contact information was pushed out
12:07:23  16   to the users version of Microsoft Outlook on their
12:07:27  17   computers, so everyone had access to this.
12:07:29  18     Q.  Okay.  So when you left Cypress, that
12:07:34  19   access terminated?
12:07:35  20     A.  Actually it didn't because it was synced
12:07:37  21   to my iPhone when I -- because I had the Cypress
12:07:42  22   e-mail on the iPhone, so I had the contacts on the
12:07:45  23   iPhone, so they remained on the iPhone.  When I set up
12:07:49  24   my JAE e-mail account, they synced to that account.
12:07:52  25   When I was ready to leave JAE and I set up a C Squared
```

---

**135**

```
12:07:58   1   account, same thing, they were synced on my phone and
12:08:01   2   went to that e-mail account.
12:08:02   3     Q.  And who organized the syncing of the
12:08:12   4   phone to the Cypress database?
12:08:14   5     A.  I don't know how to answer that.  It --
12:08:21   6     Q.  Did you do it?
12:08:22   7     A.  When you set up an e-mail account on the
12:08:25   8   phone, it synced.  It syncs the database, the
12:08:29   9   contacts.
12:08:29  10     Q.  So you said -- it's your position that
12:08:33  11   you have that contact database on your iPhone or cell
12:08:35  12   phone?
12:08:35  13     A.  I don't any more, but I did.
12:08:37  14     Q.  Okay.  And did that phone have a
12:08:39  15   password?
12:08:39  16     A.  Yes.
12:08:40  17     Q.  And when you left Cypress, did you feel
12:08:46  18   as though you should remove that database?
12:08:48  19     A.  I did not.
12:08:49  20     Q.  Why not?
12:08:49  21     A.  It was a shared database.  Everyone
12:08:52  22   contributed to it.  It was provided to everyone.  It
12:08:55  23   was knowingly provided to everyone.  I mean, to the
12:09:00  24   extent that -- to the extent that each of us would
12:09:04  25   contribute to it, who would agree to the fact that,
```

---

**136**

```
12:09:08   1   look, my contact that I just met at this show, I put
12:09:10   2   in and now it doesn't belong to me any more, it
12:09:14   3   belongs to Cypress exclusively?  I don't think anyone
12:09:17   4   at Cypress was ever told that and certainly didn't
12:09:21   5   agree to it.
12:09:21   6     Q.  Well, so when you put in contacts, did
12:09:26   7   you put contacts into the database?
12:09:26   8     A.  I did.
12:09:27   9     Q.  So -- during your first period and
12:09:30  10   second period, you didn't have access to the contact
12:09:33  11   database?
12:09:33  12     A.  I don't believe Cypress had an
12:09:34  13   e-mail -- a Cypress e-mail.  If it did, I didn't have
12:09:37  14   one.
12:09:37  15     Q.  Okay.  And then during that third
12:09:40  16   period, though, from 2010 to 2014, you did have access
12:09:43  17   to the database and you added contacts to the
12:09:47  18   database?
12:09:47  19     A.  Yes.
12:09:47  20     Q.  Was that one of your jobs that you were
12:09:49  21   paid $50 an hour for?
12:09:51  22     A.  It wasn't really specified as a job at
12:09:54  23   all.  If we got contacts at a show, we would do it.
12:09:56  24     Q.  So when you input those contacts into
12:09:59  25   the database, would you log your time and invoice
```

---

34 (Pages 133 to 136)

JAMES CHRISTOPHERSON - 5/14/2018
Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.

## 137

```
12:10:02  1   Cypress for that?
12:10:03  2       A.  No.  No.  The only thing that --
12:10:05  3   Dillsaver and I once went through with one of the
12:10:11  4   attendee lists from one of the shows, Restaurant
12:10:14  5   Finance or something, I forget which one, and we went
12:10:17  6   through and just verified, we checked to see if they
12:10:20  7   were in; if they weren't in, we added them.  Or we'd
12:10:24  8   Google it and try to find out updated information on,
12:10:28  9   so I believe that got charged hours because he and I
12:10:31  10  spent a lot, of course, on that.
12:10:33  11      Q.  So you never charged any time for
12:10:35  12  inputting contact database to Cypress?
12:10:37  13      A.  No, you'd get a few cards at a time or
12:10:40  14  the building block is what I said before, I give
12:10:43  15  Zuccarello the three-ring binder of all the Burger
12:10:46  16  King ones.  I believe that was a building block as to
12:10:49  17  what he used as a database to begin with, so those
12:10:51  18  would have rolled forward over the years.
12:10:53  19      Q.  Would you have to put a password in to
12:10:57  20  access the Outlook database to get into the system?
12:11:00  21      A.  No.  Other than log into your Cypress
12:11:04  22  e-mail.
12:11:04  23      Q.  Right.
12:11:04  24      A.  Right.  But that's -- that's up all the
12:11:07  25  time as long as you have Outlook going, it's up and
```

## 138

```
12:11:11  1   going.
12:11:11  2       Q.  Right.  But you have to, first, enter a
12:11:14  3   password?
12:11:14  4       A.  Probably the first time you get in,
12:11:16  5   yeah.
12:11:16  6       Q.  But when you log out, did you just leave
12:11:20  7   your computer open all the time?
12:11:21  8       A.  Yeah, you don't log in and log out.  You
12:11:25  9   just leave it on.
12:11:25  10      Q.  So every day, you weren't inputting your
12:11:28  11  data -- your password?
12:11:29  12      A.  No.
12:11:29  13      Q.  You just left your computer on?
12:11:31  14      A.  I believe I took it home.  I have a home
12:11:34  15  office.
12:11:34  16      Q.  Did anybody else have access to your
12:11:37  17  home?
12:11:37  18      A.  My wife lives there.
12:11:39  19      Q.  Did she use that same computer?
12:11:41  20      A.  No.
12:11:43  21      Q.  What was your title at Cypress during
12:11:44  22  the third period?
12:11:45  23      A.  I was referred to as a principal, so I
12:11:55  24  guess that's what my title was.
12:11:57  25      Q.  Did anyone refer to you as a partner?
```

## 139

```
12:11:59  1       A.  Not -- not the third period, not the
12:12:02  2   third time.
12:12:03  3       Q.  Mr. Zuccarello didn't call you a
12:12:06  4   partner?
12:12:06  5       A.  Not that I recall.
12:12:08  6       Q.  During the third period, did you enter
12:12:10  7   into any contracts and acquire any ownership interest
12:12:13  8   in Cypress?
12:12:13  9       A.  Absolutely not.
12:12:14  10      Q.  Did you enter into any agreements with
12:12:16  11  Mr. Davis during the third period?
12:12:18  12      A.  No.
12:12:18  13      Q.  To acquire equity?
12:12:20  14      A.  No.
12:12:20  15      Q.  Are you aware of any other person that
12:12:26  16  acquired equity in Cypress during your third period?
12:12:30  17      A.  No.
12:12:31  18      Q.  In 2012, you received a year-end bonus
12:12:36  19  of $200,000, correct?
12:12:37  20      A.  Correct.
12:12:40  21      Q.  Do you know if Mr. Davis contributed in
12:12:43  22  any way to that bonus?
12:12:45  23      A.  I'm not sure what you mean "contribute."
12:12:49  24  Did he help generate the revenue that allowed Cypress
12:12:52  25  to pay me the bonus?  You know, I don't know.  I don't
```

## 140

```
12:12:55  1   have the -- I don't have access to Cypress' books and
12:12:59  2   records.
12:12:59  3       Q.  Okay.  Did you know that Mr. Davis was
12:13:01  4   only willing to contribute 50,000 of that bonus?
12:13:04  5       A.  I have no knowledge.
12:13:05  6       MR. GROVES:  Object to foundation.
12:13:06  7       Q.  (BY MR. DEMPSEY) Did you know that
12:13:07  8   Mr. Zuccarello made the decision, as the owner of
12:13:09  9   Cypress, to authorize and pay you the bonus of
12:13:11  10  200,000?
12:13:12  11      A.  I'm not aware.
12:13:14  12      MR. GROVES:  Object to the foundation.
12:13:16  13      Q.  (BY MR. DEMPSEY)  And he did pay the
12:13:17  14  additional $150,000, Mr. Zuccarello did?
12:13:20  15      MR. GROVES:  Object to foundation.
12:13:20  16      Q.  (BY MR. DEMPSEY)  Do you know that?
12:13:21  17      A.  I'm not aware of an extra 150,000.
12:13:24  18      Q.  In early 2015, you received another
12:13:26  19  $25,000 special bonus, right?
12:13:28  20      A.  I believe I did.
12:13:29  21      Q.  Do you know that Mr. Davis did not
12:13:32  22  contribute to that bonus?
12:13:33  23      MR. GROVES:  Object to the foundation.
12:13:34  24      A.  I don't have knowledge of that.
12:13:35  25      Q.  (BY MR. DEMPSEY) During your third
```

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**JAMES CHRISTOPHERSON - 5/14/2018**
**Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.**

141

```
12:13:37   1    Cypress period, you also received a guitar amp gift
12:13:40   2    from Cypress?
12:13:41   3        A.  During some period.  I don't remember
12:13:44   4    exactly when that was.
12:13:45   5        Q.  Do you know that Mr. Davis did not
12:13:47   6    contribute to that bonus?
12:13:48   7            MR. GROVES:  Object to the foundation.
12:13:49   8        A.  I don't even know that Mr. Davis knew
12:13:53   9    about that.
12:13:53  10        Q.  (BY MR. DEMPSEY)  During your third
12:13:58  11    period with Cypress, you participated in a meeting
12:14:01  12    with TGIF to secure an engagement to represent TGIF in
12:14:08  13    the refranchising of their company-owned restaurants,
12:14:11  14    correct?
12:14:11  15        A.  Correct.
12:14:12  16        Q.  Davis -- Mr. Davis was also at that
12:14:14  17    meeting?
12:14:14  18        A.  He was.
12:14:15  19        Q.  And the CFO of TGIF is a personal friend
12:14:20  20    of yours?
12:14:20  21        A.  That's correct.
12:14:20  22        Q.  And after that meeting, didn't you
12:14:23  23    receive a call from the CFO of TGIF expressing concern
12:14:28  24    about Mr. Davis?
12:14:29  25        A.  Yes, but let me clarify that.  He was
```

142

```
12:14:34   1    not overly impressed with Mr. Davis' presentation.
12:14:39   2        Q.  What did he tell you?
12:14:41   3        A.  Just that.
12:14:43   4        Q.  And -- but they did engage Cypress?
12:14:46   5        A.  Correct.
12:14:46   6        Q.  What about, did the CFO of TGIF permit
12:14:53   7    Mr. Davis to be involved in that engagement?
12:14:56   8        A.  I -- I don't know.
12:14:58   9        Q.  Didn't they -- didn't he tell you that
12:15:01  10    they didn't want Mr. Davis involved?
12:15:03  11        A.  No, he didn't.
12:15:04  12        Q.  Didn't he also refer to Mr. Davis as a
12:15:06  13    clown?
12:15:07  14        A.  I don't recall that.
12:15:08  15        Q.  And you communicated this information to
12:15:13  16    Mr. Zuccarello?
12:15:13  17        A.  I don't recall that.
12:15:15  18        Q.  Mr. Zuccarello removed Mr. Davis from
12:15:19  19    the engagement, correct?
12:15:20  20        A.  I don't know.  This was -- this was
12:15:22  21    right when I was leaving the company, so I went and
12:15:24  22    did the pitch, we got the engagement and then that
12:15:31  23    was about when I left.
12:15:31  24        Q.  Do you know if Mr. Davis worked on that
12:15:33  25    engagement?
```

143

```
12:15:34   1        A.  I have no idea.  I was gone by then.
12:15:36   2        Q.  Are you aware that Mr. Davis was paid a
12:15:40   3    success fee on the engagement, along with all the
12:15:43   4    other contractors at Cypress?
12:15:43   5        A.  I have no idea -- except for me,
12:15:46   6    right, I think you meant paid a success fee on it.
12:15:51   7        Q.  Well, the -- as -- you know, you weren't
12:15:53   8    there when it closed --
12:15:54   9        A.  Correct.
12:15:55  10        Q.  -- right?  So -- did you ever have any
12:15:59  11    concerns about Mr. Davis' competency in handling
12:16:02  12    Cypress deals?
12:16:02  13        A.  Not that I can recall.
12:16:08  14        Q.  You didn't communicate any competency
12:16:12  15    issues about Mr. Davis to Mr. Zuccarello?
12:16:14  16        A.  So the one thing I can recall was when I
12:16:25  17    had rejoined in 2000, he sent a letter out that I
12:16:31  18    thought used not very good grammar in it, so I
12:16:35  19    expressed concerns about that.  I said, hey, this is
12:16:38  20    not very professional, guys, let's clean this up.
12:16:41  21        Q.  When you were mentioning "he," you mean
12:16:46  22    Mr. Davis?
12:16:46  23        A.  Yes.
12:16:46  24        Q.  No other issues you brought up to
12:16:48  25    Mr. Zuccarello?
```

144

```
12:16:48   1        A.  Not that I can recall.
12:16:49   2        Q.  But there could have been?
12:16:51   3        A.  There could have been.  I don't recall.
12:16:52   4    I don't recall having those issues come to mind
12:16:57   5    with -- with respect to Mr. Davis and his deals.
12:17:00   6        Q.  Did you ever have any concerns about
12:17:02   7    Mr. Davis' sobriety?
12:17:04   8        A.  No.
12:17:04   9        Q.  You didn't communicate those to
12:17:07  10    any -- you didn't communicate any concerns about that
12:17:09  11    to Mr. Zuccarello?
12:17:12  12        A.  No.
12:17:12  13        Q.  To anybody else?
12:17:13  14        A.  No.
12:17:14  15        Q.  All right.  You left in 2014, right?
12:17:17  16        A.  Yes.
12:17:18  17        Q.  You left voluntarily?
12:17:21  18        A.  Yes.
12:17:21  19        Q.  And a few months before you left, didn't
12:17:29  20    you ask to meet with Mr. Zuccarello to discuss your
12:17:31  21    issues with certain things at Cypress?
12:17:33  22        A.  We had met and talked on the phone
12:17:35  23    several times about -- about matters, yes.
12:17:39  24        Q.  Okay.  Mr. Zuccarello flew down to
12:17:41  25    Arizona and the two of you met to discuss these
```

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**JAMES CHRISTOPHERSON - 5/14/2018**
**Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.**

---

145

```
12:17:44   1   issues?
12:17:45   2       A.  I -- I don't recall if he flew there
12:17:50   3   specifically or if he was coming to his house there
12:17:53   4   anyway.
12:17:53   5       Q.  As part of that meeting, you expressed
12:17:56   6   concern that Mr. Davis was having you do all of his
12:17:59   7   work, but his compensation was much higher than yours
12:18:02   8   as a dealmaker versus yours as a support person?
12:18:05   9       A.  No.  The issue was -- I told Zuccarello,
12:18:07  10   this is not related to any one of the other guys or
12:18:11  11   the contractors or the dealmakers.  I told him, I
12:18:16  12   don't think my compensation is matching my
12:18:19  13   contribution.  So all of these guys, Pabst, Davis, you
12:18:25  14   name it, they were making a ton of money on deals that
12:18:28  15   closed and I was doing a lot of the legwork.  I was
12:18:31  16   doing all the back of the scenes, I was putting out
12:18:33  17   the fires, I was really the guy there to get the deal
12:18:36  18   closed.  That was my concern.
12:18:37  19       Q.  Okay.  Didn't Mr. Zuccarello say he
12:18:42  20   would fix that situation, but in order to do so --  to
12:18:45  21   be compensated as a dealmaker, that you'd have to
12:18:48  22   transition into a dealmaker, rainmaker?
12:18:51  23       A.  That wasn't the point of the discussion.
12:18:52  24   The point was the value that I'm providing you right
12:18:56  25   now is -- is more valuable than you're compensating me
```

146

```
12:19:00   1   for.  That was the issue.
12:19:01   2       Q.  But you don't dispute that
12:19:05   3   Mr. Zuccarello made those comments?
12:19:07   4       A.  You know, he's made those comments over
12:19:09   5   the years.  He said, hey, if you want to get paid more
12:19:11   6   or if you want to be a dealmaker, he would say, look,
12:19:15   7   I don't need an execution guy if I don't have the
12:19:18   8   deals coming in, so they get most of the money and you
12:19:21   9   get a little bit.  And my point was, look, you have
12:19:24  10   guys that can bring in deals that can't close them.
12:19:27  11   And all that comes on to me to run interference and to
12:19:33  12   put out the fires and get it closed.  I thought that
12:19:35  13   was worth more than he was paying me and he disagreed.
12:19:38  14       Q.  And you went ahead and accepted a
12:19:45  15   position with the JAE firm?
12:19:47  16       A.  Correct.
12:19:52  17       MR. GROVES:  Counsel, what are we
12:19:53  18   thinking on lunch?
12:19:55  19       MR. DEMPSEY:  You hungry?
12:19:57  20       MR. GROVES:  Yes.
12:19:58  21       MR. DEMPSEY:  Let me see.  Well, we can
12:20:06  22   take lunch at 12:30.  Is that all right?
12:20:10  23       MR. GROVES:  Yep.
12:20:11  24       MR. DEMPSEY:  All right.
12:20:11  25       Q.  (BY MR. DEMPSEY) All right.  So you left
```

147

```
12:20:15   1   in August of 2014, correct?
12:20:18   2       A.  Yes.
12:20:19   3       Q.  And you sent an e-mail around to the
12:20:22   4   Cypress team expressing appreciation for working there
12:20:27   5   and you wanted to maintain friendships and so forth,
12:20:30   6   is that about right?
12:20:31   7       A.  Yep.
12:20:31   8       Q.  And then at the end of 2014, you called
12:20:33   9   Mr. Zuccarello seeking a year-end bonus for 2014?
12:20:38  10       A.  Correct.
12:20:39  11       Q.  And do you recall anyone else -- making
12:20:43  12   this request to anyone else?
12:20:51  13       A.  I wasn't making the request to him.  I
12:20:54  14   fully expected to get paid what I earned.  I called
12:20:56  15   him and said, I didn't get a bonus today and he -- I
12:20:59  16   called him a couple times and he never returned my
12:21:02  17   phone call.
12:21:03  18       Q.  Okay.  Did you call up Carty Davis?
12:21:05  19       A.  I called Carty Davis a few days later.
12:21:07  20   I said -- yes.
12:21:08  21       Q.  But after you tried to reach
12:21:10  22   Mr. Zuccarello?
12:21:10  23       A.  Correct.
12:21:11  24       Q.  Did Mr. Davis return your calls?
12:21:14  25       A.  He took my call.
```

148

```
12:21:15   1       Q.  And what did he tell you?
12:21:18   2       A.  He said, I didn't know you didn't get a
12:21:20   3   bonus.
12:21:21   4       Q.  Okay.  But did you expect him to pay
12:21:24   5   your bonus?
12:21:25   6       A.  I did not.
12:21:25   7       Q.  Why not?
12:21:27   8       A.  Because the checks came from Zuccarello.
12:21:29   9       Q.  Was the decision Mr. Zuccarello's?
12:21:34  10       MR. ROBINSON:  Objection, foundation.
12:21:35  11       MR. GROVES:  Same objection.
12:21:35  12       A.  I don't know whose decision it was.
12:21:37  13       Q.  (BY MR. DEMPSEY) And then you later
12:21:42  14   filed a lawsuit against Cypress, correct?
12:21:44  15       A.  Correct.
12:21:45  16       Q.  And that's the Arizona action?
12:21:46  17       A.  Correct.
12:21:47  18       Q.  And --
12:21:50  19       (Deposition Exhibit 56 was marked.)
12:22:19  20       Q.  Are you familiar with Exhibit 56?
12:22:21  21       A.  Yes.
12:22:22  22       Q.  Is this the complaint that you filed in
12:22:24  23   Arizona against Cypress?
12:22:25  24       A.  Yes.
12:22:25  25       Q.  Is it a true and accurate copy of the
```

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

JAMES CHRISTOPHERSON - 5/14/2018
Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.

---

157

```
01:39:34   1
```
there, correct?
```
01:39:35   2
```
    A.  Excluding the models that I developed,
```
01:39:39   3
```
correct.
```
01:39:39   4
```
    Q.  Okay.  Did you develop models or
```
01:39:43   5
```
functionality to the models?
```
01:39:45   6
```
    A.  I developed models, which incorporated
```
01:39:47   7
```
the functionality, the technology, the invention that
```
01:39:51   8
```
I created.
```
01:39:52   9
```
    Q.  Okay.  And, again, is there any way to
```
01:39:55   10
```
distinguish those models?  Did you leave those models
```
01:39:59   11
```
behind at Cypress when you --
```
01:40:00   12
```
    A.  Sure.  Sure.  As far as I know, they
```
01:40:02   13
```
still use them now.  They're still using what I
```
01:40:05   14
```
created at Cypress.
```
01:40:05   15
```
    Q.  How would one know what your model is
```
01:40:09   16
```
versus what the other Cypress models were?
```
01:40:11   17
```
    A.  One would know by seeing the technology
```
01:40:15   18
```
that I created and seeing the lack of that technology
```
01:40:18   19
```
in the previous Cypress models.
```
01:40:20   20
```
    Q.  Okay.  So with respect to the models
```
01:40:26   21
```
that were already at Cypress that didn't feature your
```
01:40:31   22
```
technology, I mean, these models took awhile to
```
01:40:36   23
```
develop, right?
```
01:40:39   24
```
    MR. ROBINSON:  Objection, foundation.
```
01:40:41   25
```
    A.  They're very basic models.  Anyone with

---

158

```
01:40:44   1
```
some Excel experience can develop them.  Did they take
```
01:40:47   2
```
some time?  Yeah, it takes time to do anything, but
```
01:40:50   3
```
they were very simple.  They were Excel in its most
```
01:40:54   4
```
basic use.
```
01:40:55   5
```
    Q.  (BY MR. DEMPSEY) These models developed
```
01:40:57   6
```
over the 16-year time period from 2000 to 2016?
```
01:41:02   7
```
    A.  Well, I hope it didn't take 16 years to
```
01:41:06   8
```
develop them because a decent Excel person can develop
```
01:41:10   9
```
one in a half hour.
```
01:41:11   10
```
    Q.  Sure.  But the -- the model that you
```
01:41:14   11
```
developed in a half hour doesn't have the experience
```
01:41:18   12
```
that has been developed over time and been fine-tuned
```
01:41:25   13
```
with that experience and built into the model?
```
01:41:31   14
```
    MR. ROBINSON:  Objection, form.
```
01:41:32   15
```
    A.  So what experience are you referring
```
01:41:34   16
```
to built into the model?
```
01:41:36   17
```
    Q.  (BY MR. DEMPSEY) So are you saying -- I
```
01:41:38   18
```
just want to know, are these models, are you saying
```
01:41:40   19
```
that they are -- there's no -- no -- no experience or
```
01:41:47   20
```
history from prior deals that are built in to help
```
01:41:52   21
```
shape or better design them?
```
01:41:54   22
```
    A.  You might take the same approach as you
```
01:41:56   23
```
took in the last model.  But there's nothing complex
```
01:42:02   24
```
or unique about the approach to them.  It's a basic
```
01:42:06   25
```
Excel model.

---

159

```
01:42:07   1
```
    Q.  Okay.  So with the models that you
```
01:42:09   2
```
worked on, you never improved -- other than your one
```
01:42:12   3
```
technology, you never improved upon them over time?
```
01:42:15   4
```
    A.  The one technology, which is actually a
```
01:42:21   5
```
series of technological advancements, that was the
```
01:42:27   6
```
main -- the most significant, if not the only,
```
01:42:32   7
```
advancement that I created for those.
```
01:42:34   8
```
    Q.  So are you able to get these models, you
```
01:42:39   9
```
know, anywhere -- can you go to Office Depot and get
```
01:42:43   10
```
those models off the shelf?
```
01:42:45   11
```
    A.  You can get Excel off the shelf.  You
```
01:42:47   12
```
can go to E-financial Models, which is a website and
```
01:42:51   13
```
download any number of financial models.  There are
```
01:42:54   14
```
firms who sell them or you can download some for free.
```
01:42:59   15
```
    Q.  And are you saying that those are the
```
01:43:02   16
```
equivalent of the Cypress models?
```
01:43:03   17
```
    A.  Not the equivalent, but it's someone
```
01:43:06   18
```
else's -- another analyst's take on how to do it.
```
01:43:09   19
```
    Q.  Okay.  What would distinguish the
```
01:43:11   20
```
Cypress models from those that you can just buy?
```
01:43:13   21
```
    A.  The difference in approach that the
```
01:43:19   22
```
analyst took, what color shading he used, maybe, the
```
01:43:22   23
```
spacing he used, the arithmetic is all the same.  The
```
01:43:27   24
```
math is basic arithmetic.
```
01:43:29   25
```
    Q.  The arithmetic is the same?

---

160

```
01:43:31   1
```
    A.  Correct.  The function is the same.
```
01:43:33   2
```
    Q.  The functions, but what about any
```
01:43:36   3
```
numbers that are used for expectations of cap rates or
```
01:43:42   4
```
anything else that might come from a firm's general
```
01:43:46   5
```
experience working in this industry?
```
01:43:48   6
```
    A.  Right.  So those aren't specific to a
```
01:43:50   7
```
model.  That's specific to people being plugged into
```
01:43:56   8
```
the market and know -- knowing what cap rates are.
```
01:43:59   9
```
Knowing what multiples are.  That really has nothing
```
01:44:04   10
```
to do with the model except it's an input.
```
01:44:04   11
```
    Q.  Does the model have a number of
```
01:44:06   12
```
assumptions built into it?
```
01:44:08   13
```
    A.  Yes.
```
01:44:08   14
```
    Q.  Where do those assumptions come from?
```
01:44:10   15
```
    A.  From what I just said.  People's
```
01:44:12   16
```
experience in the market, knowing what cap rates are,
```
01:44:15   17
```
knowing what multiples are.  Knowing what kind of comp
```
01:44:22   18
```
sales of a system is running and so what kind of sales
```
01:44:25   19
```
projections you might have.  That kind of thing.
```
01:44:28   20
```
    Q.  So where does -- where does one get that
```
01:44:30   21
```
experience?
```
01:44:30   22
```
    A.  Where does one get the experience?
```
01:44:34   23
```
    Q.  Yeah, to build those assumptions.
```
01:44:36   24
```
    A.  Again, by being plugged into the market.
```
01:44:40   25
```
If you're in this market every day, you know that a

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

JAMES CHRISTOPHERSON - 5/14/2018
Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.

---

161

01:44:42 1 Wendy's was selling for 6.5 times.
01:44:46 2     Q.  So did the Cypress models that you were
01:44:49 3 using during your third period at Cypress, those
01:44:53 4 models had assumptions built into them?
01:44:56 5     A.  Every model I know has assumptions built
01:44:59 6 into it.
01:44:59 7     Q.  Those models with those assumptions are
01:45:02 8 based on experience of those who created the
01:45:05 9 assumptions?
01:45:05 10     A.  Experience.
01:45:07 11         MR. ROBINSON:  Objection, foundation.
01:45:10 12     Q.  (BY MR. DEMPSEY) You can answer.
01:45:10 13     A.  Or, for example, in the case of Wendy's,
01:45:14 14 they knew what price they wanted to get for the stores
01:45:17 15 that we sold when I was with Cypress, and so the
01:45:20 16 assumption was, what multiple gets me this price that
01:45:24 17 I'm after.
01:45:25 18     Q.  (BY MR. DEMPSEY) So when you go to --
01:45:26 19 what was it, E-models?
01:45:28 20     A.  E-financial models.
01:45:29 21     Q.  E-financial Models.  Really, could you
01:45:33 22 start up a business in this space with E-financial
01:45:39 23 Models without any of the assumptions that you've
01:45:41 24 built up over time?
01:45:42 25     A.  Every model would need assumptions, so

---

162

01:45:47 1 you'd need to have some assumptions put into it.
01:45:49 2     Q.  Okay.
01:45:50 3     A.  So if you spent 30 years in and around
01:45:52 4 the restaurant industry, you probably have some basis
01:45:55 5 for assumptions to make.
01:45:56 6     Q.  And so with Cypress being around for
01:45:58 7 around 25, 30 years, and it's using its models, aren't
01:46:05 8 those models going to be filled with the assumptions
01:46:07 9 of Cypress' experience?
01:46:10 10         MR. ROBINSON:  Objection, foundation.
01:46:11 11     A.  So not really because one of the
01:46:15 12 important inputs to the model would be, for example,
01:46:20 13 what's today's cap rate.  What's today's multiple
01:46:25 14 EBITDA to determine value.  That's not the same as
01:46:28 15 what it was in 1995.  They fluctuate.  So it's -- the
01:46:32 16 experience, the history doesn't determine what those
01:46:34 17 are going to be.  It's being in the market and knowing
01:46:37 18 what stores are selling for, what multiples, what cap
01:46:40 19 rates for the real estate that's being current in the
01:46:44 20 market.
01:46:44 21     Q.  How does one know to change those
01:46:47 22 assumptions?
01:46:47 23     A.  By being connected to the market, you
01:46:50 24 know what, interest rates are going up or this and
01:46:53 25 this is happening, so we're seeing downward pressure

---

163

01:46:58 1 on multiples, we're seeing upward pressure on
01:47:00 2 multiples.
01:47:01 3     Q.  I want to talk to you about the contact
01:47:05 4 database that Cypress has.  We talked about that
01:47:11 5 before the break, correct?
01:47:12 6     A.  Yes.
01:47:13 7     Q.  Yeah.  So, again, you didn't have access
01:47:17 8 to it during your second period or your first period?
01:47:20 9     A.  I believe that's correct.  I don't think
01:47:22 10 we used a Cypress e-mail then.
01:47:24 11     Q.  Okay.  And -- or a Cypress e-mail, what
01:47:27 12 do you mean by Cypress e-mail?
01:47:28 13     A.  When I joined the third time,
01:47:34 14 Mr. Zuccarello set me up and everyone up with a Jim
01:47:38 15 Christopherson, whatever, at Cypress Group dot biz, an
01:47:39 16 e-mail, a business e-mail account.  So when that
01:47:43 17 occurred, the contacts were pushed on to my version of
01:47:46 18 Outlook.
01:47:47 19     Q.  You're using Microsoft Outlook, correct?
01:47:49 20     A.  Yes.
01:47:50 21     Q.  And that Cypress contact database is in
01:47:54 22 a separate subfolder?
01:47:55 23     A.  It was in the contacts folder.
01:47:57 24     Q.  And that contacts folder had several
01:48:01 25 thousand names in it?

---

164

01:48:03 1     A.  Probably, yes.
01:48:04 2     Q.  And those contacts came from Cypress'
01:48:11 3 many years of operating in the restaurant business?
01:48:14 4     A.  It came from the contractors who worked
01:48:17 5 with Cypress.  It came from their many years of
01:48:20 6 working in the business.  So people had individual
01:48:22 7 contacts, it got added to it.  You would meet a guy at
01:48:30 8 a show and you get cards from people and you add it
01:48:33 9 into there.  So people were contributing to the
01:48:35 10 database or the contacts list all the time.
01:48:41 11     Q.  Okay.  That goes all the way back to
01:48:44 12 before your first time at Cypress, the database, the
01:48:49 13 source of those contacts and the database, they
01:48:52 14 originate from contacts from before you were even
01:48:55 15 working there the first time?
01:48:56 16     A.  That's possible, as well as while I'm
01:48:59 17 working there the first time with the Burger King
01:49:02 18 notebook.
01:49:03 19     Q.  The Burger King notebook, you
01:49:04 20 contributed that to the Cypress database?
01:49:07 21     A.  I did.
01:49:07 22     Q.  How many contacts did that have?
01:49:10 23     A.  I don't remember.
01:49:11 24     Q.  Do you have an estimate, was it five or
01:49:13 25 500?

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

JAMES CHRISTOPHERSON - 5/14/2018
Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.

165

01:49:13  1    A.  As I told you earlier, it was a
01:49:15  2  three-ring notebook that was an inch and a half thick.
01:49:20  3  Listed all the franchisees, all the stores, phone
01:49:22  4  numbers.
01:49:22  5    Q.  And that was during your second period?
01:49:24  6    A.  No, that was my first period.
01:49:26  7    Q.  Your first period.  And then so after
01:49:29  8  that and your second period, did you contribute any
01:49:32  9  contacts to Cypress?
01:49:32  10    A.  I don't recall at the time.  I don't
01:49:35  11  recall.
01:49:35  12    Q.  And your third period, did you
01:49:37  13  contribute contacts?
01:49:38  14    A.  Yes.
01:49:39  15    Q.  We're going to have to slow down.
01:49:40  16    A.  I'm sorry.
01:49:41  17    Q.  That's okay.  And how did you contribute
01:49:45  18  those contacts to Cypress?
01:49:46  19    A.  I would get a card, for example.  You
01:49:52  20  can input into the database -- into the contacts list
01:49:56  21  and it would sync out to all the other users.
01:50:00  22    Q.  Who would input that?
01:50:02  23    A.  Whoever was -- everybody inputted.
01:50:05  24  Anyone.
01:50:05  25    Q.  And did -- do you know if Cypress hired

166

01:50:08  1  people to -- that had the responsibility to actually
01:50:12  2  put those contacts into the database?
01:50:14  3    A.  Not -- not while I was there.  Not that
01:50:16  4  I'm aware of.
01:50:16  5    Q.  Do you know if Mr. Dillsaver has entered
01:50:19  6  a lot of contacts into the database?
01:50:21  7    A.  Dillsaver and I both did.
01:50:22  8    Q.  Okay.  So you did -- you spent a lot of
01:50:25  9  time on that?
01:50:26  10    A.  As I told you earlier, we had one
01:50:28  11  project where we went through and it was around the
01:50:30  12  holidays, we had some down time, so we went through
01:50:33  13  one of the attendee lists and updated it for -- we
01:50:39  14  looked in the database and said is this guy in there,
01:50:42  15  is he not in there.  If he's in there -- if he's not
01:50:46  16  in there, add him if he is in there, update the
01:50:49  17  information.
01:50:49  18    Q.  Okay.  And that was for one conference
01:50:52  19  attendee list?
01:50:53  20    A.  That was one time we did that.
01:50:55  21    Q.  How much time did that take?
01:50:57  22    A.  I don't know.  It was -- it must have
01:51:02  23  been a couple thousand to go through.  Maybe we spent
01:51:08  24  5 or 10 hours apiece on it.  Something like that.
01:51:11  25    Q.  A full day each?

167

01:51:12  1    A.  Yeah, but in -- maybe not a full day at
01:51:17  2  a time.  We would do a few hours at a time and then
01:51:20  3  come back to it.
01:51:20  4    Q.  And that was just for one conference
01:51:24  5  attendee list?
01:51:25  6    A.  That's what I recall.  I know there was
01:51:27  7  also -- I'm not sure where it came from, but someone.
01:51:30  8  One of the guys provided a Wendy's -- an updated
01:51:33  9  Wendy's franchisee list, and then that -- I think
01:51:37  10  Dillsaver did this himself.  But that all got added to
01:51:41  11  the database.  I remember seeing a worksheet that
01:51:45  12  said, is he in the contacts list or is he not in and
01:51:50  13  if not, action taken, added or something like that.
01:51:53  14    Q.  Okay.  So sounds like you know
01:51:54  15  Mr. Dillsaver was doing a lot of the contact entry
01:51:57  16  into this database?
01:51:58  17    A.  I know of those two instances where he
01:52:03  18  had added or added or edited, as did I.
01:52:07  19    Q.  Okay.  So this database has been amassed
01:52:14  20  over the last 20 some years; is that right?
01:52:20  21    MR. ROBINSON:  Objection, foundation.
01:52:21  22    A.  I'm not sure.  I got it when I first
01:52:24  23  joined in 2010.
01:52:25  24    Q.  (BY MR. DEMPSEY)  When you looked at it
01:52:26  25  in 2010 or during your third period, were you able to

168

01:52:30  1  recognize contacts that went back many years?
01:52:32  2    A.  Look, we worked in the same industry for
01:52:34  3  a long time.  I knew a lot of people in there.
01:52:36  4    Q.  And in that database, isn't there other
01:52:40  5  fields there that have a lot of notes from different
01:52:43  6  people at Cypress that have special information about
01:52:48  7  the -- you know, the characteristics of that
01:52:51  8  particular client or customer or what they're looking
01:52:54  9  for for prospective purposes?
01:52:58  10    A.  There were some notes.  A lot of it was
01:53:01  11  copied and pasted out of websites or out of articles
01:53:04  12  or whatever.  It was mostly fairly generic.  There
01:53:08  13  were some notes that said, spoke to this guy at such
01:53:11  14  and such a conference, will follow up.  A lot of the
01:53:15  15  notes, when I saw them, were 10 years old.  You know,
01:53:21  16  drastically out of date.
01:53:23  17    Q.  But they were there 10 years ago?
01:53:24  18    A.  There were some notes put in quite some
01:53:27  19  time ago, but that -- the news article or whatever may
01:53:31  20  not have even applied to the current situation.
01:53:34  21    Q.  But there is a lot of data separate and
01:53:37  22  apart from the contact information, the phone, name,
01:53:40  23  e-mail address, there's a lot of other information
01:53:45  24  related to those contacts?
01:53:46  25    A.  I wouldn't say a lot of other.  Some of

42 (Pages 165 to 168)

**JAMES CHRISTOPHERSON - 5/14/2018**
**Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.**

---

169

01:53:49  1   the contacts, there were some articles or website copy
01:53:53  2   and pastes that got put in there.
01:53:55  3        Q.  At Cypress during your third period,
          4   would you use that database frequently?
01:53:57  5        A.  I didn't use it so much frequently.  The
01:53:59  6   dealmakers would use it more frequently to build
01:54:07  7   prospect lists.
01:54:10  8        Q.  And what's a prospect list?
01:54:11  9        A.  Prospect list is a list of prospects who
01:54:13 10   might be candidates for buyers, for example, of a
01:54:18 11   particular transaction.
01:54:22 12        Q.  Was that the most valuable place to get
01:54:23 13   the contact list information from?
01:54:29 14        A.  Not necessarily.
01:54:30 15        Q.  Where else would you get contact or
01:54:33 16   prospect lists?
01:54:35 17        A.  I'll give you a great example.  We did a
01:54:36 18   great big project for Wendy's, refranchising Wendy's
01:54:39 19   restaurants, and Wendy's knew who they wanted on the
01:54:47 20   short list for the markets that we sold for them, and
01:54:52 21   who they kind of didn't want to have buy the stores,
01:54:56 22   so Wendy's was very actively involved in populating
01:54:59 23   and editing the prospect lists for that project.
01:55:02 24        Q.  Okay.  So that was one project?
01:55:06 25        A.  One very large project.

---

170

01:55:12  1        Q.  It was a large project.  But for other
01:55:15  2   projects, was it routine for the Cypress team to use
01:55:21  3   the contact database to build its prospects lists?
01:55:24  4        A.  It would be.
01:55:25  5             MR. ROBINSON:  Objection, foundation.
01:55:27  6        A.  To my knowledge, it would be one of the
01:55:29  7   sources that they used.
01:55:30  8        Q.  (BY MR. DEMPSEY) Let me reask the
01:55:32  9   question.  To your knowledge, would the Cypress
01:55:35 10   contact database be routinely used by others at
01:55:40 11   Cypress to build contact or prospect lists?
01:55:43 12             MR. ROBINSON:  Objection, asked and
01:55:44 13   answered.
01:55:44 14        A.  To my knowledge, it was one of the
01:55:49 15   sources that the dealmakers or the rainmakers would
01:55:53 16   use to build the prospect list.
01:55:55 17        Q.  (BY MR. DEMPSEY) Okay.  And why?
01:55:56 18        A.  Why what?
01:55:57 19        Q.  Why would they use it?
01:55:59 20             MR. ROBINSON:  Objection, foundation.
01:56:00 21        A.  It's one of the sources of information.
01:56:03 22        Q.  (BY MR. DEMPSEY) And the contact
01:56:05 23   database that has -- it has -- I want to talk a little
01:56:11 24   bit about it.  I just want to clarify.  It has a
01:56:14 25   separate note section for each contact; is that right?

---

171

01:56:16  1        A.  For -- it has a section.  It doesn't
01:56:18  2   necessarily have notes for each contact.
01:56:20  3        Q.  But it has a -- the ability to add notes
01:56:24  4   for each contact?
01:56:25  5        A.  That is true for Microsoft Outlook
01:56:28  6   contacts, yes.
01:56:28  7        Q.  And then there are separate categories
01:56:32  8   for the contacts?
01:56:33  9        A.  There are categories that -- that I
01:56:39 10   believe Mr. Zuccarello or someone created to
01:56:41 11   categorize them.
01:56:42 12        Q.  Can you gave me a couple of examples of
01:56:44 13   the categories?
01:56:45 14        A.  Sure.  Wendy's franchisee, Burger King
01:56:53 15   franchisee, lender, private equity.  I hate to say it,
01:56:58 16   one of the categories that they had for clients was
01:57:01 17   official dickhead, so there were a lot of categories.
01:57:06 18        Q.  Okay.  So the -- was -- there was a
01:57:12 19   separate category built on -- who was responsible for
01:57:14 20   developing the categories?
01:57:15 21        A.  I don't know.
01:57:16 22        Q.  And how many categories were there?
01:57:19 23        A.  I don't know.
01:57:20 24        Q.  Would -- did you use those categories to
01:57:28 25   filter lists?

---

172

01:57:29  1        A.  I -- I did one project where I filtered
01:57:34  2   lists with -- yeah, with the categories.
01:57:37  3        Q.  And so this contact database is not just
01:57:42  4   a list of telephone or telephone, e-mail,
01:57:46  5   address, but somebody has gone through and actually
01:57:51  6   assigned categories to various contacts?
01:57:54  7        A.  That's -- yeah, that would be true.
01:57:57  8        Q.  All right.  After you left Cypress in
01:58:15  9   2014, did you continue to do any work with Mr. Davis?
01:58:17 10        A.  I did not.
01:58:19 11        Q.  Did you stay in touch?
01:58:23 12        A.  I saw him once a year, maybe twice a
01:58:29 13   year at trade shows.
01:58:30 14        Q.  So that's -- you left in -- Cypress in
01:58:40 15   August of 2014?
01:58:41 16        A.  Yes.
01:58:41 17        Q.  So end of 2014, 2015, moving into 2016,
01:58:48 18   you saw him at a couple trade shows?
01:58:50 19        A.  While I was at JAE, I saw him at
01:58:55 20   probably two trade shows a year.
01:58:57 21        Q.  Okay.  When did you first begin
01:59:02 22   communicating with Mr. Davis about working together
01:59:04 23   again?
01:59:04 24        A.  I think it was around May of 2016.
01:59:10 25        Q.  Who made the initial communication?

---

43 (Pages 169 to 172)

JAMES CHRISTOPHERSON - 5/14/2018
Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.

---

**217**

```
03:07:37  1    Q.  You think you did that all that
03:07:39  2  within -- you did this ton of contact sorting within
03:07:43  3  about two hours?
03:07:44  4    A.  That's my best guess.
03:07:46  5    Q.  That was the scope of the project?
03:07:47  6    A.  No, it was not.  That was the beginning
03:07:49  7  of the project that I never completed.
03:07:50  8    Q.  How long do you think the project would
03:07:52  9  have taken you to complete?
03:07:54 10    A.  A few more hours, maybe.  I'm not sure.
03:08:06 11    Q.  And the -- these contact lists that you
03:08:16 12  identified in the screen shot, were these -- I mean,
03:08:24 13  weren't these -- did you say these were from the
03:08:27 14  Cypress contact database?
03:08:29 15    A.  I didn't say that.
03:08:30 16    Q.  Okay.
03:08:30 17    A.  They were out -- they were exported from
03:08:33 18  the shared contacts database that everyone at Cypress
03:08:37 19  was using.
03:08:37 20    Q.  So did you -- is it your testimony that
03:08:41 21  you sorted those while you were at Cypress and they
03:08:46 22  were on the Cypress database in this format?
03:08:49 23    A.  They were on the contacts database that
03:08:52 24  everyone was using, so I went to my version of
03:08:55 25  Microsoft Outlook, went into the contacts list,
```

**218**

```
03:08:58  1  exported them by these categories.
03:09:00  2    Q.  Okay.  But did you -- when you sorted
03:09:02  3  them -- while you were at Cypress, were you sorting
03:09:05  4  them on the Cypress Outlook database?
03:09:09  5    A.  The Cypress -- the Outlook database that
03:09:13  6  was on my computer was the source of this sort.
03:09:16  7    Q.  Okay.  But my question is, when you were
03:09:19  8  doing the sorting, you had not exported this database
03:09:25  9  at that time?
03:09:26 10    A.  I believe it was exported from the
03:09:31 11  contacts on my database, on my Outlook contacts.
03:09:35 12  Out -- it was exported from my Microsoft Outlooks that
03:09:40 13  were on my computer.
03:09:41 14    Q.  Weren't these -- these lists already
03:09:47 15  sorted in this way on the Cypress contact database?
03:09:52 16    A.  Well, no.  So this is -- this is an
03:10:00 17  export from Outlook contacts.
03:10:04 18    Q.  From the Cypress database?
03:10:06 19    A.  From the shared database, yeah, from the
03:10:08 20  Cypress -- from the contacts database that everyone
03:10:11 21  had.
03:10:16 22    Q.  Just so the record is clear, the lists
03:10:16 23  that are referenced on this e-mail here, Exhibit 64,
03:10:20 24  those were lists that were exported from the Cypress
03:10:25 25  database?
```

**219**

```
03:10:27  1    A.  Those were -- those were categories that
03:10:32  2  were used in the contacts database that every
03:10:36  3  contractor had and exported based on those categories.
03:10:41  4    Q.  Okay.  And when -- when did you export
03:10:44  5  these -- these lists from the Cypress Outlook?
03:10:49  6      MR. GROVES:  Object to the foundation.
03:10:51  7    A.  So they were exported from the contacts
03:10:55  8  on my version of Outlook.  I believe -- I think it was
03:11:05  9  the -- I think the spring of '14 because I think the
03:11:10 10  first one I started to work on was in maybe May of
03:11:16 11  '14.
03:11:20 12    Q.  (BY MR. DEMPSEY)  Okay.  Just let me ask
03:11:26 13  the backup question here.  Who -- who did the
03:11:31 14  exporting of the list that you're referencing here?
03:11:36 15    A.  I believe I exported it.
03:11:40 16    Q.  So how -- tell me how that was done.
03:11:44 17    A.  There's an export function in Microsoft
03:11:48 18  Outlook for your contacts.
03:11:50 19    Q.  Okay.  So May -- around spring or May of
03:11:53 20  2014, you go into the Cypress database and then you
03:11:58 21  use the function to export these lists.  Where did you
03:12:03 22  export them to?
03:12:04 23    A.  To my hard drive.
03:12:05 24    Q.  And then after that, did you perform any
03:12:14 25  more sorting?
```

**220**

```
03:12:15  1    A.  I started to work on the -- I think the
03:12:19  2  private equity one first, and then I don't think I
03:12:22  3  finished with that and then I don't believe I did any
03:12:26  4  more work with them.
03:12:27  5    Q.  So when you're referencing the sorting
03:12:29  6  here, the sorting of these lists had been done before
03:12:33  7  you exported them to your hard drive?
03:12:36  8    A.  I don't think so.  I think the sorting
03:12:40  9  was -- I think it was exported and then they were
03:12:43 10  sorted into the subcategories and so you got the
03:12:46 11  smaller subcategories.
03:12:49 12    Q.  So -- so there would be a difference,
03:12:52 13  then, in the categories that are listed here on this
03:12:56 14  e-mail -- you created those categories?
03:12:59 15    A.  I didn't.  No, those were in the
03:13:03 16  database, contacts database that was shared by all the
03:13:06 17  contractors.  So just like everyone had the contact of
03:13:12 18  one person in there, everyone had that same contact in
03:13:16 19  the categories that whoever put that guy in was
03:13:20 20  assigned to.
03:13:21 21    Q.  All right.  I'm trying to get clarity
03:13:23 22  about what you sorted when.  Did you sort before you
03:13:29 23  exported?
03:13:29 24    A.  I don't think so.  I don't -- I can't
03:13:34 25  remember.  I think -- I think I had to export first
```

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

JAMES CHRISTOPHERSON - 5/14/2018
Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.

---

221

03:13:39  1  and then sort it, but I -- maybe you can do it both
03:13:43  2  ways. I'm not sure.
03:13:44  3       Q.  But these -- these labels that you have
03:13:47  4  here -- on here, aren't they the same ones that are on
03:13:50  5  the Cypress database?
03:13:52  6       A.  On the shared database, yes, they're the
03:13:54  7  same.
03:13:55  8       Q.  So this extra sorting that you did
03:14:01  9  was -- am I getting it right, you did it after you did
03:14:04  10  the exporting?
03:14:05  11       A.  I can't remember for sure if it was --
03:14:08  12  which one came first.
03:14:09  13       Q.  Okay.  So it's a possibility you did the
03:14:11  14  sorting before you exported it?
03:14:14  15       A.  It's possible or might have exported the
03:14:16  16  whole thing and then sorted it and made subsets.
03:14:20  17       Q.  And then you asked if -- this is an
03:14:23  18  e-mail you wrote to Carty and Carty and Jack,
03:14:27  19  Mr. Davis and Jack Dalrymple, why are you sending --
03:14:30  20  why are you inviting or suggesting that you would send
03:14:33  21  these contact lists to Mr. Davis and Mr. Dalrymple?
03:14:40  22       A.  Because Davis asked me to get Jack
03:14:46  23  involved with starting to update the -- the Outlook
03:14:52  24  database.  So much of what was in the database that we
03:14:57  25  used, frankly, out of date.  There were people in

---

222

03:15:02  1  there that were dead.  There were people in there that
03:15:05  2  were still listed with GE Franchise Finance.  That
03:15:09  3  company doesn't exist any more.  So Mr. Davis wanted
03:15:15  4  someone like Jack to go through and start updating.
03:15:18  5       Q.  And was Mr. Dalrymple an employee or
03:15:26  6  contractor of Cypress?
03:15:27  7       A.  I believe you mean C Squared.
03:15:31  8       Q.  No.  Cypress.
03:15:32  9       A.  Was Jack?
03:15:34  10       Q.  Right.  Yeah.
03:15:34  11       A.  I don't know.  Not that I know of.
03:15:39  12       Q.  Why are you suggesting that you can send
03:15:41  13  this contact list to Mr. Dalrymple?
03:15:43  14       A.  It was a shared database.  We all had
03:15:47  15  access to it.  We all contributed to it.  So it
03:15:51  16  was -- it's as much mine as it is anyone else who
03:15:54  17  contributed.
03:15:57  18       Q.  Just -- when you talk about this shared
03:16:01  19  data, you're using the phrase "shared database."
03:16:04  20  Isn't it true on the system it's actually called the
03:16:08  21  Cypress contacts?
03:16:08  22       A.  If that's how someone names the folder,
03:16:11  23  then that's what it would be called.
03:16:12  24       Q.  But that's what it's called on the
03:16:14  25  Cypress system?

---

223

03:16:15  1       A.  Could be.  I don't -- I don't remember.
03:16:17  2  I haven't been on the Cypress system for some time.
03:16:20  3       Q.  Would you dispute that it's called that?
03:16:23  4       A.  I -- it may have been called that.  It
03:16:25  5  could have been called that.
03:16:26  6       Q.  So you downloaded the contacts from the
03:16:31  7  Cypress contacts and then you're suggesting you can
03:16:35  8  send them to Mr. Dalrymple?
03:16:37  9       A.  I'm suggesting that everyone who had
03:16:42  10  access to those contacts who contributed to the
03:16:45  11  contacts had equal rights to it.
03:16:49  12       Q.  Okay.  Were you getting paid by
03:16:54  13  Mr. Davis in any way for taking on this work?
03:16:58  14       A.  No.
03:16:58  15       Q.  What was your arrangement with Mr. Davis
03:17:02  16  at this point?
03:17:02  17       A.  I was simply helping him out as he was
03:17:08  18  contemplating his next move.
03:17:10  19       Q.  At this point, were you having phone
03:17:12  20  conversations with him?
03:17:13  21       A.  Sure.  We probably had some phone
03:17:17  22  conversations by then.
03:17:18  23       Q.  Did he tell you -- what did he tell you
03:17:21  24  about his longevity at Cypress?
03:17:22  25       A.  The same as I told you earlier, that he

---

224

03:17:25  1  was ready to make a change and he was finally going
03:17:28  2  to -- to move on.
03:17:31  3       Q.  So here you're helping him take the
03:17:35  4  Cypress contacts?
03:17:37  5       MR. GROVES:  Object to the form.
03:17:38  6       A.  No.  No.  These are contacts that
03:17:41  7  belonged to all of us who contributed to them, so
03:17:45  8  Davis says himself that he's contributed hundreds to
03:17:48  9  this database.  You know, to say that it's the Cypress
03:17:56  10  database that if Davis contributed 450 names that now
03:18:00  11  that belongs to Cypress and Davis doesn't have any use
03:18:02  12  of that any more, that -- that's completely illogical.
03:18:06  13       Q.  (BY MR. DEMPSEY)  Okay.  So on the
03:18:08  14  other -- there's an attachment to the e-mail from
03:18:11  15  Mr. Davis to you and it has CRG valuation June 28, '16
03:18:19  16  and then an IA, I think adjustment, I don't know.
03:18:25  17  6/28/16.  Looks like two spreadsheets.  We've not
03:18:29  18  attached them to this exhibit because they're marked
03:18:32  19  attorneys' eyes only, but I mean, what -- what is he
03:18:36  20  sending you with those?
03:18:40  21       A.  So is he -- let me see.  Best I can tell
03:18:58  22  is there -- they are -- with maybe Gary from CRG
03:19:04  23  are making some adjustments to some assumptions in a
03:19:08  24  valuation model.
03:19:10  25       MR. ROBINSON:  Hold on.  If we're

---

56 (Pages 221 to 224)

JAMES CHRISTOPHERSON - 5/14/2018
Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.

---

269

```
04:28:10    1   him on the side.
04:28:35    2           MR. GROVES:  You've got an hour left for
04:28:48    3   seven.
04:28:48    4           MR. DEMPSEY:  What's that?
04:28:49    5           MR. GROVES:  I said you've got an hour
04:28:51    6   and eight minutes left before you hit seven and we
04:28:54    7   have the right to ask questions as well, so -- and the
04:28:56    8   witness isn't required to be here longer than seven
04:29:01    9   hours.
04:29:01   10           MR. DEMPSEY:  Well, I mean, you didn't
04:29:02   11   cross notice this.
04:29:03   12           MR. GROVES:  It doesn't matter.  I don't
04:29:05   13   need to cross notice.  Everybody has a right to ask
04:29:07   14   questions.
04:29:08   15           MR. DEMPSEY:  We're entitled to our
04:29:10   16   seven hours.
04:29:11   17           MR. ROBINSON:  That's not the case law.
04:29:14   18           MR. DEMPSEY:  Well, we can go off the
04:29:17   19   record for a moment to discuss this.  What are you
04:29:19   20   referring to?
04:29:20   21           THE VIDEOGRAPHER:  Off the record.  The
04:29:21   22   time is 4:29.
04:29:25   23           (Off-the-record discussion.)
04:31:09   24           THE VIDEOGRAPHER:  We are back on the
04:31:12   25   record.  The time is 4:31 p.m.
```

270

```
04:31:21    1       Q.  (BY MR. DEMPSEY)  Okay.
04:31:37    2           (Deposition Exhibit 82 was marked.)
04:31:38    3       Q.  Mr. Christopherson, we've handed you
04:31:39    4   what's been marked as Exhibit 82.  It's also from your
04:31:42    5   production.  E-mail with an attachment sending it to
04:31:49    6   Mr. Davis, subject "Number 2 pitches."  This is dated
04:31:55    7   October 19, 2016.  In your e-mail -- by this point,
04:32:00    8   this is October now, you're now using a signature line
04:32:07    9   using the title "partner" at C Squared Advisors, LLC.
04:32:14   10   Is that an accurate description of your position with
04:32:18   11   C Squared Advisors at this time?
04:32:20   12       A.  This was in the phase where we had
04:32:22   13   initial discussions of being a partner, but before I
04:32:25   14   realized that -- before it didn't materialize and
04:32:28   15   before I realized that -- that I wasn't a partner and
04:32:33   16   I was never going to be a partner, so that's why that
04:32:36   17   is in the signature block.
04:32:37   18       Q.  Okay.  And then Mr. -- you're sending to
04:32:42   19   Mr. Davis two pitches here, Cypress Stanton pitch from
04:32:49   20   2014 and another Cypress pitch from 2014, right?
04:32:53   21       A.  Yes.
04:32:53   22       Q.  And these pitches, these are Cypress
04:33:02   23   Group pitches?
04:33:02   24       A.  Yes.
04:33:03   25       Q.  And these are labeled "confidential,"
```

271

```
04:33:08    1   correct?
04:33:08    2       A.  Yes.
04:33:08    3       Q.  In fact, they're labeled "confidential"
04:33:11    4   on every single page, correct?
04:33:17    5       A.  Yes.
04:33:18    6       Q.  Why were you e-mailing Mr. Davis
04:33:31    7   Cypress' confidential pitch material?
04:33:35    8       A.  He asked me if I could find any pitches
04:33:39    9   that showed him with the title of "partner" in
04:33:43   10   Cypress.
04:33:44   11       Q.  And these were PowerPoint presentations?
04:33:52   12       A.  Correct.
04:33:53   13       Q.  And they were in soft -- they were files
04:33:56   14   that you could send through the e-mail?
04:33:57   15       A.  Correct.  I had the files.  I still have
04:34:01   16   the files.
04:34:01   17       Q.  Okay.  And so you could modify these
04:34:05   18   files later on?
04:34:07   19       A.  One could do that.  This was my design
04:34:11   20   that I put together while I was at Cypress.
04:34:22   21       Q.  You knew those Cypress pitch materials
04:34:24   22   were confidential?
04:34:26   23       A.  So the template itself was never
04:34:29   24   identified as being a trade secret or confidential.
04:34:34   25   Everyone in Cypress had access to it.  It wasn't -- it
```

272

```
04:34:44    1   wasn't very well protected or it wasn't protected.  I
04:34:48    2   still had access to it for quite some time, four
04:34:51    3   months, maybe after I left Cypress, so you can write
04:34:54    4   "confidential" on here, but it was never communicated
04:34:56    5   to be or thought to be a trade secret of Cypress.
04:34:59    6       Q.  Okay.  The -- you're the one that
04:35:05    7   actually typed the words "confidential" into the
04:35:06    8   PowerPoint?
04:35:06    9       A.  That could be.
04:35:11   10           (Deposition Exhibit 83 was marked.)
04:35:12   11       Q.  83 is another document from your
04:35:23   12   production from October 26 from you to Mr. Davis.
04:35:32   13   Looks like you're forwarding case studies; is that
04:35:39   14   right?
04:35:39   15       A.  Yes.
04:35:40   16       Q.  Now, this e-mail down below, you say
04:35:48   17   this is the "first day not at JAE" -- "not at JAE,"
04:35:53   18   correct?
04:35:54   19       A.  Correct.
04:35:54   20       Q.  So you are now finally free from JAE?
04:35:57   21       A.  Correct.
04:35:58   22       Q.  Where did you get this case study
04:36:08   23   presentation from?
04:36:08   24       A.  I had them in various PowerPoints that
04:36:12   25   resided on my hard drive.
```

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

JAMES CHRISTOPHERSON - 5/14/2018
Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.

293

05:18:51  1    **Q.  Wasn't it the concern that Mr. Davis had**
05:18:56  2    **acquired an equity interest in that franchisee?**
05:18:59  3        A.  That I don't know.  I believe he
05:19:02  4    has -- I believe he's a creditor in it.  I thought he
05:19:05  5    was owed money from the franchisee.
05:19:06  6        **Q.  Okay.  And why was it a conflict?**
05:19:10  7        A.  Because C Squared and Carty were going
05:19:15  8    to represent this franchisee in a debt workout, but he
05:19:19  9    was a creditor.  So you're working out -- you're
05:19:23  10   getting creditors to take a haircut when he's one of
05:19:25  11   the creditors.
05:19:26  12       **Q.  Were you aware that Kris Kaffenberger**
05:19:29  13   **was aware of this conflict?**
05:19:31  14       A.  I believe Wendy's had some information
05:19:35  15   on it.  I don't -- I believe they knew something about
05:19:39  16   it.
05:19:40  17       **Q.  Is this one of the reasons you didn't**
05:19:43  18   **list C Squared on your LinkedIn profile?**
05:19:45  19       A.  Not -- not really.  But it was -- I just
05:19:51  20   decided to distance myself, and since I was only there
05:19:53  21   less than a year, I didn't think it warranted a
05:19:56  22   separate line.
05:19:56  23       **Q.  Do you have any concerns about the --**
05:20:02  24   **Mr. Davis' -- the manner in which he -- his ethical**
05:20:12  25   **issues with clients?**

294

05:20:14  1        MR. GROVES:  Object to the form.
05:20:14  2        A.  My belief is he didn't think this
05:20:20  3    through enough and jumped to try to pursue an
05:20:25  4    engagement without thinking about it, and that made me
05:20:29  5    somewhat uncomfortable.
05:20:30  6        **Q.  (BY MR. DEMPSEY)  Did he pursue the**
05:20:32  7    **engagement?**
05:20:33  8        A.  I left then, so I don't know what
05:20:34  9    happened with it.
05:20:35  10       **Q.  And are you owed any money from C**
05:20:39  11   **Squared Advisors?**
05:20:39  12       A.  I am not.
05:20:40  13       **Q.  Do you claim any interest in C Squared**
05:20:43  14   **Advisors?**
05:20:43  15       A.  None.
05:20:44  16       **Q.  And do you believe you're liable for any**
05:20:46  17   **of the debts of C Squared Advisors?**
05:20:48  18       A.  None.  No.
05:20:49  19       **Q.  And you're not -- you don't believe**
05:20:51  20   **you're a partner with Mr. Davis?**
05:20:52  21       A.  Absolutely not.
05:21:02  22       MR. DEMPSEY:  I'll pass the witness.
05:21:02  23            EXAMINATION
05:21:02  24   BY MR. GROVES:
05:21:07  25       **Q.  Mr. Christopherson, my name is**

295

05:21:09  1    K.C. Groves.  I represent Mr. Davis and Cypress
05:21:13  2    International, Inc. in this lawsuit.  I introduced
05:21:17  3    myself to you at the beginning of the day.  And I have
05:21:20  4    just a few questions.  All of my questions relate to
05:21:24  5    the three periods of time when you were with The
05:21:29  6    Cypress Group, so it doesn't have anything to do with
05:21:32  7    what happened after you left Cypress, including when
05:21:35  8    you joined up with Mr. Davis at C Squared.  Okay?
05:21:38  9        A.  Yes.
05:21:38  10       **Q.  From the testimony you gave earlier**
05:21:44  11   **today, it's my understanding that you never made a**
05:21:46  12   **capital contribution to The Cypress Group?**
05:21:49  13       A.  That's correct.
05:21:49  14       **Q.  Do you know whether Mr. Davis ever made**
05:21:52  15   **a capital contribution to The Cypress Group?**
05:21:55  16       A.  I believe he has.  I believe I've seen
05:21:58  17   in some of the documents produced that I reviewed, I
05:22:05  18   recall there's some schedules in there which it
05:22:08  19   appears that there were lines for equity from members,
05:22:12  20   so that's all I know about it.  He hasn't -- I'm not
05:22:17  21   privy to any of the contracts or agreements or
05:22:20  22   anything like that.
05:22:21  23       **Q.  You know what a capital call is; is that**
05:22:26  24   **correct?**
05:22:26  25       A.  Yes.

296

05:22:27  1        **Q.  Did you ever respond to a capital call**
05:22:29  2    **at Cypress -- at The Cypress Group?**
05:22:33  3        A.  I never received one nor responded to
05:22:35  4    one.
05:22:36  5        **Q.  Do you know whether Mr. Davis ever**
05:22:38  6    **responded to a capital call at The Cypress Group?**
05:22:40  7        A.  I don't know for sure.  He did tell me
05:22:41  8    on occasion that he has contributed -- put in money
05:22:46  9    for -- to cover operating losses for the company.
05:22:49  10       **Q.  Did you ever loan money to The Cypress**
05:22:53  11   **Group to cover its operating shortfalls?**
05:22:55  12       A.  I did not.
05:22:56  13       **Q.  Do you know whether Mr. Davis ever**
05:22:57  14   **loaned money to The Cypress Group to cover operating**
05:23:00  15   **shortfalls?**
05:23:01  16       A.  I do not.
05:23:02  17       **Q.  Again, based on your testimony this**
05:23:11  18   **morning, it's my understanding that you've never paid**
05:23:13  19   **a share of the The Cypress Group operating expenses;**
05:23:16  20   **is that correct?**
05:23:16  21       A.  That's correct.
05:23:16  22       **Q.  Do you know whether Mr. Davis has ever**
05:23:19  23   **paid a share of The Cypress Group's operating**
05:23:23  24   **expenses?**
05:23:23  25       A.  He told me that he covered expenses.  He

74 (Pages 293 to 296)

**JAMES CHRISTOPHERSON - 5/14/2018**
**Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.**

---

297

05:23:26  1  used to tell me he covered 50 percent of the expenses.
05:23:29  2  Have I seen the accounting of it that shows it?  No, I
05:23:33  3  wasn't privy to that.
05:23:34  4      Q.  You know what a profits distribution is;
05:23:42  5  is that correct?
05:23:42  6      A.  Yes.
05:23:42  7      Q.  Did you ever receive a profits
05:23:45  8  distribution from The Cypress Group?
05:23:47  9      A.  I did not.
05:23:48  10      Q.  Do you know whether Mr. Davis ever
05:23:50  11  received a profits distribution from The Cypress
05:23:53  12  Group?
05:23:53  13      A.  Again, in the documents I saw, it looked
05:23:55  14  like there were documents that read "profit
05:23:58  15  distribution."
05:23:58  16      Q.  Did you ever play a role in hiring any
05:24:03  17  Cypress employees?
05:24:06  18      A.  No.  No, I did not.
05:24:10  19      Q.  Do you know whether Mr. Davis played a
05:24:13  20  role in hiring Cypress employees?
05:24:15  21      A.  As I said earlier today, before I
05:24:18  22  rejoined in 2010, Mr. Zuccarello had me sit down with
05:24:22  23  Mr. Davis to what I felt like re-interview to come
05:24:26  24  back to Cypress.
05:24:27  25      Q.  What specifically was discussed between

---

298

05:24:33  1  you and Mr. Zuccarello about why he wanted you to meet
05:24:35  2  with Mr. Davis?
05:24:36  3      A.  Not much, really.  He just said I want
05:24:39  4  you to sit down with Carty and make sure that you guys
05:24:42  5  are okay with everything, and that you'll work well
05:24:44  6  together and that kind of thing.
05:24:46  7      Q.  At any point in time, during that time
05:24:49  8  frame when you were about to rejoin Cypress, did you
05:24:54  9  and Mr. Davis or did you -- yeah, did you and
05:24:57  10  Mr. Davis discuss his role at Cypress?
05:25:02  11      A.  Not at that time.
05:25:04  12      Q.  At any time?
05:25:06  13      A.  Well, I -- I don't know if we discussed
05:25:10  14  it.  I -- I knew that his role was a rainmaker, a
05:25:16  15  dealmaker, a front-end guy.
05:25:19  16      Q.  Other than your meeting with Mr. Davis
05:25:24  17  prior to rejoining Cypress, do you know whether
05:25:27  18  Mr. Davis was involved in hiring any of the other
05:25:30  19  employees of The Cypress Group?
05:25:32  20      A.  I don't know.
05:25:32  21      Q.  Do you know whether he was involved in
05:25:34  22  hiring any of the other independent contractors of
05:25:40  23  The Cypress Group?
05:25:40  24      A.  I don't know.
05:25:40  25      Q.  During your time with The Cypress Group,

---

299

05:25:50  1  over the three different occasions, did you have any
05:25:52  2  responsibility of managing the performance of Cypress
05:25:55  3  employees?
05:25:55  4      A.  As I indicated earlier, I directed work
05:25:59  5  flow for Alan Dillsaver and I reviewed all the work
05:26:03  6  product that he put out.
05:26:06  7      Q.  Did you have any other responsibilities
05:26:09  8  for managing the performance of Cypress employees?
05:26:12  9      A.  No, I would say not.
05:26:15  10      Q.  Same question as to independent
05:26:17  11  contractors, did you have any -- I know that
05:26:19  12  Mr. Dillsaver was an independent contractor.
05:26:21  13      A.  Right.  Sorry.
05:26:21  14      Q.  Any other independent contractors?
05:26:24  15      A.  No.
05:26:24  16      Q.  Do you know whether Mr. Davis played a
05:26:29  17  role in managing the performance of any of the
05:26:32  18  employees of The Cypress Group?
05:26:34  19      A.  I don't know.
05:26:35  20      Q.  Do you know whether Mr. Davis had any
05:26:37  21  role in managing the performance of any of The Cypress
05:26:40  22  Group's independent contractors?
05:26:43  23      A.  I don't know.
05:26:43  24      Q.  Have you ever -- during your time with
05:26:52  25  The Cypress Group, did you ever play a role setting

---

300

05:26:56  1  compensation for any of the other employees or
05:26:57  2  independent contractors?
05:26:57  3      A.  I did not.
05:26:59  4      Q.  Do you know whether Mr. Davis played a
05:27:02  5  role in setting compensation for any of the Cypress
05:27:06  6  independent contractors or employees?
05:27:07  7      A.  I know that after Dillsaver had worked
05:27:14  8  on one of the projects for R & R, Mr. Davis
05:27:20  9  spearheaded and got him a $25,000 bonus for the work
05:27:24  10  that he did on that -- that he did on that project.
05:27:28  11      Q.  Do you recall any other instances when
05:27:31  12  Mr. Davis was involved in setting or advocating for
05:27:35  13  compensation for any employee or independent
05:27:39  14  contractor of The Cypress Group?
05:27:40  15      A.  I do not.
05:27:40  16      Q.  Did you play a role in deciding what
05:27:44  17  titles would be used by The Cypress Group's team
05:27:47  18  members?
05:27:47  19      A.  No, I did not.
05:27:48  20      Q.  Do you know whether Mr. Davis played a
05:27:51  21  role in making decisions about who would have what
05:27:53  22  titles?
05:27:54  23      A.  I -- I don't.  I don't know.
05:28:05  24      MR. GROVES:  No further questions.
05:28:07  25      MR. DEMPSEY:  Recross.

---

75 (Pages 297 to 300)

**JAMES CHRISTOPHERSON - 5/14/2018**
**Cypress Advisors, Inc.  v. Kent McCarty Davis, et al.**

305

    I, JAMES CHRISTOPHERSON, do hereby
certify that I have read the above and foregoing
deposition and that the same is a true and accurate
transcription of my testimony, except for attached
amendments, if any.
            Amendments attached   (  ) Yes   (  ) No


        _____

        JAMES CHRISTOPHERSON



    The signature above of JAMES
CHRISTOPHERSON was subscribed and sworn to or affirmed
before me in the county of _____, state
of _____, this _____ day of
_____, 2018.



        _____

        Notary Public
        My Commission expires:



Cypress Advisors, Inc., 5/9/18 (tds)

---

306

            REPORTER'S CERTIFICATE
STATE OF COLORADO        )
                         )  ss.
CITY AND COUNTY OF DENVER )

        I, TRACY R. STONEHOCKER, Certified
Realtime Reporter, Registered Professional Reporter
and Notary Public ID 19924009337, State of Colorado,
do hereby certify that previous to the commencement of
the examination, the said JAMES CHRISTOPHERSON was
duly sworn or affirmed by me to testify to the truth
in relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place
aforesaid and was thereafter reduced to typewritten
form; that the foregoing is a true transcript of the
questions asked, testimony given, and proceedings had.
        I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

        IN WITNESS WHEREOF, I have affixed my
signature this 14th day of May, 2018.

        My commission expires June 12, 2020.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

JAMES CHRISTOPHERSON

306

REPORTER'S CERTIFICATE

STATE OF COLORADO        )
                         )  ss.
CITY AND COUNTY OF DENVER )


       I, TRACY R. STONEHOCKER, Certified Realtime Reporter, Registered Professional Reporter and Notary Public ID 19924009337, State of Colorado, do hereby certify that previous to the commencement of the examination, the said JAMES CHRISTOPHERSON was duly sworn or affirmed by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

       I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

       IN WITNESS WHEREOF, I have affixed my signature this 14th day of May, 2018.

       My commission expires June 12, 2020.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.


Tracy R. Stonehocker
Registered Professional Reporter